**UNITED STATES COURT OF APPEALS**
**FOR THE SEVENTH CIRCUIT**

No. 15-3047

---

BACKPAGE.COM, LLC,

*Plaintiff-Appellant*,

vs.

THOMAS J. DART, Sheriff of Cook, County Illinois,

*Defendant-Appellee*.

---

On Appeal from the United States District Court
for the Northern District of Illinois
No. 1:15-cv-06340
The Honorable John J. Tharp, Jr.

---

**APPELLANT'S OPENING BRIEF AND SHORT APPENDIX**

---

James C. Grant
Ambika K. Doran
DAVIS WRIGHT TREMAINE LLP
1201 Third Avenue
Seattle, Washington 98101
Telephone: (206) 622-3150

Robert Corn-Revere
Ronald G. London
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Ave., N.W., Suite 800
Washington, D.C. 20006
Telephone: (202) 973-4200

PAUL HASTINGS LLP
Christopher F. Allen
71 S. Wacker Drive
Chicago, IL 60606
Telephone: (312) 499-6000

Attorneys for Plaintiff-Appellant Backpage.com, LLC

**DISCLOSURE STATEMENT OF DAVIS WRIGHT TREMAINE LLP**

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, the undersigned counsel respectfully submits the following:

1. The party represented is Backpage.com, LLC.

2. The law firms whose partners or associates have appeared or are expected to appear for Backpage.com in this case are Davis Wright Tremaine, LLP; Paul Hastings LLP; and Henze Cook Murphy PLLC.

3. Backpage.com is a Delaware limited liability company and a wholly owned subsidiary of another company, which is privately held. No publicly held corporation owns any interest in Backpage.com or its parent company.

By: *__/s/ James C. Grant__*

James C. Grant
DAVIS WRIGHT TREMAINE LLP
1201 Third Avenue, Suite 2200
Seattle, WA 98101
Telephone: (206) 622-3150

## DISCLOSURE STATEMENT OF PAUL HASTINGS LLP

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, the undersigned counsel respectfully submits the following:

1. The party represented is Backpage.com, LLC.

2. The law firms whose partners or associates have appeared or are expected to appear for Backpage.com in this case are Davis Wright Tremaine, LLP; Paul Hastings LLP; and Henze Cook Murphy PLLC.

3. Backpage.com is a Delaware limited liability company and a wholly owned subsidiary of another company, which is privately held. No publicly held corporation owns any interest in Backpage.com or its parent company.

By: *__/s/ Christopher F. Allen_____________*

Christopher F. Allen
PAUL HASTINGS LLP
71 S. Wacker Drive
Chicago, IL 60606
Telephone: (312) 499-6000

## TABLE OF CONTENTS

**Page**


STATEMENT OF JURISDICTION ....................1

STATEMENT OF ISSUES ....................1

STATEMENT OF THE CASE ....................2

A. Summary. ....................2

B. Factual Background. ....................3

1. Background on Backpage.com. .................... 3

2. Sheriff Dart's Failed History of Seeking to Censor Online Escort Advertising. .................... 4

3. Sheriff Dart Devised a Strategy to Shut Down Backpage.com By Extralegal Means. .................... 6

4. Sheriff Dart and His Team Implemented the Strategy to Compel Visa and MasterCard to Defund Backpage.com .................... 7

5. MasterCard and Visa Complied with Dart's Demands After Further Pressure. .................... 8

6. After July 1, Dart's Team Continued to Press the Card Companies and Others to "Defund" and Thereby Eliminate Backpage.com. .................... 10

C. Procedural History. ....................11

1. The District Court Granted a Temporary Restraining Order. .................... 11

2. The District Court Denied a Preliminary Injunction. .................... 12

STANDARD OF REVIEW ....................14

SUMMARY OF ARGUMENT ....................15

ARGUMENT ....................17

I. THE DISTRICT COURT ERRONEOUSLY DENIED PRELIMINARY INJUNCTIVE RELIEF BY MISINTERPRETING *BANTAM BOOKS* AND OTHER FIRST AMENDMENT PRECEDENT. ....................17

A. Sheriff Dart's Scheme to Defund Backpage.com Is an Extralegal Prior Restraint Under *Bantam Books*. ....................17

B. The District Court Misapplied *Bantam Books*. ....................................24

II. THE DISTRICT COURT IMPROPERLY REVERSED BURDENS OF PROOF. ....................................................................................................34

A. The District Court Failed to Require Sheriff Dart to Meet His Burden to Justify Speech Restrictions, Instead Imposing the Burden on Backpage.com to Prove Its Speech Is Lawful. ....................34

B. The District Court Misapplied Analogous Precedent Holding That a First Amendment Plaintiff Need Only Show a Government's Actions to Repress Speech Were "A Motivating Factor." ..........................................................................................36

III. THE DISTRICT COURT MISAPPLIED THE IRREPARABLE HARM, BALANCE OF HARDSHIPS AND PUBLIC INTEREST FACTORS FOR PRELIMINARY INJUNCTIVE RELIEF. ...........................40

A. The District Court Disregarded the Record and First Amendment Presumptions Regarding Irreparable Harm. .....................40

B. The District Court Improperly Assessed the Balance of Hardships and Public Interest, Again Ignoring First Amendment Principles. ...................................................................................42

CONCLUSION ........................................................................................................44

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*ACLU of Illinois v. Alvarez*,
679 F.3d 583 (7th Cir. 2012) ....................44

*ACLU v. City of Pittsburgh*,
586 F. Supp. 417 (W.D. Pa. 1984) ....................18, 19, 28, 29

*Adickes v. S.H. Kress & Company*,
398 U.S. 144 (1970) ....................31, 32, 33

*Air Line Pilots Association, International v. Departmentt of Aviation*,
45 F.3d 1144 (7th Cir. 1995) ....................30, 33

*Am. Family Association, Inc. v. City & County of San Francisco*,
277 F.3d 1114 (9th Cir. 2002) ....................27

*Ashcroft v. ACLU*,
542 U.S. 656 (2004) ....................36

*Ashcroft v. Free Speech Coalition*,
535 U.S. 234 (2002) ....................35

*Backpage.com, LLC v. Cooper*,
939 F. Supp. 2d 805 (M.D. Tenn. 2013) ....................6, 42

*Backpage.com, LLC v. Hoffman*,
2013 WL 4502097 (D.N.J. Aug. 20, 2013) ....................6

*Backpage.com, LLC v. McKenna*,
881 F. Supp. 2d 1262 (W.D. Wash. 2012) ....................6, 42

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963) .................... *passim*

*Board of Trustees of State University of New York v. Fox*,
492 U.S. 469 (1989) ....................34

*Borough of Duryea v. Guarnieri*,
131 S. Ct. 2488 (2011) ....................25

*Brentwood Academy v. Tennessee Secondary School Athletic Association*,
531 U.S. 288 (2001) ....................32

*Carlin Communications, Inc. v. Mountain States Tel. & Tel. Co.*,
827 F.2d 1291 (9th Cir. 1987) ....................................................................33, 34

*CBS, Inc. v. Democratic National Committee*,
412 U.S. 94 (1973)........................................................................................24

*Christian Legal Society v. Walker*,
453 F.3d 853 (7th Cir. 2006) ........................................................................15

*City of Lakewood v. Plain Dealer Publishing Company*,
486 U.S. 750 (1988)........................................................................................20

*Council for Periodical Distribs. Association v. Evans*,
642 F. Supp. 552 (M.D. Ala. 1986) ..........................................................18, 30, 39

*Dart v. Craigslist, Inc.*,
665 F. Supp. 2d 961 (N.D. Ill. 2009) ........................................................2, 3, 4, 42

*Déjà vu of Nashville, Inc. v. Metropolitan Government of Nashville & Davidson County*,
274 F.3d 377 (6th Cir. 2001) ........................................................................44

*Doe ex rel. Roe v. Backpage.com, LLC*,
2015 WL 2340771 (D. Mass. May 15, 2015)........................................................6

*Drive In Theatres, Inc. v. Huskey*,
435 F.2d 228 (4th Cir. 1970) ....................................................................18, 26

*Elrod v. Burns*,
427 U.S. 347 (1976)........................................................................................41

*Ezell v. City of Chicago*,
651 F.3d 684 (7th Cir. 2011) ................................................................15, 34, 41

*Fairley v. Andrews*,
578 F.3d 518 (7th Cir. 2009) ....................................................................37, 38

*Freedman v. Maryland*,
380 U.S. 51 (1965)....................................................................................19, 31

*Garcetti v. Ceballos*,
547 U.S. 410 (2006)........................................................................................25

*Glassroth v. Moore*,
335 F.3d 1282 (11th Cir. 2003) ......................................................................25

*Greene v. Doruff*,
660 F.3d 975 (7th Cir. 2011) ....................................................................37, 38

*Gross v. FBL Financial Services, Inc.*,
557 U.S. 167 (2009)....................37, 38

*Hammerhead Enterprises, Inc. v. Brezenoff*,
707 F.2d 33 (2d Cir. 1983)....................27, 29, 30

*Henderson v. Huibregtse*,
281 F. App'x 577 (7th Cir. 2008)....................30

*Jackson v. Metro. Edison Company*,
419 U.S. 345 (1974)....................32

*Korte v. Sebelius*,
735 F.3d 654 (7th Cir. 2013)....................36

*Lugar v. Edmondson Oil Company*,
457 U.S. 922 (1982)....................31, 32

*Mays v. Springborn*,
719 F.3d 631 (7th Cir. 2013)....................38

*Miller v. Davis*,
2015 WL 4866729 (E.D. Ky. Aug. 12, 2015)....................25

*Mt. Healthy City School District Board of Education v. Doyle*,
429 U.S. 274 (1977)....................38

*Near v. Minnesota ex rel. Olson*,
283 U.S. 697 (1931)....................18

*Nebraska Press Association v. Stuart*,
427 U.S. 539 (1976)....................18

*Okwedy v. Molinari*,
333 F.3d 339 (2d Cir. 2003)....................18, 22, 30

*Penthouse International, Ltd. v. McAuliffe*,
610 F.2d 1353 (5th Cir. 1980)....................26, 28, 29

*Penthouse International, Ltd. v. Meese*,
939 F.2d 1011 (D.C. Cir. 1991)....................27

*Peterson v. City of Greenville*,
373 U.S. 244 (1963)....................33,34

*Playboy Enterprises, Inc. v. Meese*,
639 F. Supp. 581 (D.D.C. 1986).................... *passim*

*Pleasant Grove City v. Summum*,
555 U.S. 460 (2009)....................25

*R.C. Maxwell Co. v. Borough of New Hope*,
735 F.2d 85 (3d Cir. 1984)....................27

*Rattner v. Netburn*,
930 F.2d 204 (2d Cir. 1991)....................18, 22, 23

*Reed v. Town of Gilbert*,
135 S. Ct. 2218 (2015)....................35

*Reno v. ACLU*,
521 U.S. 844 (1997)....................20

*Republican Party of Minn. v. White*,
536 U.S. 765 (2002)....................25

*Roland Machinery Company v. Dresser Industries, Inc.*,
749 F.2d 380 (7th Cir. 1984)....................15,41

*Rossignol v. Voorhaar*,
316 F.3d 516 (4th Cir. 2003)....................18, 31, 32

*Schultz v. City of Cumberland*,
228 F.3d 831 (7th Cir. 2000)....................20

*Southeastern Promotions, Ltd. v. Conrad*,
420 U.S. 546 (1975)....................19, 35, 36

*Speiser v. Randall*,
357 U.S. 513 (1958)....................35

*Spiegla v. Hull*,
371 F.3d 928 (7th Cir. 2004)....................37, 38, 39

*Street v. New York*,
394 U.S. 576 (1969)....................26

*Stromberg v. California*,
283 U.S. 359 (1931)....................26

*Stuller, Inc. v. Steak N Shake Enterprises, Inc.*,
695 F.3d 676 (7th Cir. 2012)....................15, 41

*Surita v. Hyde*,
665 F.3d 860 (7th Cir. 2011)....................23, 38

*Tandia v. Gonzales*,
487 F.3d 1048 (7th Cir. 2007) ....................22

*Thalheimer v. City of San Diego*,
645 F.3d 1109 (9th Cir. 2011) ....................36

*United States v. Playboy Entm't Grp., Inc.*,
529 U.S. 803 (2000) ....................19, 34, 36, 43

*Walker v. Texas Division, Sons of Confederate Veterans, Inc.*,
135 S. Ct. 2239 (2015) ....................24

**Constitutional Provisions**

U.S. Const. amend. I .................... *passim*

**Federal Statutes**

28 U.S.C. § 1292(a)(1) ....................1

28 U.S.C. § 1331 ....................1

28 U.S.C. § 1343 ....................1

42 U.S.C. § 1983 ....................1, 32, 33, 34

42 U.S.C. § 1988 ....................1

47 U.S.C. § 230 ....................4, 6

**Rules**

Fed. R. App. P. 4(a)(1)(A) ....................1

## STATEMENT OF JURISDICTION

This action arises under the First and Fourteenth Amendments of the Constitution and 42 U.S.C. §§ 1983, 1988. The district court and this Court have jurisdiction under 28 U.S.C. §§ 1331 and 1343. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1) to hear this appeal from the district court's August 21, 2015 order denying a preliminary injunction. On September 17, 2015, Backpage.com timely filed a notice of appeal under Fed. R. App. P. 4(a)(1)(A).

## STATEMENT OF ISSUES

This appeal concerns whether the district court erred by denying a preliminary injunction enjoining the actions of Cook County Sheriff Dart and declaring them likely an unconstitutional extralegal prior restraint under *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963), despite its findings that the Sheriff and his staff set out to "defund" Backpage.com by pressuring Visa and MasterCard to cut off use of their cards on the website, threatened the card companies if they did not comply, and the companies did comply immediately because of Dart's actions.

More specifically, the issues here are whether the district court misinterpreted the law by:

I. Requiring Backpage.com to prove Visa's and MasterCard's decisions were involuntary and based solely on Dart's threats rather than his "advocacy," when no court has imposed such a requirement under *Bantam Books*, and Supreme Court precedent is to the contrary,

II. Reversing the burdens of proof for First Amendment cases and disregarding that Backpage.com need only establish a *prima facie* case that Dart's actions

were "a motivating factor" for the terminations, while the Sheriff bore the burden to justify his speech restrictions and establish the card companies would have terminated if Dart had never written; and

III. Misapplying the preliminary injunction factors for irreparable harm, balance of hardships and public interest, disregarding how these factors are applied in First Amendment cases.

## STATEMENT OF THE CASE

### A. Summary.

Sheriff Dart has pursued a campaign against online classified advertising services for over eight years, demanding they shut down portions of their websites where users post adult-oriented ads. His public advocacy and attempts to use legal means failed. *See Dart v. Craigslist, Inc.*, 665 F. Supp. 2d 961 (N.D. Ill. 2009). So he devoted a team to find a way to "take down" Backpage.com, "legally or otherwise." His team came up with an "out-of-the-box" plan to pressure credit card companies to cut off use of their cards on Backpage.com.

On June 29, 2015, Sheriff Dart sent "cease and desist" letters to Visa and MasterCard, demanding they terminate all dealings with Backpage.com. Dart's letters made thinly veiled threats that the companies would be subject to investigation and sanctions if they did not comply with his "request." His staff then inundated the companies with calls, emails and more threats. Visa and MasterCard buckled, cutting off Backpage.com within 48 hours.

Backpage.com brought suit, and the district court entered a temporary restraining order, concluding Backpage.com had established likely success on its claim that Sheriff Dart had effected an extralegal prior restraint under *Bantam Books*. The court also found irreparable harm, as "free speech injuries are irreparable almost by definition," and that the

public interest favored relief because "Backpage's business is imperiled, and [it]s users are in imminent jeopardy of losing a forum for … speech." Temporary Restraining Order ("TRO") at 5, 6 (Dkt. 29) (APPO35-36).

After a hearing on August 20, 2015, the district court denied Backpage.com's preliminary injunction motion. The court again found Dart's letters conveyed threats to Visa and MasterCard and the companies terminated because of the letters. Memorandum and Order ("PI Op.") at 14-16 (Dkt. 66) (APP015-16). Yet the court interpreted the law to require Backpage.com to show not only that the companies complied with Dart's demands but also to prove their motivations, *i.e.*, that they acted involuntarily and solely because they feared official reprisal based on his threats. *Id.* at 16-24 (APP017-25). Rejecting Backpage.com's arguments that no court had ever imposed such a requirement, the district court held Backpage.com failed to satisfy the burden it set.

The TRO expired August 24, 2015. Thus, Sheriff Dart and his staff are no longer under any restraint to continue threatening third parties or trying to eliminate the website.

### B. Factual Background.

#### 1. Background on Backpage.com.

Backpage.com is the second largest online classified advertising website in the U.S., after Craigslist. Declaration of Carl Ferrer ("Ferrer Decl.") (Dkt. 6) ¶ 2, 3 (APP052-53). Users post more than six million ads monthly in various categories, including buy/sell/trade, automotive, real estate, jobs, dating and adult. *Id.* Users provide all content for their ads; Backpage.com hosts the forum for their speech. *Id.* ¶ 4.

Until Sheriff Dart's actions, Backpage.com charged for certain ads. *Id.* ¶ 5. For example, Backpage.com charged for ads in the adult and dating categories, payable by major

credit cards—a practice ***requested*** by Sheriff Dart and other law enforcement officials because credit cards provide identifying data to track and prosecute individuals if they engage in illegal activities. *Id.*; *id.* Exs. K; M (APP080-101); Declaration of Lisa Zycherman ("Zycherman Decl.") (Dkt. 7) Ex. A (APP102-107). Backpage.com also charged for ads (of all types) posted nationally or in multiple markets, and for more prominent placement. Ferrer Decl. ¶ 5 (APP053). From 2004 to 2015, Visa, MasterCard and American Express allowed their cards to be used on Backpage.com. *Id.* ¶ 6.

### 2. Sheriff Dart's Failed History of Seeking to Censor Online Escort Advertising.

Since 2007, Sheriff Dart has pursued a crusade against classified advertising websites to censor adult-oriented ads. Zycherman Decl. Ex. B (APP108-110); DEX 28 at 4. He filed suit in 2009 to force Craigslist to eliminate its adult category, claiming that Craigslist "violate[d] criminal laws prohibiting prostitution and related offenses." *Dart v. Craigslist*, 665 F. Supp. 2d at 967. The district court dismissed Dart's suit, holding that Craigslist was immune from liability because, under 47 U.S.C. § 230, websites "are not culpable for 'aiding and abetting' their customers who misuse their services to commit unlawful acts," and having an adult services category "is not unlawful in itself nor does it necessarily call for unlawful content." *Id.* at 967, 968-69. The court concluded: "Sheriff Dart may continue to use Craigslist's website to identify and pursue individuals who post allegedly unlawful content. ***But he cannot sue Craigslist for [its] conduct***." *Id.* at 969 (emphasis added) (internal citation omitted).

When Craigslist shuttered its adult services category in September 2010, Dart's office announced it would "focus[] on Backpage.com as the new battleground." Zycherman Decl. Ex. D (APP111-112). From 2011-2014, the Sheriff repeatedly denounced Backpage.com

publicly, demanding the website "remove the Personals and Adults sections." Ferrer Decl. Ex. I (APP074-76); *see also id.* ¶¶ 18, 19 (APP060) & Ex. J (APP077-79).

Backpage.com sought to cooperate with Sheriff Dart, and met with his staff to explain the extensive measures the website takes to prevent, screen and remove improper ads (especially to guard against human trafficking or child exploitation)[1] and its cooperation with law enforcement agencies.[2]*See id.* ¶¶ 20, 21 (APP060-61). Dart's office insisted Backpage.com should require credit card payments for adult ads to provide customers' "identifying information to law enforcement agencies upon request," *id.* Ex. K (APP080-82), and Backpage.com explained it already did this. *Id.* ¶¶ 7, 21 (APP053, 061). Dart's staff said then that they were "impressed not only with the work done [by Backpage.com], but also with [your] candor and sincerity …." *Id.* ¶ 21. But soon after, Dart renewed his demand that Backpage.com eliminate its adult category, threatening prosecution if it did not "immediately cease and desist[]." *Id.* Ex. L (APP083-87). The Sheriff also continued his public statements that "Backpage is a conduit to criminality." Zycherman Decl. Ex. E (APP113-114).

[1] Before termination of services by the credit card companies, Backpage.com had a multi-tiered system to screen, block and remove posts that may be improper. In addition to posting rules and alerts throughout the site (encouraging users to report suspect ads and providing warnings and resources regarding any concerns of exploitation or trafficking), this included automated filtering for more than 100,000 terms, URLs, and email and IP addresses, and two levels of manual review by approximately 100 personnel. *See* Ferrer Decl. ¶¶ 7-1 5 (APP053-58), Exs. G, H (APP064-73).

[2] Backpage.com works with law enforcement in connection with investigations and prosecutions, responding to subpoenas (usually within 24 hours), voluntarily conducting additional research, and providing training. *See* Ferrer Decl. ¶ 16 (APP058-59). Officials, including those in Cook County, have commended the company for its support. *Id.* ¶ 17 (APP059-60).

In the meantime, courts held in several cases that escort ads on Backpage.com are protected speech and states cannot censor such ads under 47 U.S.C. § 230.[3] Sheriff Dart has railed against the law, saying it is "antiquated," and leads to "nonsensical outcomes," Complaint Ex. B (Dkt. 2) at 2 (APP042), and unsuccessfully urged that federal law be changed, specifically to target Backpage.com, *see* Zycherman Decl. Ex. F (APP115-118).

### 3. Sheriff Dart Devised a Strategy to Shut Down Backpage.com By Extralegal Means.

Sheriff Dart was "frustrated" "[a]fter the legislative and litigious efforts failed." *Id.* Ex. G, H (APP119-126). In February 2015, he hired a new counsel, tasking her to explore all angles "to take down Backpage.com" "legally or otherwise." PX 2 (APP212), PX 3 (APP213). Dart devoted a team of ten staff members to this effort. 8/20/2015 Tr. at 75:3-75:8 (APP151). His team "[came] up with an out-of-the-box idea" to use "the financial route" of pressuring Visa and MasterCard, as "it would simply not be possible" for the website to survive if those companies said "no more." *Id.*

The Sheriff's special counsel set forth the plan to "disrupt Backpage.com" in a strategy memorandum approved by Dart and his senior advisors. PX 5 (APP216);8/20/2015 Tr. at 78:23-80:16 (APP154-56). The memo explained the objective was to "pressure" the credit card companies by appealing to their concerns about "potential liability," noting "[t]hey could lose millions if they are found ***or accused*** of making … financial gains from …

[3] Legislatures in Washington, Tennessee, and New Jersey passed criminal laws targeting Backpage.com, but federal courts enjoined each one as unconstitutional and preempted by Section 230. *See Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262 (W.D. Wash. 2012); *Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805 (M.D. Tenn. 2013); *Backpage.com, LLC v. Hoffman*, 2013 WL 4502097 (D.N.J. Aug. 20, 2013). A federal court in Massachusetts also held Backpage.com immune under Section 230 and dismissed private plaintiffs' claims based on ads on the website. *Doe ex rel. Roe v. Backpage.com, LLC*, __ F. Supp. 2d. __, 2015 WL 2340771 (D. Mass. May 15, 2015), *appeal filed*, No. 15-1724 (1st Cir. June 17, 2015).

arguably 'tainted' money." PX 5 (APP218) (emphasis added). The strategy was to allude to financial institutions' legal obligations to file reports of suspected illegal activity and emphasize they "are susceptible to money laundering prosecutions, reputational damages and/or hefty fines." *Id.* The approach was modeled on previous government efforts to cut off credit card services through Operation Choke Point and to Wikileaks, though the strategy memo acknowledged both efforts had been widely criticized and ultimately abandoned. *Id.* (APP220-21).

#### 4. Sheriff Dart and His Team Implemented the Strategy to Compel Visa and MasterCard to Defund Backpage.com

On June 29, 2015, Sheriff Dart sent letters to the CEOs of Visa and MasterCard, copying their directors and major shareholders. Complaint Exs. B, C (Dkt. 2) (APP040-51). The letters tracked the strategy memo. Writing in his capacity as Cook County Sheriff, Dart insisted the companies "immediately cease and desist from allowing your credit cards to be used to place ads on … Backpage.com." *Id.* Ex. B at 1. He noted the companies' merchant agreements "clearly give [them] the right to cancel or block any transactions if the customer 'indirectly engages in or facilitates any activity that is illegal.'" *Id.* at 2. He said his office "ha[d] objectively found" that Backpage.com "promote[s] prostitution and facilitate[s] sex trafficking." *Id*. at 1. He mentioned the companies' duties to file "Suspicious Activity Reports" and suggested they might have further obligations "to alert law enforcement authorities" of possible problems. *Id.* at 2. Dart underscored his message by citing statutes imposing criminal penalties for money laundering, allowing termination of status as an insured depository institution, and permitting investigations and enforcement actions. *Id.* at 2 & n.iv. He made clear his office would pursue the card companies, concluding: "Within

the next week, please provide me with contact information for an individual within your organization that I can work with on this issue." *Id.* at 3.

Sheriff Dart has admitted his objective was to "demand" and "compel" the card companies to defund Backpage.com, as he said in a press release trumpeting his success:

> **SHERIFF DART'S DEMAND TO DEFUND SEX TRAFFICKING COMPELS VISA AND MASTERCARD TO SEVER TIES WITH BACKPAGE.COM.**

Complaint Ex. A (APP038); *see* PX 4 (APP214) (objective was to "compel the credit card companies to stop accepting Backpage payments"); PX 9 (APP235) (aim was to "defund Backpage and hopefully put them out of business").

#### 5. MasterCard and Visa Complied with Dart's Demands After Further Pressure.

Within 48 hours of receiving Sheriff Dart's letters, MasterCard and Visa announced they would cease doing business with Backpage.com. The companies viewed Dart's letters and other pressure as threatening, and both said publicly and internally that they terminated because of the Sheriff's actions.[4] For example, MasterCard acknowledged it had allowed use of its cards on Backpage.com for many years and neither its policies nor anything else had changed, except it had received Dart's letter.[5]

---

[4] Zycherman Decl. Ex. H (APP120) (MasterCard terminated "[b]ased on a request from the Cook County Sheriff's office" that allegedly "confirmed" "illegal or brand-damaging activities."); Ferrer Decl. ¶ 25 (APP062) (Visa terminated because it had "received ***allegations*** from US law enforcement that … backpage.com is linked to child prostitution and human trafficking.") (emphasis added).

[5] *See* PX 65 (APP274) ("Backpage has been accepting MasterCard for a long time," expressing concerns about terminating "legal but controversial merchants," but treating Dart's letter as a "law enforcement referral" that provided "cover"); *see also* PX 62 (APP263) (MasterCard had received "verbal complaints" before, but Dart's letter was a law enforcement "referral in writing," requiring the company to "take decisive action").

MasterCard capitulated to the Sheriff's demands less than 24 hours after receiving his letter. PX 1 (APP210).[6] Visa did not respond so quickly, and so Dart's threats became more blatant. The Sheriff's team targeted Visa, PX 11 (APP236), "hounding" people in the company with calls and emails. PI Op. at 15 (APP016). On the evening of June 30, the Sheriff's spokesman wrote Visa to give "fair warning" about Dart's press conference the next morning:

> Obviously, the tone of the press conference will change considerably if your executives see fit to sever ties with Backpage …. Of course we need to know tonight if that is the case so that we can ensure the Sheriff's messaging celebrates Visa's change in direction as opposed to pointing out its ties to sex trafficking.

PX 13 (APP237). Visa regarded the communications from Dart's office as "blackmail." PX 54. Ultimately, Visa also caved to the Sheriff's demands, approximately an hour before the press conference. PX 22 (APP238).[7]

---

[6] The district court asserted that "[u]nbeknownst to Dart, MasterCard had already taken steps to disaffiliate with Backpage.com" before June 29. PI Op. at 7 (APP008). The court based this on communications earlier in June between MasterCard and one of Backpage.com's acquiring banks. (Merchants do not have direct relationships with MasterCard and Visa, but instead set up accounts with acquiring banks that handle card transactions.) In response to an inquiry from MasterCard, the bank addressed and apparently resolved some technical issues about Backpage.com's account, PX 59 (APP260-62), and indicated in a June 23 email that it would terminate processing MasterCard transactions "to demonstrate cooperation," PX 63 (APP271). The bank stated "we cannot really hold much against them," and thus said it could only terminate under "regular terms" with thirty days' notice (by July 31, 2015). *Id.* But, it is undisputed that this did not happen. Ferrer Dep. at 128:6-128:10 (APP288). Instead, this bank terminated on July 1 when MasterCard demanded that it do so ***because of*** Dart's letter. *See* PX 63 (APP267), PX 65 (APP274); Ferrer Decl. ¶ 24 (APP062). And, even if this bank had stopped handling MasterCard transactions, it is also undisputed Backpage.com had other banks that would have processed MasterCard charges (as well as all Visa transactions). *See* Ferrer Dep. at 128:11-129:14 (APP288-89).

[7] Sheriff Dart procured a declaration from a mid-level Visa employee asserting Visa did not "perceive Sheriff Dart to be threatening Visa with prosecution or any other official state action, nor did Visa base its decision on any such threat." DEX 4 ¶ 4 (APP280). This

### 6. After July 1, Dart's Team Continued to Press the Card Companies and Others to "Defund" and Thereby Eliminate Backpage.com.

Sheriff Dart's campaign to "defund" Backpage.com did not end with his June 29 letters to Visa and MasterCard and their concessions. For three weeks (until the district court's TRO), Dart's team monitored the website daily, PX 24 (APP239), PX 25 (APP240), tested to see if they could use credit cards, and pressured Visa again when they were able to do so. PX 29 (APP242-43) (the intention was to "follow up on every potential loophole" by continued pressure on "V & MC"); PX 33 (APP244), PX 43 (APP254-56). When Dart's team learned American Express cards could be used to purchase ad credits, they set out to block this as well, telling American Express the Sheriff wanted the issue immediately escalated to the company's legal department and executives with decision-making authority. PX 34 (APP245) so his message would not get "lost in translation"). When Dart's team determined users could purchase credits by mail, they contacted the governor and attorney general of Texas (where Backpage.com's U.S. operations are based), and urged the Chief Inspector of the U.S. Postal Service to investigate or prosecute. PX 36, PX 37, PX 38 (APP248-53).

As a consequence of Dart's actions, Backpage.com lost essentially all revenues for all ads. Ferrer Decl. ¶ 27 (APP062-63). To counteract this censorship and minimize injury to the website's goodwill and its users, Backpage.com stopped charging for ads on July 6, 2015.

---

one narrowly circumscribed sentence says nothing about the prospect that Dart could make referrals to other authorities, does not offer any affirmative explanation for Visa's decision, and does not contradict the statements of more senior Visa executives that they felt Dart was blackmailing the company. Moreover, the declaration confirms Visa first considered terminating Backpage.com only ***after*** being contacted by Dart. *Id.* ¶ 3.

*Id.* ¶ 28. But, as the company's CEO attested, providing services for free is a temporary measure that cannot last; like all publishers, Backpage.com needs revenues to survive. *Id.*

### C. Procedural History.

#### 1. The District Court Granted a Temporary Restraining Order.

Backpage.com filed suit against Sheriff Dart on July 21, 2015, seeking injunctive and declaratory relief and damages. The district court entered a TRO on July 24, concluding Dart had effected an extralegal prior restraint of speech prohibited by *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963). TRO Order at 4 (APP034). The court found that the Sheriff's letters, written "in his official capacity on Sheriff's Department letterhead, requesting a 'cease and desist,' invoking the legal obligations of 'financial institutions' to cooperate with law enforcement, and requiring ongoing contact with the companies" demonstrated that Dart "brought the weight of his office to bear on his 'request' that the companies stop their association with Backpage altogether." *Id.* at 5 (APP035). It also found Visa and MasterCard "withdrew authorization for use of their credit cards at Backpage.com as a result of Dart's request." *Id.* at 2. Irreparable harm was established because the Sheriff's actions deprived Backpage.com of its "lifeblood" of revenues (the "entire business hangs in the balance"), and "free speech injuries are irreparable almost by definition." *Id.* at 5. The court concluded the balance of hardships and public interest favored a TRO, as there was no evidence Backpage.com's demise would reduce trafficking; to the contrary, "an oft-used tool" of law enforcement "will be lost if Backpage were to fold." *Id.* at 6 (APP036).

Thus, the district court restrained Sheriff Dart and his office from taking any actions to "request, direct, persuade, coerce, or threaten credit card companies … or any other third parties to discontinue, terminate, disallow or interfere with payment or services to

Backpage.com." Order (Dkt. 33). The court imposed the TRO for the maximum 28-day period allowed, through August 21, 2015. Order (Dkt. 32).

For the preliminary injunction hearing, the court directed the parties to focus on two questions it identified in the TRO Order: "(1) whether Dart's letter constitutes a threat, and (2) whether the credit card companies involuntarily withdrew business from Backpage." TRO Order at 4 (APP034). The court indicated it would not permit discovery and did not want to hear arguments on the issues it had resolved (*e.g.*, irreparable harm, balance of equities) or Dart's attacks against the website generally. *See* 8/13/2015 Tr. at 19:10-20:8, 28:14-16 (APP128-30).

### 2. The District Court Denied a Preliminary Injunction.

At the preliminary injunction hearing, the Sheriff's office presented three witnesses (including Sheriff Dart), repeating their criticisms and accusations about Backpage.com. Backpage.com presented evidence showing the Sheriff's threats and pressure on the card companies was much greater than known before—including about his ten-person team, the strategy memo, efforts to blackmail Visa, and the team's ongoing efforts after July 1 to completely "defund" and eliminate Backpage.com.

The day after the hearing, the district court entered an order denying a preliminary injunction and allowing the TRO to expire, Order (Dkt. 59), issuing an opinion on August 24 explaining its ruling, Opinion (Dkt. 63), later amended to remove redactions (Dkt. 66). Regarding the first of the court's two issues (whether Dart's actions were a threat), it found Dart's letters were "an implied threat to take, or cause to be taken, some official action against the [card] companies if they declined his 'request' to stop providing a method to pay for advertising on Backpage.com." PI Op.at 13-14 (APP014-15). It found that although the

Sheriff's office may not have authority to proceed directly, he could make referrals to other agencies to urge "investigation and prosecution," as he did "in this very case" by urging the U.S. Postal Service to investigate Backpage.com. *Id.* at 14. The court found "it cannot be credibly argued" that Dart's actions were not coercive given the strategy memo explaining the plan to "appeal[] to the credit card companies' interest in avoiding liability" and the references in the letters to statutes concerning money laundering and financial institutions' other legal obligations. *Id.* at 14-15. The court found further support of Dart's intended threats in his statements "tak[ing] credit for 'compelling' the [card] companies' actions," and the "urgency of the sheriff's department's follow-up communications" "hounding" the card companies to emphasize that they "could not simply ignore Dart." *Id.* at 15.

Despite these findings, the court asserted that "[t]o the extent that the letter[s] could reasonably be found to be a 'threat,' [they do] not clear the threshold with much room to spare." *Id*. It offered no support for this characterization except to say the letters' references to the card companies' legal duties and potential liability were "clunky," and "large, sophisticated corporations" such as Visa and MasterCard would not "fear … legal reprisals" as a result of the Sheriff's threats. *Id.*

Regarding its second question (whether Visa and MasterCard acted "involuntarily"), the district court said it was "clear" that Sheriff Dart's letters caused Visa and MasterCard to terminate card services for Backpage.com. *Id.* at 16, 21 (APP017, 022). But it went on to parse the Sheriff's letters to assess (in the court's view) the extent to which they conveyed threats versus "information and advocacy." *Id.* at 21. More specifically, the court required Backpage.com to prove the companies acted "involuntarily" and solely because they were coerced by the Sheriff, *id.* at 19-23 (APP020-24), rejecting Backpage.com's arguments that

no court had ever imposed such a requirement for a *Bantam Books* claim. Despite its findings and the undisputed evidence that Visa and MasterCard allowed use of their cards on Backpage.com for eleven years until the Sheriff's demands, the court concluded both companies terminated "voluntarily and not because they were coerced by threats from Dart." *Id.* at 21 (APP022). The court concluded Backpage.com was unlikely to prevail on the merits. *Id.* at 22 (APP023).

The district court also reversed its TRO conclusions concerning all the other elements for injunctive relief, without any additional evidence (since it had indicated it did not want any). The court did not mention First Amendment principles but instead surmised that "no irreparable harm … has yet occurred [because] Backpage remains in business," PI Op. at 24 (APP025), disregarding the same evidence it previously credited that, without revenues, "the whole forum is [in] jeopardy of disappearing," TRO Order at 5 (APP035). The court held that Backpage.com failed to establish irreparable injury because it did not provide evidence of the amounts of its financial losses or "how much revenue from lawful activity, as opposed to its total revenue, is in jeopardy." PI Op. at 25, 27 (APP026, 028).

Backpage.com filed a timely notice of appeal along with a motion for a stay and injunction pending appeal, given the infringement of speech rights Sheriff Dart has caused.

## STANDARD OF REVIEW

In First Amendment cases, this Court "make[s] an independent review of the record" because it "must decide independently whether 'a given course of conduct falls on the near or far side of the line of constitutional protection.'" *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006) (quoting *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 567 (1995)); *see Ezell v. City of Chicago*, 651 F.3d 684, 693-94 (7th Cir.

2011) (applying thorough review where district court made "several critical legal errors" by failing to understand constitutional analyses in denying preliminary injunction). In general, the Court reviews a district court's "legal conclusions *de novo*, its findings of fact for clear error, and its balancing of the injunction factors for an abuse of discretion." *Stuller, Inc. v. Steak N Shake Enters., Inc.*, 695 F.3d 676, 678 (7th Cir. 2012). But when a district court's denial of a preliminary injunction is founded on misapplication of the law (as here), such conclusions are subject to "plenary appellate review." *Roland Mach. v. Dresser Indus., Inc.*, 749 F.2d 380, 385 (7th Cir. 1984).

## SUMMARY OF ARGUMENT

The district court found—and the record amply supports—that Sheriff Dart threatened and intimidated Visa and MasterCard to cut off use of their cards on Backpage.com. The Sheriff's admitted purpose was to starve Backpage.com of revenues to force it to shut down, thereby eliminating the adult-oriented ads he finds objectionable. And, as the district court also found, Dart's actions were successful—Visa and MasterCard immediately terminated because of the Sheriff's demands, eliminating effectively all revenues for the website.

Under *Bantam Books*, Sheriff Dart's actions are the very definition of informal censorship and extralegal prior restraint—perhaps the most egregious example in decades. The district court's findings of Dart's threats and their consequences is all that is needed to grant a preliminary injunction under the law. But the district court misapplied the law and fundamental First Amendment principles in many ways:

***First***, the court imposed unprecedented requirements for a *Bantam Books* claim. No case has held that a plaintiff must prove third parties' motivations for bowing to government pressure. The district court invented this requirement based on its view that it should weigh

Sheriff Dart's rights to engage in "advocacy" as compared to the First Amendment rights of Backpage.com and its users. But this misunderstands that government actors do not have First Amendment rights in performing their duties—the First Amendment is a ***check*** on government powers, not a license for coercion. Moreover, the district court's invented requirement contradicts longstanding Supreme Court precedent that officials can be liable for private parties' actions, whether the parties were coerced or acted willingly because of officials' encouragement, and the state cannot avoid responsibility by claiming third parties would have done the same thing anyway.

***Second***, the district court reversed the burdens applicable in First Amendment cases, imposing all burdens on Backpage.com as though this was a run-of-the mill case having nothing to do with free speech rights. The court ignored that the government bears the burden of justifying any restriction on speech. It is improper to require citizens to prove the lawfulness of their speech, as the district court did here. At most, Backpage.com's burden was to make out a prima facie case of "a motivating factor," with the burden thereafter shifting to the Sheriff to prove that the same thing would have happened regardless of his actions.

***Finally***, the district court misapplied the other preliminary injunction factors—concerning irreparable harm, the balance of hardships and public interest—again ignoring First Amendment presumptions and principles.

# ARGUMENT

## I. THE DISTRICT COURT ERRONEOUSLY DENIED PRELIMINARY INJUNCTIVE RELIEF BY MISINTERPRETING *BANTAM BOOKS* AND OTHER FIRST AMENDMENT PRECEDENT.

### A. Sheriff Dart's Scheme to Defund Backpage.com Is an Extralegal Prior Restraint Under *Bantam Books*.

#### 1. *Bantam Books* and Its Progeny.

Sheriff Dart's campaign to "defund" Backpage.com is a quintessential example of "a scheme of state censorship effectuated by extralegal sanctions" barred by *Bantam Books*, 372 U.S. at 72. His actions are similar in many respects to the scheme struck down in *Bantam Books*, except, if anything, the Sheriff's conduct is far worse.

In *Bantam Books*, the Rhode Island "Commission to Encourage Morality in Youth" sent letters to distributors entreating them to prevent the circulation of certain books the commission deemed "objectionable." *Id.* at 59, 61. The letters were phrased as requests for "cooperation," and the commission had no authority to prosecute or take other legal action, although it said it would provide its views to police and the state attorney general. *Id.* at 62-63 & n.5. The Supreme Court held this coercive innuendo violated the First Amendment: "We are not the first court to look through forms to the substance and recognize that informal censorship may sufficiently inhibit the circulation of publications to warrant injunctive relief." *Id.* at 67. It rejected the state's argument that the letters were not unlawful because distributors were "free to ignore" them, finding they were "thinly veiled threats to institute criminal proceedings against [the distributors] if they do not come around." *Id.* at 68. Likewise, it was "immaterial whether in carrying on the function of censor, the Commission may have been exceeding its statutory authority." *Id.* at 69 n.9. The First Amendment constrained the Commission because, by imposing an informal "system of prior

administrative restraints," it functioned as an "instrument[] of regulation independent of the laws." *Id.* at 69, 70.

Many cases have followed *Bantam Books*, finding other officials' informal censorship efforts unconstitutional. For example, in *Drive In Theatres, Inc. v. Huskey*, 435 F.2d 228 (4th Cir. 1970), the Fourth Circuit upheld an injunction against a sheriff who threatened theatre owners for showing X- or R-rated movies. In *ACLU v. City of Pittsburgh*, 586 F. Supp. 417, 425 (W.D. Pa. 1984), the court enjoined a mayor who sent a letter urging magazine vendors not to distribute an issue of *Hustler* magazine he believed was offensive. And in *Playboy Enterprises, Inc. v. Meese*, 639 F. Supp. 581, 585-88 (D.D.C. 1986), the court enjoined and ordered retraction of a letter from the Attorney General's Commission on Pornography to retailers suggesting the commission's report might list them as distributors of pornography.[8]

**2. Informal Censorship Violates All Substantive First Amendment Protections.**

The rule of *Bantam Books* is founded on First Amendment tenets, including perhaps the most fundamental of all: Prior restraints are "the essence of censorship," *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 713 (1931), and "the most serious and the least tolerable infringement on First Amendment rights," *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). "Any system of prior restraints of expression comes to [the courts] bearing a heavy presumption against its constitutional validity," *Bantam Books*, 372 U.S. at 70, a presumption that "is heavier—and the degree of protection broader—than that against limits

[8] *See also, e.g.*, *Okwedy v. Molinari*, 333 F.3d 339, 343 (2d Cir. 2003); *Rossignol v. Voorhaar*, 316 F.3d 516, 526 (4th Cir. 2003); *Rattner v. Netburn*, 930 F.2d 204, 210 (2d Cir. 1991); *Council for Periodical Distribs. Ass'n v. Evans*, 642 F. Supp. 552, 560-62 (M.D. Ala. 1986), *vacated in part on other grounds*, 827 F.2d 1483 (11th Cir. 1987), discussed below.

on expression imposed by criminal penalties," *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 558-59 (1975). Prior restraints are permissible only in "the most exigent circumstances," *ACLU v. Pittsburgh*, 586 F. Supp. at 423, if they (1) "fit within one of the narrowly defined exceptions to the prohibition against prior restraints," ***and*** (2) the government provides requisite "procedural safeguards that reduce the danger of suppressing constitutionally-protected speech." *Southeastern Promotions*, 420 U.S. at 559.[9]

Informal prior restraints are far more destructive of constitutional rights than formal procedures—they are entirely beyond the rule of law, affording no substantive or procedural protections whatsoever. The Supreme Court's explanation aptly describes Sheriff Dart's actions: "There is no provision whatever for judicial superintendence before notices issue or even for judicial review," instead, censorship turns on officials' discretionary "determinations of objectionableness" without any "judicial determinations that such publications may lawfully be banned" and with "no safeguards whatever against the suppression of … constitutionally protected[] matter." *Bantam Books*¸ 372 U.S. at 70-71.

Informal censorship undermines essentially all substantive First Amendment protections, including that it is the government's obligation to prove its actions burdening speech serve a compelling interest using the least restrictive means possible, *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000), and that speech restrictions are narrowly tailored and precisely defined, *Reno v. ACLU*, 521 U.S. 844, 871-74 (1997). Similarly, it is antithetical to First Amendment doctrine for a government official to target or

[9] The essential due process safeguards are: (1) the burden of instituting judicial proceedings and proving that material is unprotected must rest on the censor; (2) any restraint prior to judicial review can be imposed only for a specified brief period and only for the purpose of preserving the status quo; and (3) prompt final judicial determination must be assured. *Southeastern Promotions*, 420 U.S. at 560; *see Freedman v. Maryland*, 380 U.S. 51, 58 (1965).

seek to eliminate particular speech based on his distaste for the speech. *See City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 770 (1988) (government does not have discretion to penalize speech it disfavors). "[N]or can the government suppress an entire category of speech … because the First Amendment bars 'prohibition of public discussion of an entire topic.'" *Schultz v. City of Cumberland*, 228 F.3d 831, 840 (7th Cir. 2000). The *Bantam Books* doctrine reflects these principles and was developed precisely to prevent "scheme[s] of censorship devoid of the constitutionally required safeguards." *Bantam Books*, 372 U.S. at 64.

### 3. The District Court's Denial of a Preliminary Injunction Contradicts Its Findings Establishing Dart Imposed an Illegal Prior Restraint.

The district court's fact findings establish that Sheriff Dart's campaign to eliminate Backpage.com met all the hallmarks of a *Bantam Books* prior restraint, and then some. Two findings are most important. First, the court found that Dart's letters conveyed threats:

> "Dart's letter to the credit card companies could reasonably be interpreted as an implied threat to take, or cause to be taken, some official action against the companies if they declined his 'request' to stop providing a method to pay for advertising on Backpage.com." PI Op. at 13-14 (APP014-15).

Second, the court found that the letters caused Visa and MasterCard to terminate services:

> "[T]he Court does not quarrel with the premise that *the letter* precipitated the companies' actions—the Court has made the preliminary finding, consistent with the evidence, that the companies responded to Dart's letter …." *Id.* at 16 (APP017).
>
> "To be clear: the Court does not doubt that Dart's *letter* caused action by Visa and MasterCard …." *Id.* at 21 (APP022).

This, by itself, was enough to enter a preliminary injunction. Yet, the court made other findings that added considerably more support:

- Dart had "multiple employees" working on "Backpage.com advertising in particular." *Id.* at 4 (APP005).

- His office devised a plan "to exert national pressure" on the credit card companies, appealing to the companies' interests to avoid "potential liability." *Id.* at 5 (APP006).

- Dart wrote letters in his official capacity as Sheriff insisting Visa and MasterCard "cease and desist" allowing use of their cards on Backpage.com, while implying they would face "government sanction—specifically investigation and prosecution—if they did not comply with his 'request.'" *Id.* at 14 (APP015).

- Dart "referred to his letter[s] not as a 'request' but as a demand," "consistent with his role as sheriff, but not 'a father and caring citizen.'" *Id.* at 15 (APP016).

- The letters' references to statutes about money laundering, investigation and de-licensing of financial institutions were "intended to suggest the companies could face civil or criminal liability for facilitating payments for unlawful ads placed on Backpage.com" and "it cannot be credibly argued" otherwise. *Id.* at 14-15 (APP015-16).

- Even if Dart did not have authority to take direct legal action against the card companies, he admitted "his department often coordinates with other … law enforcement agencies," and "in this very case, Dart contacted the Inspector General of the United States Postal Service and the FBI, urging them to investigate" Backpage.com. *Id.* at 14 (APP015).

- The Sheriff's request that Visa and MasterCard respond and identify contact persons within "one week" gave a "strong suggestion that the companies could not simply ignore Dart." *Id.* at 15 (APP016).

- "[M]ultiple staff members … hound[ed] personnel within each company about terminating their relationships with Backpage.com," insisting on immediate responses and adding "another layer of coercion." *Id.* at 5, 8-9, 15 (APP005, 008-09, 016).

- "Dart's office was happy to take credit for 'compelling' the companies' actions" in response to the Sheriff's "demand." *Id.* at 15 (APP016).

- One of Dart's senior advisors characterized their success by saying: "Choked of its financial lifeline—and branded by the financial community as untouchable—Backpage will likely wither." *Id.* at 10 (APP010).

After explaining these findings, however, the Court wrote: "To the extent that the letter could reasonably be found to be a 'threat,' … it does not clear the threshold with much

room to spare." *Id.* at 15 (APP016). The court offered no basis for this view except to say the threats in Dart's letters were "oblique," "footnoted," "clunky," cited "irrelevant statutes," and would not inspire "fear of legal reprisals" for "large sophisticated corporations" such as MasterCard and Visa that have "access to top-tier legal resources." *Id.* at 15. The court's interpretation contrary to the facts is frankly unfathomable. *See Tandia v. Gonzales*, 487 F.3d 1048, 1054 (7th Cir. 2007) (judge's inference based on speculation and conjecture rather than evidence entitled to no deference).

The district court asserted Sheriff Dart's actions "pale in comparison" to previous *Bantam Books* cases. PI Op. at 15 (APP016). This is not only wrong, it is backwards—no prior case even comes close to what Sheriff Dart has done. No other case since (and including) *Bantam Books* has involved such a focused, well-resourced, and coordinated governmental effort to silence an entire forum for speech.

For example, in *Okwedy*, the Staten Island Borough president wrote a billboard company asking it to remove certain ads "as a responsible member of the business community," with no greater threat than to note the company owned "a number of billboards on Staten Island and derives substantial economic benefits from them." 333 F.3d at 341-42. The Second Circuit held this could reasonably be interpreted as intimating a threat of adverse action, even though the borough president had no "direct regulatory or decision-making authority." *Id.* at 342-43. In *Rattner*, the same court held a village trustee's letter to the chamber of commerce (on personal stationary ostensibly for "[my]self and my neighbors") objecting to an ad in the chamber's newsletter was enough to make out a *Bantam Books* claim. 930 F.2d at 206, 209. The Second Circuit rejected the district court's view that the letter could not be a threat because it did not contain language expressly referring to legal

reprisal, again holding it was enough that it "c[ould] reasonably be interpreted" as intimidating adverse action (a boycott of chamber businesses or heightened scrutiny by the village) and the impact of the letter was demonstrable (the chamber eliminated its newsletter). *Id.* at 208, 209-10.[10] In *Playboy v. Meese*, the court held the Meese Commission's suggestion to retailers that its report would include one witness's testimony asserting they were purveyors of pornography established a *Bantam Books* claim (and the court entered a preliminary injunction), even though the commission had no authority to prosecute or sanction retailers. 639 F. Supp. at 585.

In these cases, the officials' threats were much less overt than Dart's actions. None involved additional pressure and coercion if third parties did not immediately capitulate to the officials' demands. None involved a team devoted for months to "take down" a website. Contrary to the district court's suggestion, PI Op. at 15 (APP016), a sheriff need not dispatch deputies to make arrests for there to be a *Bantam Books* claim. *See Rattner*, 930 F.2d at 210 ("[T]he fact that [the trustee's] letter and statement 'were not followed up with unannounced visits by police personnel,' should hardly have been deemed dispositive since the Chamber immediately capitulated to what may reasonably be viewed as an implicit threat." (quoting and disagreeing with district court opinion, 733 F. Supp. 162, 170 (S.D.N.Y. 1989))). Threats of government investigation or sanction—whether express or implied and whether carried out or not—are enough if they result in speech being suppressed. And the evidence

[10] The Second Circuit's objective test is consistent with other First Amendment cases in this Circuit. *See Surita v. Hyde*, 665 F.3d 860, 878 (7th Cir. 2011) ("We apply an objective test: whether the alleged conduct by the defendants would likely deter a person of ordinary firmness from continuing to engage in protected activity.").

here, as reflected in the district court's findings, shows that is exactly what Sheriff Dart intended and accomplished.

### B. The District Court Misapplied *Bantam Books*.

#### 1. The District Court Disregarded First Amendment Law in Seeking to Parse Sheriff Dart's Threats from Ostensible "Advocacy."

The district court's decision is premised on a fundamental misunderstanding of First Amendment law. Although the court acknowledged that the credit card companies dropped Backpage.com in response to Dart's "*letter*," PI Op. at 16, 21 (APP017, 022), it said the correspondence was also an attempt to persuade the card companies, and that Backpage.com must distinguish attempts to coerce from attempts to convince. *Id.* at 13 (APP014). The court observed that "government officials, including law enforcement officials, retain their own First Amendment rights to speak on matters of public concern," and that Dart's letter " was primarily information and advocacy," which it concluded is "perfectly legal." *Id.* at 13, 16, 21.

This analysis misconstrues the most elementary of constitutional concepts—governments do not have constitutional ***rights***, they exercise ***powers*** limited by the constitution.Certainly the government is empowered to communicate its views in carrying out its various functions. *See, e.g.*, *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239, 2245-46 (2015). But when the use of government power infringes individual rights, the First Amendment (among other constitutional provisions) provides a check on that authority. *Id.* at 2246 ("the Free Speech Clause itself may constrain the government's speech"); *see also CBS, Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94, 139 (1973) (Stewart, J., concurring) ("The First Amendment protects the press from governmental interference; it confers no analogous protection on the Government."); *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009) ("The Free Speech

Clause restricts government regulation of private speech; it does not regulate government speech.”).[11]

No doubt government officials retain their First Amendment rights ***to speak as citizens***, but “when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes.” *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006); *see Borough of Duryea v. Guarnieri*, 131 S. Ct. 2488, 2493 (2011). Thus, a county clerk has a First Amendment right to join any church she wants, but has no constitutional right to refuse to issue marriage licenses to gay couples based on her faith. *Miller v. Davis*, __ F. Supp. 2d __, 2015 WL 4866729, at *13 (E.D. Ky. Aug. 12, 2015). Likewise, a candidate for a judicial position has a First Amendment right to advocate his views during his campaign, *Republican Party of Minn. v. White*, 536 U.S. 765 (2002), but has no right (or power) to impose his beliefs from the bench, *Glassroth v. Moore*, 335 F.3d 1282 (11th Cir. 2003) (Chief Justice of Alabama Supreme Court violated Establishment Clause by placing monument to the Ten Commandments in the state judicial building). Sheriff Dart wrote to the card companies “in his official capacity,” PI Op. at 14 (APP015), and thus was wielding government power, not exercising his First Amendment rights as “a father and caring citizen,” *id.* at 15 (APP016). His actions and communications threatening the credit card companies—directly or indirectly—are ***limited*** by the First Amendment, not immunized by it.

Based on its mistaken premise, the district court erred in assuming it must parse exhortations in Dart’s letters (as an exercise of First Amendment rights) from statements (and

[11] The suggestion that public officials may assert First Amendment rights in performance of their official duties suffers from a fundamental conceptual problem—taken literally it would mean that neither Congress nor the Illinois legislature could adopt a law “abridging” Sheriff Dart’s purported right to say whatever he pleased. But that, of course, is not the law. *Summum*, 555 U.S. at 468 (“The involvement of public officials in advocacy may be limited by law, regulation, or practice.”).

actions) that "could reasonably be interpreted as an implied threat." *Id*. at 13 (APP014). While *Bantam Books* "does not require law enforcement officials to 'renounce all informal contacts with persons suspected of violating valid laws,'" *id*. at 12 (APP013) (quoting *Bantam Books*, 372 U.S. at 71-72), it does require them to avoid making any threats. This is a binary calculus; either the government communication includes a threat, or it does not. And if it does, it is prohibited under *Bantam Books*. *Cf. Street v. New York*, 394 U.S. 576, 587-88 (1969) (First Amendment bars government action where unconstitutional and potentially constitutional speech restrictions are "intertwined"); *Stromberg v. California*, 283 U.S. 359, 367-68 (1931) (First Amendment requires overturning conviction where "it is impossible to say under which clause of the statute the conviction was obtained").

Thus, the district court was wrong to conclude it is "perfectly legal" to combine "attempts to convince" with "attempts to coerce." PI Op. at 13 (APP014). If not, then no *Bantam Books* case could ever be made, since ***all*** such cases involve a mix of advocacy connected to public censure and veiled threats. *See, e.g.*, *Huskey*, 435 F.2d at 229 (sheriff made statements in newspaper and radio interviews that anything other than G-rated movies were obscene); *Penthouse Int'l, Ltd. v. McAuliffe*, 610 F.2d 1353, 1358 (5th Cir. 1980) (county attorney gave statements to newspapers in connection with his effort to ban adult magazines); *Playboy v. Meese*, 639 F. Supp. at 584 (retailers were concerned they would be identified in commission's report).[12] Accordingly, once the district court found Sheriff Dart's actions

---

[12] Other cases cited by the district court, *see* PI Op. at 13 (APP0014), turned on findings that there was no governmental threat at all. *See Am. Family Ass'n, Inc. v. City & Cnty. of San Francisco*, 277 F.3d 1114, 1125 (9th Cir. 2002) ("there was no sanction or threat of sanction"); *Penthouse Int'l, Ltd. v. Meese*, 939 F.2d 1011, 1016 (D.C. Cir. 1991) (government threatened "no sanction—criminal or otherwise"); *R.C. Maxwell Co. v. Borough of New Hope*, 735 F.2d 85, 88 (3d Cir. 1984) (letter mentioned only the possibility of proceedings under an ordinance "not yet drafted"); *Hammerhead Enters., Inc.*

objectively conveyed threats and caused the card companies to terminate, that should have been dispositive.[13]

**2. The District Court Invented a Requirement That a Plaintiff Must Prove Third Parties Acted "Involuntarily."**

In a similar vein, the district court's ruling reflected its view that Backpage.com was required to establish "the involuntary nature of the third parties' actions." PI Op. at 17 (APP018), *see id.* at 19 (APP020). Backpage.com pointed out that no court has ever imposed such a requirement and doing so would make establishing a *Bantam Books* claim impossible. The district court cited the same cases as Backpage.com, saying obliquely that "in each case, the voluntariness of the third parties' decisions was considered" *id.* at 17, but without noting the analyses or holdings of the cases.

First, the court misread *Bantam Books*. It relied on the Supreme Court's mention of the trial court's finding in that case that the distributor's compliance with the Commission's directives "was not voluntary." PI Op. at 17 (APP018) (quoting *Bantam Books*, 372 U.S. at 68). But the district court ignored the context of this statement—the Supreme Court was explaining the pernicious effect of extralegal prior restraints and the "general rule" that people will not disregard public officials' veiled threats:

> It is true, as noted by the Supreme Court of Rhode Island, that [the distributor] was "free" to ignore the Commission's notices, in the sense that his refusal to "cooperate" would have violated no law. But it was found as a fact—and the finding … binds us—that [the distributor's] compliance with the Commission's directives was not voluntary. People do not lightly disregard public officers' thinly veiled threats to institute criminal proceedings against

---

*v. Brezenoff*, 707 F.2d 33, 37 (2d Cir. 1983) (letter threatened no sanctions and had no effect).

[13] In any event, the record reflects that MasterCard and Visa did feel that they were threatened by Dart's letters and other pressure from his office. *See supra* at 8-10 & PX 13 (APP237), PX 54 (APP257-59), PX 62 (APP263-64), PX 65 (APP274-78).

> them if they do not come around, and [the distributor's] reaction … was no exception to this general rule.

372 U.S. at 68. To suggest this ***requires*** a plaintiff to prove third parties felt "compelled by [an official's] threat to involuntarily comply," PI Op. at 18 (APP019), interprets it to say something it does not. No court has interpreted *Bantam Books* as the district court did.

In fact, in all of the cases the district court cited as having "examined the voluntariness of third parties' decisions," *id.* at 18, the courts ***rejected outright*** officials' claims that third parties acted voluntarily given the nature of *Bantam Books* claims. None ***required*** a plaintiff to prove third parties' "involuntariness."

For example, *McAuliffe*, 610 F.2d 1353, rejected the county attorney's argument that "retailers and distributors voluntarily removed [magazines] from their shelves," because "[t]his view ignores the substance of the actions taken by [the attorney] and his investigators. *Id.* at 1360. Under *Bantam Books*, the Fifth Circuit held, courts must "look through the form to the substance," and given that the attorney's actions "were almost completely effective in driving the suspect publications from the newsstands of Fulton County," this "created an informal system of prior restraint" without more. *Id.* at 1360-61.

Similarly, *ACLU v. Pittsburgh* "reject[ed] as untenable the City's position that the vendors voluntarily removed the publications from their shelves." 586 F. Supp. at 422. Granting injunctive and declaratory relief, the court found it sufficient that "the Mayor deliberately set about to achieve the suppression of a publication he personally deemed objectionable [an issue of *Hustler*] and succeeded in his aim." *Id.* at 421-22. The case follows *Bantam Books* in recognizing that courts cannot "blind themselves" to "human experience" or the fact that "the mere threat of police action will in most cases result in the threatened person desisting from the contemplated action, although the proposed action may

be entirely legal." *Id.* at 422. Thus, this case also held it was sufficient for a *Bantam Books* claim that the vendors pulled the magazine after the mayor's actions, without requiring any proof about ***why*** they did so.

*Playboy v. Meese*, 639 F. Supp. 581, also examined the voluntariness of third parties' decisions, but held that "voluntariness" is irrelevant. The court rejected the government's claim that retailers voluntarily removed publications such as *Playboy* and *Penthouse* from stores after the Meese Commission sent letters intimating they would be identified in its report as "engaged in the sale of pornography." *Id.* at 583. "While the defendants argue that distributors voluntarily decided not to sell the magazine[s], it seems more than ironic that many of the decisions not to sell were made *after the Commission's letters were sent out.*" *Id.* at 585 (emphasis in original).

The district court also referenced *Hammerhead*, saying it "supports the view that a threat … that in fact influences [third parties'] conduct is required." PI Op. at 19 (APP020). But that decision says the opposite. That case involved a New York City administrator's letters to retailers objecting to a board game but not threatening any sanctions, and no stores refused to sell the game as a result of his letters. 707 F.2d at 38-39. The Second Circuit held that the analysis under *Bantam Books* is objective, *i.e.*, whether a government official's actions can ***reasonably be interpreted*** as intimating some threat of adverse action. *Id.* at 39. Moreover, the court expressly declined to hold that a showing "that any one was in fact intimidated" is a "requisite element[] of a First Amendment violation." *Id.* at 39 & n.7.[14]

[14] The district court also cited *Henderson v. Huibregtse*, 281 F. App'x 577 (7th Cir. 2008), *see* PI Op. at 20 (APP021), but that case is not analogous. There, an inmate sued prison officials after the local newspaper refused to sell him a subscription, claiming the paper's refusal was based on a city council "ordinance" that "compel[ed] [the newspaper] to put a stop to inmate subscriptions." 281 F. App'x at 580. This Court rejected the inmate's

The district court erroneously claimed "*Bantam Books* and the other cases relied upon [by] Backpage simply do not address the situation … where there is affirmative evidence, not just the defendant's conjecture, that the third parties upon whom the government official prevailed acted voluntarily for reasons independent of any threat." PI Op. at 22 (APP023). This too is wrong, as courts have held government actors can be liable even where a third party claims it acted independently. *See, e.g.*, *Playboy v. Meese*, 639 F. Supp. at 583-84, 587-88 (7-Eleven voluntarily removed adult magazines, yet court still required Meese commission to retract letters to all retailers); *Okwedy*, 333 F.3d at 342, 344 (upholding claim against borough president notwithstanding that billboard company asserted it made decision to remove ads); *Evans*, 642 F. Supp. at 560 (certain stores removed magazines voluntarily after district attorney objected, yet court found sufficient evidence of prior restraint); *Air Line Pilots Ass'n, Int'l v. Dep't of Aviation*, 45 F.3d 1144, 1150 (7th Cir. 1995) (city could be responsible for disallowing ads at O'Hare Airport notwithstanding management company's assertion it decided to block the ads).

Contrary to the district court's selective reading of the law, ***no case*** has ever required a plaintiff alleging a *Bantam Books* claim to prove third parties' motivations for complying with government intimidation or that they acted involuntarily. Such a requirement would effectively eviscerate *Bantam Books*. The point of an informal prior restraint is to pressure third parties who are the most vulnerable and least likely to resist, thereby accomplishing censorship indirectly when the government cannot do so directly. *See Bantam Books*, 372 U.S. at 64 n.6 ("The distributor who is prevented from selling a few titles is not likely to

---

argument because the city council actually passed only an advisory resolution, and, regardless, the newspaper established its policy of not selling to inmates ***before*** the resolution and two years before the plaintiff tried to buy a subscription.

sustain sufficient economic injury to induce him to seek judicial vindication of his rights."); *accord Freedman*, 380 U.S. at 59. If third parties can avoid pressure by saying they had some other motivation for acceding to government demands, they likely would always say that to stay on the "right side" of law enforcement, *see Rossignol*, 316 F.3d at 526, and avoid claims for having participated in an unconstitutional prior restraint.

Until now, the *Bantam Books* case law has uniformly held that it is enough to show a government official took actions that, viewed objectively, sought to effect an extralegal prior restraint, which resulted in speech being infringed. The district court's attempt to create a new and effectively impossible "involuntariness" requirement has no support in the law.

### 3. The District Court's Ruling Violates Constitutional Principles That Third Parties' Actions Are Attributable to the State Regardless of Whether the Parties Were Coerced or Acted Voluntarily.

The Supreme Court has long recognized that government may be liable for private parties' actions if the actions are "fairly attributable to the State." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152, 169-71 (1970). While a private party may make business decisions that infringe speech, doing so is unconstitutional when the party acts pursuant to "state compulsion or involvement." *Id.* at 169. States cannot violate constitutional rights "through the medium of others." *Id.* at 171. Indeed, "[t]he whole purpose of [42 U.S.C. § 1983] was to prevent public authorities from violating constitutional rights through the use of nominally private means." *Rossignol*, 316 F.3d at 527.

The state action doctrine turns on "whether there is a sufficiently close nexus between the State and the challenged action of [a private party] so the action of the latter may be fairly treated as that of the State itself." *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974).

The Supreme Court has identified several different circumstances in which private parties may be treated as state actors. It has held, for example, "that a challenged activity may be state action when it results from the State's exercise of 'coercive power,' *Blum* [*v. Yaretsky*, 457 U.S. 991, 1004 (1982)], when the State provides 'significant encouragement, either overt or covert,' *ibid.*, or when a private actor operates as a 'willful participant in joint activity with the State or its agents, *Lugar*[, 457 U.S. at 941]." *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001).

Thus, Backpage.com can prevail on a claim against Sheriff Dart for Visa's and MasterCard's decisions to terminate use of their cards whether the companies felt coerced ***or*** they acted voluntarily because the Sheriff encouraged the result. The record provides ample evidence the companies terminated Backpage.com because they felt threatened by Sheriff Dart. But even if that were not so, Dart would still be liable because, at the least, he provided "significant encouragement" for Visa and MasterCard to comply with his demands, and they undisputedly complied.

This Court's decision in *Air Line Pilots Association* is analogous. There, a pilots association sought to display an ad at O'Hare Airport critical of United Airlines. TMI, the private company that managed advertising at the airport, agreed to run the ad but reneged when a City representative ordered it not to. Later, the City withdrew its objection, and TMI briefly installed the ad, but then removed it again, and continued to refuse to run the ad thereafter. 45 F.3d at 1148. This Court reversed the district court's dismissal of the association's Section 1983 complaint, holding that TMI's conduct was state action because the City (1) participated in TMI's activities (showing a "symbiotic relationship"), and (2) provided significant encouragement and expressed "antagonism to the proposed message …

on more than one occasion." *Id.* at 1149-50. The Court rejected the City's argument that it should be absolved because the refusal to run the ad was solely TMI's decision. *Id.* at 1150. The City could not "shift[] the responsibility for challenged decision-making onto the shoulders of a private party." *Id.*

The district court's ruling reflects that, in its view, no matter how much Sheriff Dart sought to threaten or coerce Visa and MasterCard, he is absolved if the companies say they might have terminated services for Backpage.com anyway. Even if the record supported this (and it does not), courts have long held that when state officials act to infringe constitutional rights, they cannot defend on the basis that a private party would have done the same thing anyway. In *Peterson v. City of Greenville*, 373 U.S. 244 (1963), the city argued a store would have demanded segregation at its lunch counter regardless of a city ordinance. The Court held that when a state takes actions to "command[] a particular result," it "will not be heard" to contend a private party "would have acted as [it] did independently." *Id.* at 248. The rule applies regardless of whether the state action is a formal law, *id.*, a state custom, *Adickes*, 398 U.S. at 152, 169-71, or an effort to effect an informal prior restraint, *Carlin Comm'cns, Inc. v. Mountain States Tel. & Tel. Co.*, 827 F.2d 1291, 1295 (9th Cir. 1987).

*Carlin Communications* is directly on point. There, a county attorney threatened to prosecute Mountain Bell if the company continued to allow Carlin's adult-themed 976 service. 827 F.2d at 1293. "With this threat, Arizona 'exercised coercive power' over Mountain Bell and thereby converted its otherwise private conduct into state action for purposes of § 1983." *Id.* at 1295 (quoting *Blum*, 457 U.S. at 1004). The phone company "insist[ed] that it remains an unresolved question of fact whether the county attorney's letter was the real motivating force behind the termination," but the Ninth Circuit said: "Even if

unresolved, this factual question is immaterial." *Id.* It held "the same conclusion [of *Peterson*] applies"—the state could not assert the phone company would have taken the same action to block Carlin's 976 service notwithstanding the attorney's demands. *Id.*

## II. THE DISTRICT COURT IMPROPERLY REVERSED BURDENS OF PROOF.

The district court's opinion says nothing about the burdens and presumptions that apply in First Amendment cases. Instead, the court seemed to treat the preliminary injunction motion as though this were a dispute between private parties rather than a case concerning a state effort to impose a prior restraint. In doing so, the court "made several critical legal errors" requiring reversal. *Ezell*, 651 F.3d at 693.

### A. The District Court Failed to Require Sheriff Dart to Meet His Burden to Justify Speech Restrictions, Instead Imposing the Burden on Backpage.com to Prove Its Speech Is Lawful.

In First Amendment cases, it is always the ***government's burden*** to justify its speech-restrictive actions. *Playboy Entm't*, 529 U.S. at 816 ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions."); *id.* at 818 ("When First Amendment compliance is the point to be proved, the risk of non-persuasion … must rest with the Government, not with the citizen."); *Bd. of Trs. v. Fox*, 492 U.S. 469, 480 (1989). Thus, when the state seeks to restrict speech based on its content, as Sheriff Dart did here, the state bears the burden of proving its actions further a compelling interest and are narrowly tailored to that end. *See Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2231 (2015). Likewise, under *Bantam Books* and other prior restraint cases, the burden falls on the government to prove that speech is unprotected, consistent with the "heavy presumption" that such restraints are invalid. *Bantam Books*, 372 U.S. at 70-71; *see Southeastern Promotions*, 420 U.S. at 560.

Rather than follow these principles, the district court put the burden on Backpage.com to ***disprove*** Sheriff Dart's accusations that the website "facilitates" illegal conduct.[15] This is backwards. The First Amendment presumes speech is protected unless and until the government proves it is unlawful:

> The Government may not suppress lawful speech as the means to suppress unlawful speech. Protected speech does not become unprotected merely because it resembles the latter. The Constitution requires the reverse. "[T]he possible harm to society in permitting some unprotected speech to go unpunished is outweighed by the possibility that protected speech of others will be muted …."

*Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 255 (2002) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973)); *see Speiser v. Randall*, 357 U.S. 513, 526 (1958) (invalidating California law requiring veterans seeking tax exemption to aver and prove they had not advocated government overthrow as impermissibly putting burden on citizens to prove lawfulness of speech).

In a First Amendment case, the government's burden of proof at the preliminary injunction stage tracks its burdens at trial. *Korte v. Sebelius*, 735 F.3d 654, 673 (7th Cir. 2013), *cert. denied sub nom. Burwell v. Korte*, 134 S. Ct. 2903 (2014); *see Gonzales v. O Centro Espirita Beneficiente Uniao do Vegetal*, 546 U.S. 418, 430 (2006) (challenge concerning religious freedoms "should be adjudicated in the same manner as constitutionally mandated applications of the test, including at the preliminary injunction stage"); *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004). Thus, for a preliminary injunction the plaintiff's burden is to establish a *prima facie* case that its First Amendment rights have been violated, and the burden then shifts to the government to justify its actions under the applicable standard—

[15] *See* PI Op. at 3-4 (APP004-05) (asserting Backpage.com had "adduced no evidence of what, if any, percentage of ads in the adult section relates to non-criminal 'escort' or other legal 'adult' activity"); *see also id.* at 26-27, 28.

strict scrutiny in this case. *Korte*, 735 F.3d at 673; *see Thalheimer v. City of San Diego*, 645 F.3d 1109, 1116 (9th Cir. 2011) (party seeking preliminary injunction "bears the initial burden of making a colorable claim that its First Amendment rights have been infringed, or are threatened …, at which point the burden shifts to the government to justify the restriction.").

The district court did not acknowledge, much less apply, these principles. Backpage.com clearly established more than a *prima facie* case, as the court's findings reflect. Had the court followed First Amendment law, the burden should have shifted to Dart to prove he sought to promote a compelling state purpose; his actions were narrowly tailored and the least restrictive means to accomplish the purpose; they fell within one of the narrowly defined exceptions to the prohibition against prior restraints; he promptly instituted judicial proceedings to prove all content on Backpage.com is unprotected; and the prior restraint he imposed was only for a specified brief period of time and only to preserve the status quo. *See Playboy Entm't*, 529 U.S. at 813; *Southeastern Promotions*, 420 U.S. at 559-60. Obviously, none of this happened. Just as obviously, Sheriff Dart offered nothing to satisfy his First Amendment burdens and cannot do so.

### B. The District Court Misapplied Analogous Precedent Holding That a First Amendment Plaintiff Need Only Show a Government's Actions to Repress Speech Were "A Motivating Factor."

The district court's misunderstanding of First Amendment presumptions and burdens is illustrated by comparison to Supreme Court and Seventh Circuit cases concerning First Amendment retaliation claims, under which a plaintiff's burden is only to show "motivating factor" causation, while the government bears the burden to show the same thing would have happened despite its animus to the plaintiff's speech.

The district court cited *Fairley v. Andrews*, 578 F.3d 518 (7th Cir. 2009), for the proposition that "to actually recover for [an official's] threat … the plaintiff must establish … proof of causation.'" PI Op. at 19 (APP020) (quoting *Fairley*, 578 F.3d at 525). However, this Court overruled *Fairley* on this point. In that case, prison guards asserted First Amendment retaliation claims after they spoke up about mistreatment of prisoners and indicated they would testify truthfully in a civil case. The panel in *Fairley* concluded the plaintiffs bore the burden of proving causation, *i.e.*, that prison officials retaliated against them because of their testimony and not for some other reason. 578 F.3d at 525. It based this on its reading of *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167 (2009), that "demonstrating but-for causation is part of the plaintiff's burden in all suits under federal law." 578 F.3d at 526.

But *Greene v. Doruff*, 660 F.3d 975 (7th Cir. 2011), abrogated *Fairley*'s causation analysis. *Greene* concluded that requiring a plaintiff in a First Amendment retaliation case to prove but-for causation was inconsistent with Seventh Circuit precedent, specifically *Spiegla v. Hull*, 371 F.3d 928, 941-43 (7th Cir. 2004), which held that "a plaintiff need only show that a violation of his First Amendment rights was *a 'motivating factor'* of the harm he's complaining of, and that if he shows this, the burden shifts to the defendant to show that the harm would have occurred anyway." 660 F.3d at 977 (emphasis added). This "was not a Seventh Circuit innovation; it followed directly from the Supreme Court's decision in *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274 (1977), also a First Amendment case and not overruled by *Gross*." *Id.* at 977. *See also Mays v. Springborn*, 719 F.3d 631, 634 (7th Cir. 2013) ("the rule of *Gross* and *Fairley* is inapplicable to First Amendment cases"); *Surita v. Hyde*, 665 F.3d 860, 874 (7th Cir. 2011).

Thus, a plaintiff need show only that its speech was "a motivating factor" for government action and need not prove that government animus was "the *sole* motivating factor." *Mays*, 719 F.3d at 635 (jury instructions to this effect were plain error); *Spiegla*, 371 F.3d at 942 ("a motivating factor does not amount to a but-for factor or to the only factor, but is rather a factor that motivated the defendant's actions"). A plaintiff must not be put "to the burden of disproving a host of alternative hypotheses concerning possible causes of his harm." *Greene*, 660 F.3d at 980. Ultimately, the aim of this burden-shifting is to establish but-for causation, while respecting that presumptions fall against the government when it acts to restrict or punish speech. Thus, if the government fails to carry ***its burden*** of proving the plaintiff would have suffered the same adverse consequences regardless of her speech, then the conclusion is that causation for the plaintiff's claim—*i.e.*, but-for causation—is established. *See Greene*, 660 F.3d at 979; *Spiegla*, 371 F.3d at 942; *Surita*, 665 F.3d at 879.

Here again, the district court did not apply the holdings or analyses of the cases it cited. The record plainly shows Sheriff Dart's letters and his staff's other pressure tactics were a motivating factor in Visa's and MasterCard's decisions to terminate card services. Indeed, the court's findings establish that Dart's actions were ***the but-for cause*** of the terminations. PI Op. at 16, 21 (APP017, 022). Applying this Court's decisions in retaliation cases, that should end the inquiry.

Thus, even assuming Visa's and MasterCard's motivations for capitulating to Dart's demands are relevant (although they are not, *see* Section I.B.3, *supra*), the burden fell to the Sheriff to prove the companies would have taken the same actions notwithstanding his letters and other pressure. *See Spiegla*, 371 F.3d at 943 (burden shifts to defendant "to prove by a preponderance of the evidence that the same actions would have occurred in the absence of

protected conduct"). Given the record, it is unfathomable to suggest Dart did (or could) meet this burden. For years, Dart attacked Backpage.com from his "bully pulpit," but his advocacy failed. For eleven years, Visa and MasterCard allowed use of their cards on the website. As MasterCard said, nothing changed until Dart's June 29 letter. PX 65 (APP274). Although the burden in all events was on Sheriff Dart, he offered no evidence that MasterCard and Visa would have terminated all services to Backpage.com as they did and when they did absent his actions.

Indeed, the district court not only imposed a burden on Backpage.com to prove why Visa and MasterCard acted as they did, but went further to require it to show how the companies would have acted if the court had declared Dart's actions likely unconstitutional. PI Op. at 23-24 (APP024-25). Again, no *Bantam Books* case has ever imposed such a burden. To the contrary, as the court in *Evans* held, First Amendment injuries "would indeed be remedied by a declaratory judgment stating [an official's] actions imposed an unlawful prior restraint … and an injunction halting his efforts to coerce and extort self-censorship." 642 F. Supp. 2d at 560. Although "[t]hese remedies [c]ould not ensure that … the retailers would choose to resume trade in sexually explicit magazines," they "would ensure that the decision whether to do so would be made free of coercion and without prior restraint." *Id.*

The district court's contrary rationale would mean that courts would rarely if ever grant injunctive relief under *Bantam Books*. Even if "there is no way to know how the credit card companies would proceed if informed that Dart had acted unlawfully," PI Op. at 23 (APP024), that does not relieve the court of its duty to enter a declaration and injunction when an official's threats and coercion ***are*** unconstitutional. Nor is it "pure and unwarranted

speculation," *id.* at 24 (APP025), to suggest that if the Court enforces the law, third parties such as Visa and MasterCard will not respect its decision.

## III. THE DISTRICT COURT MISAPPLIED THE IRREPARABLE HARM, BALANCE OF HARDSHIPS AND PUBLIC INTEREST FACTORS FOR PRELIMINARY INJUNCTIVE RELIEF.

### A. The District Court Disregarded the Record and First Amendment Presumptions Regarding Irreparable Harm.

In its preliminary injunction order, the district court also abandoned First Amendment principles in an apparent effort to rebalance the sliding scale analysis. *See* PI Op. at 26 (APP027). Again, the court erred, as shown by comparing its preliminary injunction order to the earlier TRO order, which did take into account the First Amendment rights at stake here.

Regarding irreparable harm, Backpage.com presented evidence that it lost essentially all revenues because of the terminations by Visa and MasterCard that Sheriff Dart compelled. Ferrer Decl. ¶ 27 (APP062-63). The website stopped charging for ads on July 6, 2015, but this could only be a temporary measure; the company cannot stay in business for long without revenues. *Id.* ¶ 28. Despite this evidence (and there was no contrary evidence), the district court opined that Backpage.com had failed to show it would "be *irreparably* harmed [and] forced to shut down before a claim for damages could be resolved," PI Op. at 25 (APP026), suggesting Backpage.com was obliged to establish "how much revenue from lawful activity, as opposed to total revenue, is in jeopardy," *id.* at 27 (APP028).

The court's interpretation not only contradicts the record,[16] it again disregards First Amendment principles. As the court said in the TRO order, "free-speech injuries are

[16] The district court actually went beyond the record to suggest that "Craigslist.com" (actually, Craigslist.org) demonstrates that classified advertising websites can exist without revenues. *See* PI Op. at 25 (APP026). In fact, Craigslist generates upwards of $100 million in revenues through credit card charges, while spending a fraction of what Backpage.com

irreparable almost by definition." TRO Order at 5 (APP035) (citing *Nuxoll ex rel. Nuxoll v. Indian Prairie Sch. Dist. # 204*, 523 F.3d 668, 669 (7th Cir. 2008)). The loss of First Amendment rights "for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Thus, "[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary" and "[t]his is particularly true in First Amendment claims." *Ezell*, 651 F.3d at 699. In the preliminary injunction order, the district court did not even allude to this presumptive irreparable harm.

The court also did not mention the law of this Circuit that, even for claims that do not implicate First Amendment rights, irreparable harm is established where damages "may come too late to save the plaintiff's business." *Roland Mach.*, 749 F.2d at 386; *see Stuller*, 695 F.3d at 680 (affirming preliminary injunction where franchisee showed franchisor's new pricing policy would significantly reduce its revenues). As the district court correctly recognized before: "Backpage's entire business hangs in the balance," "[t]here is no dispute that revenue from ad sales is Backpage's lifeblood," "the drastic reduction … because Backpage cannot accept credit cards is enough of a commercial injury to constitute irreparable harm," "damages will not suffice if the business goes under," and "the whole forum is in jeopardy of disappearing." TRO Order at 5 (APP035). The district court's reversal of these findings in the preliminary injunction order—with no different evidence—is inexplicable.

---

does for employee costs and monitoring. *See* Keith Patrick, *How Craigslist Makes Money*, HOUS. CHRON., http://smallbusiness.chron.com/craigslist-money-27287.html.

### B. The District Court Improperly Assessed the Balance of Hardships and Public Interest, Again Ignoring First Amendment Principles.

The district court also misunderstood the balance of hardships and public interests that apply here. Instead, the court repeated and compounded its other errors about First Amendment claims to suggest the balance tips in favor of Sheriff Dart. *See* PI Op. at 26-28 (APP027-29).

In addressing public interests, the court again put the burden on Backpage.com to disprove the Sheriff's accusations that all ads in the adult category of the website are unlawful. PI Op. at 26-27 (APP027-28). As discussed, this is backwards; it is the government's burden to prove—not just allege—that speech it seeks to restrain is, in fact, unlawful. *See* Section II.A *infra*. Sheriff Dart made no such showing, nor could he, as courts have held that adult escort ads on Backpage.com are protected speech under the First Amendment, *McKenna*, 881 F. Supp. 2d at 1282, having an adult category is not unlawful nor does it call for unlawful content, *Dart*, 665 F. Supp. 2d at 968-69, and state efforts to censor such ads are unconstitutional, *see Cooper*, 939 F. Supp. 2d at 813. The district court's suggestion that Backpage.com had to offer proof about "whatever other speech exists in the adult section" and whether it concerned "lawful activity" to establish a "First Amendment interest," PI Op. at 26-27, turns the law on its head. The court also acknowledged that termination of card services affected ***all*** ads on the site, thus burdening "lawful, … protected speech," but suggested this would "inflict harm upon the public" only if it resulted in "the elimination of a forum for that lawful speech." *Id.* at 27. This too is wrong. *Playboy Entm't*, 529 U.S. at 812 ("The distinction between laws burdening and laws banning speech is but a matter of degree.").

The court's public interest analysis also repeated its unfounded premise that "the Sheriff's own First Amendment rights are at stake." PI Op. at 27. This case concerns the Sheriff's misuse of government ***powers*** and First Amendment ***restrictions*** on his actions; it does not concern his free speech rights as if he had written merely as a "father and a caring citizen." *See* Section I.B.1, *supra.*

Finally, the district court also erred in concluding that, on the Sheriff's side of the scale of harms and public interest "must … be added the profound interests of the victims of the human trafficking that Backpage's advertising facilitates." PI Op. at 28 (APP029). First, this is a blatant misstatement because Backpage.com does not advertise anything, and it takes extensive measures and works with law enforcement to prevent misuse of the website and to preclude and combat trafficking or exploitation. *See* Ferrer Decl. ¶¶ 7-17 (APP053-60) & Exs. G, H (APP064-73). For the court to suggest Backpage.com's commitments are "hypothesized" or "have not been supported with evidence," PI Op. at 28 n.12, is unfair and wrong. Moreover, in this respect the court again disregarded the First Amendment—it could not merely credit Dart's arguments (as it did), but instead should have required the Sheriff to establish that coercing third parties to eliminate Backpage.com as a whole was the least restrictive means and a narrowly tailored approach to achieve a compelling state interest. *See* Section I.A.2, *supra.* Backpage.com does not contest that combatting human trafficking is a compelling interest, but shutting down an entire website and vast amounts of protected speech is certainly not the least restrictive means—nor an intelligent approach—to address this problem.

Here too, the district court's purported balancing of harms and interests contradicted its TRO order, although the evidence was the same and the law did not change. In the TRO

order, the court concluded there was no basis to believe that "prostitution, trafficking, and sexual exploitation of minors will be … significantly reduced by Backpage's demise," and instead found that "an oft-used tool" of law enforcement "will be lost if Backpage were to fold." TRO Order at 6 (APP036). At the TRO stage, the court also rejected the Sheriff's argument that the public had not been harmed because Backpage.com stopped charging for ads—calling this argument "specious." *Id.* Yet, with no different evidence at the preliminary injunction stage, the court accepted the same argument, concluding that Backpage.com failed to show harm because "more rather than fewer ads have been placed since [Visa and MasterCard] dropped Backpage." PI Op. at 24 (APP024).

Regardless of the district court's effort to reach the result it chose, the law is that "injunctions protecting First Amendment freedoms are always in the public interest." *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 590 (7th Cir. 2012) (internal quotation marks omitted). When First Amendment rights are at issue, the balance of equities favors injunctive relief because "no substantial harm to others can be said to inhere" in allowing a constitutional violation to continue. *Déjà vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 274 F.3d 377, 400 (6th Cir. 2001). In this, as in many other respects, the district court ignored established First Amendment principles.

## CONCLUSION

Sheriff Dart threatened and pressured Visa and MasterCard to block use of their cards on Backpage.com. He has succeeded (thus far) in accomplishing informal censorship, which he could not do under the law. The district court erred by misapplying the law in numerous respects and denying preliminary injunctive relief. This Court should reverse to prevent the

imminent demise of an entire website and the infringement of its millions of users' speech rights.

Dated: October 2, 2015.

Respectfully submitted,

By: *__/s/ James C. Grant__*

James C. Grant
Ambika K. Doran
DAVIS WRIGHT TREMAINE LLP
1201 Third Avenue, Suite 2200
Seattle, WA 98101
Telephone: (206) 622-3150

Robert Corn-Revere
Ronald G. London
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Ave., N.W., Suite 800
Washington, D.C. 20006
Telephone: (202) 973-4200

Christopher F. Allen
PAUL HASTINGS LLP
71 S. Wacker Drive
Chicago, IL 60606
Telephone: (312) 499-6000

Attorneys for Appellant Backpage.com, LLC

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(a)(7)(C) and Seventh Circuit Rule 32, I certify that the attached Appellant's Opening Brief is proportionately spaced in 12.5-point Times New Roman typeface and contains 13,829 words (as calculated by Microsoft Word 2003), excluding the caption page, Disclosure Statement, Table of Contents, Table of Authorities, and this Certificate of Compliance.

Dated October 2, 2015.

By: *<u>/s/ James C. Grant</u>*
James C. Grant

**CERTIFICATE OF SERVICE**

I hereby certify that on October 2, 2015, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

By: *\/s/ James C. Grant*
James C. Grant

**CIRCUIT RULE 32(d) CERTIFICATION**

Pursuant to Circuit Rule 30(d), I certify that all material required by Circuit Rule 30(a) and (b) are included in the Appendix.

By: *__/s/ James C. Grant____________________*
James C. Grant

**UNITED STATES COURT OF APPEALS**
**FOR THE SEVENTH CIRCUIT**

No. 15-3047

---

BACKPAGE.COM, LLC,

*Plaintiff-Appellant*,

vs.

THOMAS J. DART, Sheriff of Cook, County Illinois,

*Defendant-Appellee*.

---

On Appeal from the United States District Court
for the Northern District of Illinois
No. 1:15-cv-06340
The Honorable John J. Tharp, Jr.

---

**SHORT APPENDIX – APP001-APP036**

---

James C. Grant
Ambika K. Doran
DAVIS WRIGHT TREMAINE LLP
1201 Third Avenue
Seattle, Washington 98101
Telephone: (206) 622-3150

Robert Corn-Revere
Ronald G. London
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Ave., N.W., Suite 800
Washington, D.C. 20006
Telephone: (202) 973-4200

PAUL HASTINGS LLP
Christopher F. Allen
71 S. Wacker Drive
Chicago, IL 60606
Telephone: (312) 499-6000

Attorneys for Plaintiff/Appellant Backpage.com, LLC

# INDEX TO APPENDICES

## SHORT APPENDIX

| No. | Document Description | Pages |
|---|---|---|
| Dkt. 59 | Minute entry denying Plaintiff's motion for preliminary injunction | APP001 |
| Dkt. 66 | Memorandum Opinion and Order denying motion for preliminary injunction | APP002-APP030 |
| Dkt. 29 | Order granting Plaintiff's motion for temporary restraining order | APP031-APP036 |

## SEPARATE APPENDIX

| No. | Document Description | Pages |
|---|---|---|
| Dkt. 2 | Complaint Exhibits A, B, and C | APP037-APP051 |
| Dkt. 6 | Declaration of Carl Ferrer in Support of Motion for Temporary Restraining Order, with Exhibits G through M | APP052-APP101 |
| Dkt. 7 | Exhibits A, B, and D through H to the Declaration of Lisa Zycherman in Support of Backpage.com, LLC's Motion for Temporary Restraining Order | APP102-APP126 |
| 8/13/2015 | Transcript of Proceedings on Hearing for Motion to Compel Discovery Requests | APP127-APP131 |
| 8/20/2015 | Transcript of Proceedings on Preliminary Injunction Hearing | APP132-APP209 |
| PX01 | Backpage Timeline | APP210-APP211 |
| PX02 | February 20, 2015 email from Joseph Ryan re: New employee | APP212 |
| PX03 | April 6, 2015 email from Caroline Palmer to Stephanie Zugschwert re: Sex trafficking of minors | APP213 |

| No. | Document Description | Pages |
|---|---|---|
| PX04 | June 17, 2015 email from Nicholas Kristof to Benjamin Breit re: Backpage | APP214 |
| PX05 | June 24, 2015 email from Stephanie Zugschwert to Stephanie Zugschwert re: my proposal and letters for sheriff - not yet acted upon, with attachments | APP215-APP234 |
| PX09 | June 25, 2015 email from Benjamin Breit to Lauren Gambino re: Backpage | APP235 |
| PX11 | July 1, 2015 email from Benjamin Breit to Mike Tobin and Ruth Ravve re: Sheriff Dart to Announce Development Regarding National Initiative to Fight Online Sex Trafficking | APP236 |
| PX13 | June 30, 2015 email from Benjamin Breit to Visa re: Letter from Cook County Sheriff Tom Dart | APP237 |
| PX22 | July 1, 2015 email from Benjamin Breit and Flynn McRoberts re: Final release | APP238 |
| PX24 | July 14, 2015 email from Marian Hatcher to Joseph Ryan re: Backpage Snap Shot Analysis from 7/5/15 thru Sunday 7/12/2015 | APP239 |
| PX25 | July 8, 2015 email from Marian Hatcher to Joseph Ryan re: Spike in Backpage Ads Posted from 7/7 to 7/8 Due to No Charge for Ads | APP240-APP241 |
| PX29 | July 2, 2015 email from Cara Smith to Stephanie Zugschwert and Marian Hatcher re: Visa, MC - Due Diligence by Partners | APP242-APP243 |
| PX33 | July 6, 2015 email from Joseph Ryan to Cara Smith re: Visa/AMEX | APP244 |
| PX34 | July 7, 2015 email from Benjamin Breit to Cara Smith re: Letter from Cook County Sheriff Tom Dart | APP245-APP247 |
| PX36 | July 8, 2015 email from Cara Smith to Elizabeth Edwards and Stephanie Zugschwert re: Recent Conversation | APP248-APP249 |

| No. | Document Description | Pages |
|---|---|---|
| PX37 | July 8, 2015 letter from Sheriff Dart to Guy Cottrell, Chief Postal Inspector | APP250-APP251 |
| PX38 | July 9, 2015 email from Flynn McRoberts to Benjamin Breit re: Final release | APP252-APP253 |
| PX43 | July 14, 2015 email from Cara Smith to John Earnhardt re: backpage | APP254-APP256 |
| PX54 | July 1, 2015 email from Elvira Swanson to John Earnhardt re: Comms opportunity for Visa on Change.org | APP257-APP259 |
| PX59 | June 10, 2015 letter from Alexander Marxer to Paul Paolucci re: Update regarding to the Conference-Call June 2nd 2015 (Non-Compliance Concerns) | APP260-APP262 |
| PX62 | June 29, 2015 email from Eileen Simon to John Verdeschi re: Backpage Follow Up | APP263-APP266 |
| PX63 | July 1, 2015 email from Paul Paolucci to John Verdeschi re: Backpages.com: Advice regarding Closure/Closure confirmed | APP267-APP273 |
| PX65 | July 2, 2015 email from John Verdeschi to Paul Paolucci and Seth Eisen re: Mastercard position on sex work transactions - backpage | APP274-APP278 |
| DEX004 | Affidavit of Martin Elliot | APP279-APP280 |
| DEX028 | Transcription of Sheriff Dart's Press Conference | APP281-APP286 |
| 8/18/2015 | Excerpts from the Deposition of Carl Ferrer | APP287-APP289 |

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois − CM/ECF LIVE, Ver 6,1**
**Eastern Division**

Backpage.com, LLC

Plaintiff,

v.

Case No.: 1:15−cv−06340
Honorable John J. Tharp Jr.

Thomas J. Dart

Defendant.

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Friday, August 21, 2015:

MINUTE entry before the Honorable John J. Tharp, Jr: Plaintiff's motion for preliminary injunction [4] is denied. The TRO [30] previously entered by the Court is terminated. An opinion setting forth the basis of this ruling will be issued on Monday, August 24, 2015. If necessary, the opinion filed on the Court's docket will be redacted as to content the parties have identified that is subject to confidentiality agreements with third parties; in that case, an unredacted version of the opinion will be emailed to Mr. Grant and Ms. Karis for further distribution to their respective teams, as consistent with the terms of such confidentiality agreements. A status hearing will be held on Tuesday, August 25, 2015, at 11:00 a.m., at which time the Court will set schedules for: (1) presentation of objections to the filing of an unredacted version of the Court's opinion on the public docket (if necessary); and (2) further discovery and case management. Mailed notice(air, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BACKPAGE.COM, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 15 C 06340 |
| v. | ) | |
| | ) | Judge John J. Tharp, Jr. |
| SHERIFF THOMAS J. DART, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

In its order of August 21, 2015, the Court denied plaintiff Backpage.com's motion for a preliminary injunction and allowed the temporary restraining order to expire, absent any agreement between the parties to voluntarily extend it. This opinion summarizes the Court's preliminary factual findings and its reasons for the ruling.

### I. BACKGROUND

Backpage.com ("Backpage"), which operates a website devoted to online classified advertising, seeks an injunction against Cook County Sheriff Thomas Dart requiring him to notify credit card companies Visa and MasterCard of any ruling by this Court that it was likely unlawful for him to exhort them in a June 29 letter and follow-up communications thereafter to "cease and desist" allowing their cards to be used to process payments to Backpage. (Backpage no longer asks for a mandatory injunction requiring Dart to "retract" the letters.)

Last month, this Court entered a temporary restraining order prohibiting Sherriff Dart from further efforts to persuade others to "defund" Backpage, pending an evidentiary hearing on Backpage's claim that Dart's actions violated the First Amendment. The Court ruled that Backpage was entitled to a TRO because it had a better than negligible chance of prevailing on its claim based on the record at the time. In particular, the Court concluded that Backpage might

be able to demonstrate that Sheriff Dart's letter constituted the kind of informal prior restraint that the Supreme Court prohibited in *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963). In that seminal case, the Court enjoined the Rhode Island Commission to Encourage Morality in Youth from its *de facto* censorship campaign of sending threatening letters to distributors of books it deemed obscene, followed up with visits from police officers. Rejecting the argument that the Commission, which lacked any direct investigative or prosecutorial authority, was simply "exhorting booksellers and advis[ing] them of their legal rights," the Court held that the Commission had effected a prior restraint because its "notices, phrased virtually as orders, reasonably understood to be such by the distributor, invariably followed up by police visitations, in fact stopped the circulation of the listed publications." *Id*. at 67, 68.

At the TRO stage, the Court also rejected Dart's challenge to Backpage.com's standing to challenge Dart's actions vis-à-vis the credit card companies, which, Dart argued, affected the expressive rights of Backpage.com users but not the forum itself. The Court rejected the argument that Backpage.com lacked an injury-in-fact, but it expressly reserved for further consideration the questions whether Dart's actions, rather than the credit card companies' voluntary decision to dissociate themselves from the content published by Backpage, caused that injury and whether injunctive relief could redress Backpage.com's alleged injuries.

Since the TRO issued, the parties have engaged in expedited discovery, including a limited number of depositions permitted by the Court. The parties submitted further briefs, and the Court held an evidentiary hearing on August 20, 2015, at which the parties presented additional documentary evidence and testimony through live witnesses and declarations. Based on the evidence of record, the Court preliminarily finds the facts as set forth below.

## II. FACTS

Backpage.com's adult services section overwhelmingly contains advertisements for prostitution, including the prostitution of minors. Backpage uses filters that prevent certain words and phrases from being posted, but many of the advertisements nevertheless clearly solicit payments for sex. Symbols, photographs, and videos depict what words cannot. In over 800 sting operations responding to Backpage ads since 2009, Dart's officers have made arrests for prostitution, child trafficking, or a related crime 100% of the time. Evidence submitted by Dart from other law enforcement agencies and non-profit anti-trafficking groups, as well as evidence from a lawsuit by a trafficking victim against Backpage, establish that Backpage.com's adult section is the leading forum for unlawful sexual commerce on the Internet and that the majority of the advertisements there are for sex.[1] Backpage maintains that there is legitimate commerce

---

[1] The National Center for Missing and exploited Children ("NCMEC"), a national data clearing house and resource created by Congress in 1984 to help find missing children and to reduce the sexual exploitation and other victimization of children, reports that of the over 8,600 reports made to its "CyberTipline" in 2014, more than 64% related to classified ads placed on Backpage.com. *See* Affidavit of Staca Shehan, Executive Director of the Case Analysis Division of NCMEC, Def. Hearing Ex. 5, at ¶¶ 12-14. Consistent with this data, and with the experience of his own deputies, the Sheriff presented affidavits from law enforcement officials from Alameda County, California, Boston, Massachusetts, and Seattle, Washington, each of which attests to the same basic correlation between advertising on Backpage.com and unlawful sexual activity. *See* Def. Hearing Ex. 8 ("our experience in California is that Backpage.com is the number one online location where these victims of crime are bought and sold"); Ex. 9 ("Backpage.com is the go-to Web site in Boston for those looking to solicit a prostitute, post prostitution ads, and recruit and traffic young women and minors"); Ex. 10 ("every time the Seattle Police Department Vice/High Risk Victims Unit has responded to an ad in the adult section of Backpage.com, we have found that the ad was a posting for illegal activity"). This is only some of the evidence submitted by the Sheriff in support of his contention that the ads placed on Backpage.com's adult services site are solicitations to unlawful activity; others include affidavits and letters from the National Association of Attorneys General, the state of Masachusetts, and numerous articles appearing in print and other media. Against this collection of evidence, Backpage has produced no evidence whatsoever regarding the lawfulness of the ads placed on its adult services site.

advertised in the adult section, but it has adduced no evidence of what, if any, percentage of ads in the adult section relates to non-criminal "escort" or other legal "adult" activity.

### *A. Sheriff Dart's Letters*

Sheriff Dart has long worked against human trafficking, including prostitution and the sexual exploitation of women and children, in his capacity as Sheriff of Cook County. His efforts comprise law enforcement measures, attempts to curtail online trafficking through civil legal action,[2] assistance programs for trafficking victims, and vocal advocacy on this issue. As part of this initiative, Dart tried in several communications over a period of years to persuade Backpage to take measures to prevent the use of the "adult" section of its website for advertisements for prostitution (and the attendant human trafficking and exploitation). Frustrated with what he perceived as Backpage's lip service to his concerns, and hamstrung from taking legal action by statutory protections for forum websites such as Backpage,[3] Dart sought more creative ways to curtail the selling of sex on Backpage.

Dart had multiple employees working on trafficking issues in general and Backpage advertising in particular. In early 2015 he hired Stephanie Zugschwert as Assistant General Counsel for Policy and tasked her with working on sex trafficking issues. She reported to Director of Policy Joseph Ryan, who in turn reported to Cara Smith, a direct report of Sheriff Dart. Shortly into her tenure, Zugschwert drafted a strategy document entitled "Backpage.com:

---

[2] *See Dart v. Craigslist, Inc.*, 665 F. Supp. 2d 961 (N.D.Ill. 2009).

[3] Under The Communications Decency Act, the provider of an "interactive computer service" such as Backpage.com cannot be held liable as a publisher. 47 U.S.C. § 230(c). The Seventh Circuit has taken the position that § 230(c) "cannot be understood as a general prohibition of civil liability for web-site operators and other online content hosts," but it does preclude liability premised on treating the online information system as the publisher or speaker of any information provided by someone else. *Chicago Lawyers' Committee for Civil Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666 (7th Cir. 2008). The statute is not implicated in this case because Dart made no effort to impose liability on Backpage for the content of users' advertisements.

Approach Major Financial Institutions." The memo is addressed to Dart, Smith, and Ryan, and is dated May 7, 2015.

The memorandum sets forth a strategy of using the "National Day of Johns"[4] as a "launching pad to exert national pressure on the financial institutions," which are identified as "Visa, MasterCard, American Express, and Discover." The memorandum described a media event where the sheriff's office would partner with other law enforcement agencies to show the financial institutions how Backpage was being used "as a front for adult and minor prostitution." According to Zugschwert, "The goal would be to ultimately present this information in a streamlined media digestible form, with our National Day of Johns partners signing on and to release it with the National Day of Johns media effort."

The memorandum goes on to provide "context" for approaching the credit card companies. It notes the "self-serving concern of financial institutions [about] their own potential liability for allowing suspected illegal transactions to take place" as well as the concern of "banks" for "their business reputations and that of their investors." The memorandum then sets forth in more detail the financial institutions' "legal/moral and reputational responsibility" to disaffiliate with Backpage. It refers to the legal obligations of financial institutions to file suspicious activity reports if illegal activity is suspected, and concludes that "banks" that knowingly allow illegal transactions "are susceptible to money laundering prosecutions, reputational damage and/or hefty fines." The document next posits that use of Visa or

[4] The "National Day of Johns" is a coordinated effort among law enforcement agencies across the country and led by Sheriff Dart that targets prostitution and other sex crimes. The initial 2015 effort, which was timed to coincide with the Super Bowl, resulted in 570 arrests; more than 70% of the arrests resulted from responses to fake ads that had been placed on Backpages.com. Feb. 3, 2015, "Illinois sheriff posts fake ads for prostitiution that nab 570 men in nationwide sting," The Times-Picayune, (available at http://www.nola.com/news/index.ssf/2015/02/illinois_sheriff_posts_fake_ad.html (last visited August 24, 2015).

MasterCard to purchase advertising on Backpage violates the companies' user rules governing illegal activity. Finally, the memorandum collects examples of "similar situations" in which financial institutions, in some cases in response to government pressure, have dissociated themselves from "high-risk" industries.

Although Dart did not necessarily read or "approve" every aspect of the memorandum, he did green-light the idea of sending letters to the credit card companies about Backpage, and he signed the two letters that had been appended to the strategy memorandum with only minimal changes (likely made by Smith). Much of the content from the strategy memorandum is reproduced in the letters, including the discussion of the legal duties of "financial institutions" to report suspicious activity and the citation to the federal money laundering statute. The letters are dated June 29, 2015. One is addressed to the Chief Executive Officer of Visa, Inc. and all of the members of its Board of Directors, and is cc'd to the CEOs of the top five institutional investors in Visa. The other is addressed to the same personnel at, or affiliated with, MasterCard. The entire text of the otherwise identical letters is reproduced in the Appendix to this opinion.

The letters, which were distributed by email attachment, were sent to numerous personnel within Visa and MasterCard other than the nominal addressees; for example, lawyers and public relations officers. Despite the letters' closing request that each institution respond "in one week" with the identity of a person that Dart could work with, the sheriff's team followed up with various people at Visa and MasterCard almost immediately by email and telephone. Visa and MasterCard were informed that Dart would hold a press conference on July 1 to announce his campaign of pressure on the credit card companies.

American Express did not receive a June 29 letter from Dart because, as the letters to Visa and MasterCard note, it already had terminated the use of American Express credit cards for

payments to place ads in Backpage's "adult" section. American Express based its decision on the reputational harm that would inure from being associated with the distasteful and/or illegal content in that portion of the website. It withdrew from Backpage in April 2015, without having received any request or other communications from Dart.[5] Dart later sent a thank-you letter to American Express.

*B. Actions by the Credit Card Companies*

Unbeknownst to Dart, MasterCard had already taken steps to disaffiliate with Backpage. Indeed, the record shows that MasterCard had been discussing internally the propriety of authorizing payments using the card for ads in Backpage's adult services section since at least March of 2015, when it received communications from "stockholders, law enforcement and lawyers" prior to its annual shareholders' meeting.[6] Def. Hearing Exs. 77, 87. In response to MasterCard's concerns about complaints from investors and negative media reports about Backpage, Bank Frick, one of Backpage's Lichtenstein-based acquiring banks,[7] decided on June 23, 2015, to terminate its relationship with Backpage, effective July 31, 2015. A communication between a MasterCard "Franchise Integrity" executive and the acquiring bank on June 2, 2015,

---

[5] Backpage has provided no evidentiary support for the allegations in its complaint, made "on information and belief," that American Express terminated use of its card for ads placed in the adult services portion of the web site at Dart's behest. Compl., Dkt. # 1 ¶¶ 4, 43. To the contrary, the evidence of record indicates that American Express told Backpage's CEO, Carl Ferrer, that it was taking this action based on negative media reports concerning Backpage.com and that its terms of use did not permit use of the card for "brand damaging or illegal transactions." McDougal Dep. at 188-192; Ferrer Dep. at 100-105. It is difficult to understand how these allegations of Sheriff Dart's involvement could have been made in view of the communications Mr. Ferrer had with American Express months before the complaint was filed.

[6] No evidence was presented linking this call to anyone in Sheriff Dart's organization.

[7] Visa and Mastercard provide the payment process which banks use to provide credit and debit card services to their customers; the banks, not Visa and Mastercard, extend credit and issue credit cards. The so-called acquiring banks also contract directly with merchants to provide credit card services. Thus merchants do not contract directly with Visa and Mastercard, but instead with the acquiring banks.

Backpage.com is listed in a summary of "concerns," with negative press reports attached. In a follow-up discussion on June 10 the same executive states that "negative media" could render association with Backpage.com "brand damaging." Other communications followed, and a June 23, 2015, email from the same acquiring bank confirms for MasterCard that "the Bank's management has taken the decision to close down the account for [Backpage]—for reason of the concerns that you raised and in a best-practice approach to demonstrate cooperation." The email proposed giving "regular" notice and terminating effective July 31.

Nevertheless, MasterCard acted more quickly after receiving Dart's letter. After the letter went out, Cara Smith, Dart's aide, communicated with persons in MasterCard's legal department, and she was informed by midday on June 30 that the acquiring bank had terminated its relationship with Backpage. A MasterCard lawyer told Smith, "We were already fairly advanced with an investigation here." On July 1 an email from the acquiring bank that had terminated Backpage noted that it was "hoping that the other acquirers processing [Backpage] will cooperate as adequately and as quickly as well." All of the Backpage acquirers for MasterCard did in fact terminate in short order.

Visa took only a little longer. Dart's aide Cara Smith emailed Visa Inc. on June 30 to flag the June 29 letter and request "a brief call." Shortly after, Smith informed Visa that Mastercard had elected to terminate and expressed hope that "Visa will take similar immediate action." Visa informed Dart's staff that a separate legal entity, Visa Europe, "owned" the relationship with Backpage.com, and that all Visa Inc. could do is "encourage an outcome." Visa Inc. promised to "encourage Visa Europe to look at [Backpage] and do due diligence and get to the right decision." In the meantime, Dart's office continued to exert pressure for a fast decision—informing Visa that it was the lone holdout and would be spoken of as such at the fast-

approaching July 1 press conference and in Dart's impending press release. Concern that Visa would be the odd-man out at the press conference clearly prompted Visa to expedite its consideration of the issue, and Visa informed Dart's office on the morning of July 1 that it would issue a statement announcing that it had "taken action to stop processing payments for Backpage.com and the merchant's acquirers have confirmed that they have suspended acquiring."

MasterCard's press statement stated that it severed ties with Backpage "based on a request from the Cook County Sheriff's office" that "confirmed" brand-damaging activities, and Visa publicly explained that it had "received allegations from U.S. law enforcement that the merchant backpage.com is linked to child prostitution and human trafficking."

Dart submitted the affidavit of Martin Elliott, Senior Director of Visa USA, Inc., and its Global Head of Brand Protection, stating that "following" Sheriff Dart's letter, members of the Global Risk group, in consultation with the legal department, "made the decision to request that Visa Europe, a separate and independent legal entity, contact Backpage.com's acquiring banks in order to terminate" the use of Visa cards on Backpage. According to Elliott, "[a]t no point did Visa perceive Sheriff Dart to be threatening Visa with prosecution or any other official state action, nor did Visa base its decision on any such threat." Internal communications at Visa, Inc., on June 30 and July 1, however, make it clear that some individuals inside Visa viewed Dart's initiative as political posturing and believed some of the communications from his office used "threatening language" or were comparable to "blackmail."

Dart's office professes surprise at the speedy response from MasterCard and Visa, maintaining that the expectation had always been, in the words of Cara Smith, that the letters would initiate "marathon" discussions with the companies, rather than precipitate any immediate

action. Yet at least one member of the Sherriff's communications team, Benjamin Breit, stated in multiple contexts that the sheriff had "compelled" the credit card companies to act. And the sheriff's own press release was titled "Sheriff Dart's Demand to Defund Sex Trafficking Compels Visa and MasterCard to Sever Ties with Backpage.com." On July 10, Joseph Ryan circulated what he called "a proposed background for the impact of our successful efforts"; in that summary, he wrote: "Choked of its financial lifeline—and branded by the financial community as untouchable—Backpage will likely wither."

### *C. Effects on Backpage*

The evidentiary record with respect to the effects of the companies' withdrawal from Backpage has not been meaningfully augmented since the TRO proceedings. At that point, Backpage's CEO attested that the company was in immediate financial jeopardy because the primary payment mechanisms of its ad-buyers had been cut off.

In the wake of the companies' decisions, Backpage elected to allow the free posting of ads throughout its website, and it is continuing to do so. It has also attempted to mitigate the effects of the credit card companies' decisions by promoting alternative payment methods, including Bitcoin and Backpage "credits," which can be purchased by mail. Prior to implementation of the TRO, Dart continued efforts to "defund" the adult section by, among other things, contacting the Governor of Texas, the FBI, and the Chief Postal Inspector to request scrutiny of the mail-order purchase of credits through Backpage's Texas-based post office box. He also contacted American Express to report that its cards could be used to buy credits which then could be used on the adult section. Dart's department continued to test the use of credit cards to purchase adult ads on Backpage and inform the credit card companies when a transaction succeeded.

Backpage did not set forth any evidence about whether any of Visa or MasterCard's acquiring banks would enter into merchant agreements with Backpage if informed that Dart acted (or likely acted) illegally in sending the letters to Visa and MasterCard. At least one of Backpage's acquiring banks responded to a letter from Backpage, in which Backpage had set forth its case for why it is a completely legitimate enterprise, by asking Visa Inc. if it could reinstate Backpage or if it was being instructed to terminate Backpage "due to compelling evidence." At MasterCard, an internal communication dated July 2 states that MasterCard should "hide behind" the law enforcement referral as to the Backpage termination, in part because MasterCard would not want to be embarrassed if Backpage were to "engage another acquirer." [65]. A July 8 MasterCard email reflects that one of the acquirers had asked if it would be permitted to reinstate Backpage.

*D. Dart's proposed clarification*

Dart and his staff testified uniformly that the goal of their campaign was to defund the "adult" section of Backpage to curtail human trafficking, although the June 29 letter speaks more generally to desisting from placing ads "on websites like Backpage.com." There is no evidence that Visa or MasterCard considered pulling their cards from the adult section only, as American Express had done. The record contains drafts of letters to MasterCard and Visa from Dart advising them that he takes no issue with Backpage.com generally and intended only to defund the adult section. In light of the TRO which restricted his communications with the credit card companies, however, Dart has not in fact given them notice of this clarification.

## III. DISCUSSION

To obtain a preliminary injunction, the moving party must demonstrate that it has no adequate remedy at law, that it will suffer irreparable harm if relief is denied, and that it has

some likelihood of success on the merits. *See Ezell v. City of Chicago*, 651 F.3d 684, 694 (7th Cir. 2011). "If the moving party meets these threshold requirements, the district court weighs the factors against one another, assessing whether the balance of harms favors the moving party or whether the harm to the nonmoving party or the public is sufficiently weighty that the injunction should be denied." *Id*. "These considerations are interdependent: the greater the likelihood of success on the merits, the less net harm the injunction must prevent in order for preliminary relief."

*A. Likelihood of Success on the Merits*

The key question remains whether Backpage can establish that Dart's actions amount to informal censorship in violation of the *Bantam Books* line of cases. The answer turns primarily on the issue of whether Dart can be said to have implicitly threatened the credit card with official action if they did not terminate their relationships with Backpage, and if so, whether the threat caused the intended result. *See Bantam Books*, 372 U.S. at 67 (explaining that Commission's actions were unconstitutional because it "deliberately set about to achieve the suppression of publications deemed 'objectionable' *and succeeded in its aim*."), 68 (further reasoning that the Commission "directly and designedly stopped the circulation of publications in many parts of Rhode Island" because the distributor's "compliance with the Commission's directives was *not voluntary*.") (emphasis supplied in both quotes). Under the direct holding of *Bantam Books*, an informal prior restraint is established where threatening government action causes a restraint on speech. But, the Court was careful to note, its ruling does not require law enforcement officials to "renounce all informal contacts with persons suspected of violating valid laws prohibiting obscenity." *Id*. at 71-72.

Subsequent cases have heeded this admonition and reaffirmed that government officials, including law enforcement officials, retain their own First Amendment rights to speak on matters of public concern. They may permissibly advocate for particular results, criticize conduct, and even threaten others with public embarrassment. *See American Family Ass'n, Inc. v. City and County of San Francisco,* 277 F.3d 1114, 1125 (9th Cir. 2002); *McLaughlin v. Watson*, 271 F.3d 566, 573 (3d Cir. 2001); *X-Men Sec., Inc. v. Pataki,* 196 F.3d 56, 69 (2d Cir. 1999); *Penthouse Int'l., Ltd. v. Meese*, 939 F.2d 1011, 1016 (D.C. Cir. 1991); *R.C. Maxwell Co. v. Borough of New Hope*, 735 F.2d 85 (3d Cir. 1984). They may not, however, make implied or explicit threats of government sanctions that have the effect of chilling protected speech. *American Family Ass'n*, 277 F.3d at 1125 ("public officials may criticize practices that they would have no constitutional ability to regulate, so long as there is no actual or threatened imposition of government power or sanction"); *McLaughlin*, 271 F.3d at 573 ("It is not enough that defendant speaks critically of plaintiff or even that defendant directly urges or influences the third party to take adverse action. Rather, defendant must "threaten" or "coerce" the third party to act"); *Penthouse Int'l*, 939 F.2d at 1015 ("[T]he Supreme Court has never found a government abridgement of First Amendment rights in the absence of some actual or threatened imposition of governmental power or sanction."). The doctrine of prior restraints on speech is implicated only where threats of official action are present. *See Bantam Books*, 372 U.S. at 72 (violation stemmed from the censorship effectuated by threats of "extralegal sanctions."). In short, attempts to convince must be distinguished from attempts to coerce; the former are perfectly legal. *Okwedy v. Molinari*, 333 F.3d 339, 344 (2d Cir. 2003).

As the Court previously concluded, Dart's letter to the credit card companies could reasonably be interpreted as an implied threat to take, or cause to be taken, some official action

against the companies if they declined his "request" to stop providing a method to pay for advertising on Backpage.com. Dart did not directly threaten the companies with an investigation or prosecution, and he admits that his department had no authority to take any official action with respect to Visa and MasterCard. But by writing in his official capacity, requesting a "cease and desist," invoking the legal obligations of financial institutions to cooperate with law enforcement, and requiring ongoing contact with the companies, among other things, Dart could reasonably be seen as implying that the companies would face some government sanction—specifically, investigation and prosecution—if they did not comply with his "request." This is true even if the companies understood the jurisdictional constraints on Dart's ability to proceed against them directly. As Dart admitted in the preliminary injunction hearing, his department often coordinates with other local law enforcement agencies and sometimes with other states and the federal government. There is no reason that he could not refer the credit card companies to the appropriate authority to investigate their suspected role in facilitating human trafficking. Dart's leadership in coordinating the National Day of Johns effort, for example, illustrates the ability of his office to bring to bear law enforcement activities on a national scale. And further, in this very case, Dart contacted the Inspector General of the United States Postal Service and the FBI, urging them to investigate the lawfulness of alternative payment methods for Backpage's sex ads.

Furthermore, Dart's pre- and post-letter statements are consistent with (though not conclusive proof of) an attempt at official coercion. The strategy memorandum expressly recommended appealing to the credit card companies' interest in avoiding liability and it cannot be credibly argued that the references to the federal money laundering statute and other regulations defining duties of financial institutions were not intended to suggest that the

companies could face civil or criminal liability for facilitating payments for unlawful ads placed on Backpage.com (even if Dart's department itself could not take direct action). And after the letters were sent, Dart's office was happy to take credit for "compelling" the companies' actions. Dart referred to his letter not as a "request" but as a "demand." A "demand" is consistent with his role as sheriff, but not "a father and a caring citizen." Finally, the urgency of the sheriff's department's follow-up communications imposed another layer of coercion due to its strong suggestion that the companies could not simply ignore Dart. Dart's letter asked for a response within "one week," and then only to identity a contact person, but within hours of sending the letter multiple staff members were hounding personnel within each company about terminating their relationships with Backpage.com.

To the extent that the letter could reasonably be found to be a "threat," however, it does not clear the threshold with much room to spare. That a jury *could* find Dart's letters to contain a threat of official action does not mean that a jury *would* make such a finding. Backpage may prevail on this issue, but there is ample reason for doubt. Compared to the language of the threats, often coupled with police action, in *Bantam Books* itself and other cases where an informal prior restraint was found, Dart's oblique, footnoted, references to irrelevant statutes and clunky statements about legal duties seem unlikely to inspire fear of legal reprisals—particularly on the part of large, sophisticated corporations with immediate access to top-tier legal resources and advice. On the spectrum between "attempts to convince" and "attempts to coerce," the letter falls, in the Court's view, much closer to the former. Yet, even if Dart's actions pale in comparison to those described in cases where a prior restraint was found, at this stage the Court cannot hold as a matter of law that the letter, and subsequent aggressive follow-up communications, were *not* threatening.

But a threat alone is not a prior restraint. Under *Bantam Books* and its progeny, the threat must cause the intended result of censoring certain speech based on its content. As Backpage's counsel conceded at the hearing, the threat must produce some "consequence." And here is where Backpage's view and Court's part ways. Backpage contends that the requisite causal connection is established because Dart's letter caused the credit card companies to act. And while the Court does not quarrel with the premise that ***the letter*** precipitated the companies' actions—the Court has made the preliminary finding, consistent with the evidence, that the companies responded to Dart's letter—it is far from clear that any ***threat*** the letter may have contained caused the companies' action. Recall that Dart is permitted, and indeed, constitutionally entitled, to speak out on matters of public concern such as the online trafficking of women and children on Backpage.com. If his use of the bully pulpit to educate and even shame the companies persuaded them to act, then there has been no prior restraint of speech by the government. And there is plenty of evidence to suggest that this is what occurred. For example, the companies' public statements attested to their desire not to be associated with illegal transactions. Internal communications likewise reflect that the terminations are attributable to the illegal or "brand damaging" activity present in the adult section of Backpage.com. Visa's affidavit states that it was not influenced by any threat.[8] And Mastercard

[8] Backpage's effort to minimize the affidavit of Visa's Global Head of Brand Protection, Martin Elliott, is unpersuasive. Elliott attests that Visa did not perceive a threat of "prosecution or any other official state action" and did not "base its decision on any such threat." Backpage insists that Elliott's affidavit "says nothing" and is irrelevant because "Sheriff Dart's office doesn't prosecute anyone. He can arrest people [and] [h]e can refer people to prosecution," and further because under *Bantam Books* the official's lack of authority to prosecute is not dispositive of the existence of a threat. These uncontroversial statements do not support the argument that the affidavit does not matter, however. Elliott's affidavit—which is not limited to potential "prosecution or any other official state action" ***by Dart himself***, as Backpage suggests— is relevant to establishing that even assuming the letter contained a threat of official action by any government authority, the threat was not what caused Visa's decision to request

had reason to terminate to Backpage before hearing anything from Dart because of its concerns about negative media attention; its acquirer merely advanced the termination date. Indeed, American Express needed no communication from Dart to abandon Backpage; this makes it even more plausible that for business reasons Visa and MasterCard simply did not want to be associated online sex trafficking.

Backpage insists, however, that it would be irrelevant if the credit card companies had acted "purely voluntarily." Backpage urges the Court to focus only on Dart's actions, not their effect on the credit card companies; according to Backpage, if there was a threat, then it does not matter whether the companies' actions were caused by the threats or by permissible advocacy or indeed by their own independent business considerations. But this is not consistent with the governing authorities. The involuntary nature of the third parties' actions—*i.e.,* action caused by a threat—has been deemed relevant in prior *Bantam Books* cases, including the seminal case itself. All of the cases cited by Backpage involved third parties' decisions to stop selling materials deemed obscene by some government official or body without any prior due process or judicial decision, and in each case, the voluntariness of the third parties' decisions was considered. In *Bantam Books*, the Supreme Court rejected the argument of Rhode Island's Commission to Encourage Morality in Youth that it "simply exhorts booksellers and advises them of their legal rights," in part because it was found as a fact—a finding the Court expressly noted that it was bound by—that the distributor's "compliance with the Commission's directives was not voluntary," in keeping with the "general rule" that "[p]eople do not lightly disregard public officers' thinly veiled threats to institute criminal proceedings against them if they do not come around." 372 U.S. at 68. Deeming it to have been "particularly relevant," *id.* at 63, the

---

that Visa Europe ask Backpage's acquiring banks to terminate their merchant agreements with Backpage.

Court highlighted and relied upon the factual finding that the book distributor was compelled by the Commission's threat to involuntarily comply with its directive; Backpage's insistence that the Court's focus on this fact was merely an idle "reference" is not persuasive.

The relevance of coercive effect as set forth in *Bantam Books* was highlighted in another case Backpage.com relies upon, *Penthouse Int'l, Ltd. v. McAuliffe*, 610 F.2d 1353, 1360 (5th Cir. 1980), in which the court noted: "The Supreme Court found that even though the distributors would violate no law if they refused to cooperate with the Commission, compliance with the directives was Not voluntary." In *McAuliffe*, the Fifth Circuit similarly concluded that "[i]t cannot be said that the retailers of the magazines in question 'voluntarily' removed the magazines from their shelves" because it resulted directly from a "calculated scheme of warrantless arrests and harassing visits to retailers." *Id.* at 1360. Likewise, the courts in *ACLU v. City of Pittsburgh*, 586 F. Supp. 417, 422 (W.D. Penn. 1984) and *Playboy Enterprises Inc. v. Meese*, 639 F. Supp. 581 (D.D.C. 1986), examined the voluntariness of third parties' decisions to take First-Amendment-protected materials out of circulation. In the first of these cases, the court relied on the plaintiff's proof by a preponderance of the evidence "that the distribution of a publication, which has not been judicially determined to be obscene, has been deterred by the Mayor's official pronouncements," specifically noting that "the vendors' compliance with Mayor Caliguiri's directives in this case was not voluntary." 639 F. Supp. at 422. In the *Playboy* case, the court also considered the issue of voluntariness when it noted the fact that "many of the decisions not to sell were made after [the defendant's] letters were sent out" in rejecting the argument that distributors voluntarily stopped selling the magazine. 639 F. Supp. at 585.

The Second Circuit cases that Backpage cites also support the view that only action involuntarily taken in response to a threat of official action would show a prior restraint. In

*Hammerhead Enterprises, Inc. v. Brezenoff*, 707 F.2d 33, 39 (2d Cir. 1983), which involved a campaign to stop retailers from selling an offensive board game, the court held that the challenged communication was not part of "an informal system of censorship" because it did not refer to "adverse consequences that might be suffered"; because the agency lacked authority to impose sanctions; and because "not a single store was influenced." The reasoning supports the view that a threat (a reference to "adverse consequences") that in fact influences conduct is required. In *Rattner v. Netburn*, 930 F.2d 204, 210 (2d Cir. 1991), the Court reversed the district court's finding that the challenged communication was not threatening or coercive because, in contrast to *Hammerhead*, "a threat was perceived and its impact was demonstrable." Again, therefore, the Court reasoned that a prior restraint is shown where there is a threat (there, a letter from a village trustee to a Chamber of Commerce publication criticizing an advertisement and intimating that the member businesses might be boycotted as a result) that caused the limitation of speech (the Chamber discontinued its newspaper). Backpage also cites *Okwedy*, but that case does not support the argument that voluntariness is irrelevant; indeed the opinion does not address the question of causation other than to recite the fact that the government official's letter caused the billboard owner to remove the signs to which the official objected. *See* 333 F.3d at 340.

Although addressing different factual contexts, Seventh Circuit case law also supports the view that there is no prior restraint unless a threat causes involuntary action. *Fairley v. Andrews*, 578 F.3d 518 (7th Cir. 2009) defines a prior restraint as "threatening penalties for future speech." *Id*. at 525. In order to actually recover for such a threat, however, the plaintiff must establish two more elements, and "[o]ne is proof of causation." *Id*. at 525. In *Fairley*, that meant that prison guards who were assaulted and threatened had to show it was because of their potential

testimony against the jail, not another reason. *Id*. *Surita v. Hyde*, 665 F.3d 860 (7th Cir. 2011) also addresses the issue of causation. In the relevant part of that case, objectors to a proposed local towing ordinance were threatened with assessment of a fee for a planned protest and a ban on future protests if they did not pay. The court held that because "a reasonable jury could find that prohibiting [plaintiff's] speech was the motivating, or even but-for, cause of [the] threats," the plaintiff's claim survived summary judgment. However, if the objector's speech was chilled for another reason—the evidence suggested that perhaps she voluntarily was not planning a rally for the date in question—then she would have no damages ensuing from the threats, and her claim would fail. *See id*. at 879. And, finally, in *Henderson v. Huibregtse,* 281 Fed. App'x 577 (7th Cir. 2008), the Seventh Circuit again addressed the question of causation where a prison inmate sued over a newspaper's refusal to supply his subscription. The court held that an advisory city resolution urging the publisher to prohibit sales to inmates was not a prior restraint because in addition to lacking a "threat," he could not establish that the resolution had coercive effect on the publisher. *Id*. at 580-81. Because the publisher, of its own volition, did not want to sell subscriptions to inmates, there was no restraint caused by the government action.

In light of this precedent, Backpage cannot credibly contend that it is "irrelevant" that Visa and Mastercard, much like the newspaper in *Henderson* vis-à-vis prisoners, simply did not want to do business with a website where advertisers peddle flesh. Once a threat is established, the plaintiff must further prove that the threat restrained speech. If something other than the government's threat caused the restraint, then the plaintiff's case fails. And in this case, in contrast to the cases on which Backpage relies, there is abundant affirmative evidence of

voluntary action by the credit card companies to dissociate themselves from Backpage's seedy offerings.[9]

To be clear: the Court does not doubt that Dart's ***letter*** caused action by Visa and MasterCard, or at least the timing of that action. But the letter was primarily information and advocacy, at most obliquely hinting that some official sanction might result from inaction, and so cannot be wholly equated with whatever implicit threat of government sanction it also contained. The record to date, which includes no contradictory evidence from Backpage, amply establishes that the credit card companies caused the termination of their agreements with the website voluntarily and not because they were coerced by threats from Dart. Based on that evidence, there is no basis to infer that the response of the credit card companies to Dart's letters would have been any different had they not contained the language to which Backpage points as carrying coercive import. There is, therefore, no basis to conclude that the threat of official action caused any restraint on speech.

Dart's actions cannot be deemed "informal censorship" to the extent that the credit card companies made a rational business decision that is in keeping with clear policies to protect their brands from reputational harm. And only censorship, albeit informal—the "restraint" part of "prior restraint"—is prohibited by the First Amendment. *See Blue Canary Corp. v. City of Milwaukee*, 251 F.3d 1121, 1123 (7th Cir. 2001) ("By 'prior restraint' Blackstone and modern courts alike mean censorship—an effort by administrative methods to prevent the dissemination of ideas or opinions thought dangerous or offensive."). No matter what Dart's methods, if his threat did not coerce the companies' actions—and the evidence suggests it did not—he cannot be liable for censoring the content on Backpage.com.

---

[9] The evidence presented regarding the contents of ads appearing in the adult services portion of the web site warrant this description.

*Bantam Books* and the other cases relied upon Backpage simply do not address the situation before this Court, where there is affirmative evidence, not just the defendant's conjecture, that the third parties upon whom the government official prevailed acted voluntarily for reasons independent of any threat. Backpage wants the Court simply to ignore this evidence, but none of its cited authorities imposes liability for a prior restraint in the face of evidence that the public official's action did not cause the subsequent curtailment of expression. Because no evidence has been presented to establish that credit card companies acted out of concern that Dart would initiate, or cause to be initiated, any enforcement proceedings or other legal action against them, the Court concludes, on this record, that Backpage's likelihood of success on the merits is nil.

Even if Backpage were correct, and it was not required to show that Dart's alleged threats had any coercive effect, the decision by the companies to terminate their relationships with Backpage because of the illegal and brand-damaging activity taking place in the adult section of Backpage.com is nevertheless relevant to show that injunctive relief is not appropriate here. To establish its standing to seek an injunction, Backpage must show that: (1) it is under threat of an actual and imminent injury in fact; (2) there is a causal relation between that injury and the conduct to be enjoined; and (3) it is likely, rather than speculative or hypothetical, that a favorable judicial decision will prevent or redress that injury. *Schirmer v. Nagode*, 621 F.3d 581, 585 (7th Cir. 2010). The Court's prior order explained why Backpage's injury in fact is established, but left open the questions of causation and redressability. Order, Dkt. # 29 at 4 n.4 (July 25, 2015). The absence of evidence that any implicit threat in Dart's letters caused the credit card companies to act could call into question whether Backpage has shown a sufficient causal connection even to establish standing (much less to establish a substantive violation of the

First Amendment), but there is a causal connection, at least in the but-for sense, that is sufficient to satisfy the requirement of an injury "fairly traceable" to the defendant's *letter*, if not specifically to any objectionable statements in the letter, though it was the credit card companies' actions that proximately caused the injury. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1391 n.6 (2014) ("Proximate causation is not a requirement of Article III standing, which requires only that the plaintiff's injury be fairly traceable to the defendant's conduct."). Success on the merits requires a higher threshold of causation, sufficient to establish not just a link between the injury and *some* conduct by the defendant, but a causal connection between the injury and the claimed threat of official action.

Redressability, however, is very much in doubt in light of the evidence now before the Court. Even though Dart's letters precipitated their speedy action, there is evidence that the credit card companies ceased doing business with Backpage.com because they did not want their products to be associated with the content posted there. Therefore, the Court's preliminary statement in the TRO order that the credit card companies might reprise the relationship if they knew Dart could not legally coerce them to stay away from Backpage now appears to be unwarranted. At the very least, Backpage has provided no evidence in support of the proposition.

Indeed, there is no way to know how the credit card companies would proceed if informed that Dart had acted unlawfully in threatening them. And that alone is enough to defeat the claim for injunctive relief; "such speculation is not enough to turn this into a case and controversy with a redressable injury." *Cabral v. City of Evansville, Ind.*, 759 F.3d 639, 642-43 (7th Cir. 2014) (citing *ASARCO, Inc. v. Kadish*, 490 U.S. 605, 615 (1989)). It is Backpage's burden to produce proof that an injunction would produce a favorable outcome to its injury, but

it produced nothing whatsoever to support the element of redressability.[10] *See Cabral*, 759 F.3d at 643. Backpage's assumption that a retraction from Dart, or a requirement that Dart send the companies a copy of this Court's opinion (assuming it were favorable regarding Backpage's First Amendment argument), would change the current state of affairs is, as far as the record shows, pure and unwarranted speculation. So, too, any inference that any other payment processor would be coerced by concern that Dart would take any official sanction against them—particularly now that Dart has publicly disavowed any intention or ability to do so. The evidence that the credit card companies caused the acquiring banks to terminate their agreements with Backpage for independent business reasons leaves no reason to believe that removing the specter of government sanction from Dart's anti-trafficking advocacy would alter the behavior of American Express, MasterCard, Visa, or any other comparable payment processor.

Because Backpage has failed to establish a causal link between the companies' actions and Dart's threats, it is unlikely to prevail on the merits of its claim that Dart imposed an informal prior restraint on speech published on Backpage.com.

*B. Irreparable Harm*

Perhaps assuming that the emergency showing made in support of the TRO sufficed to establish irreparable harm, Backpage has done little to support this required element. While it seems quite reasonable to infer that Backpage has sustained financial losses as a result of the withdrawal by the credit card companies, it is also clear that no irreparable harm—either to Backpage or to its customers—has yet occurred. Backpage remains in business, and more rather than fewer ads have been placed since the acquiring banks dropped Backpage. This spike is

[10] Of course, redressability is an element of standing to seek an injunction, not damages. Standing is evaluated separately for each form of relief requested, *see Summers v. Earth Island Institute*, 555 U.S. 488, 493 (2009), and Backpage's standing to seek damages is not at issue here.

likely attributable to the fact that Backpage made its ads free, however, and no company can expect to continue to operate without a source of revenue. But Backpage has failed to supplement the evidentiary record with any further evidence of the financial impact of the deauthorization by the credit card companies, or the lack of success of alternative methods of arranging payments by its customers (such as through Bitcoin or other private payment services, or by arrangements to facilitate payments by "Backpage credits" purchased with checks, money orders, or cash).

Thus, whether the financial losses that Backpage sustains while grappling with the withdrawal of credit card processors will result in Backpage's demise has not yet been established. That may well be the result, but the evidence that Backpage has adduced to date—which consists entirely and only of a statement by its CEO that the action by the credit card companies has "cut off nearly all revenue to Backpage.com"—does not establish that it is more probable than not that Backpage will be *irreparably* harmed—that is, that it will be forced to shut down before a claim for damages could be resolved. In that regard, NCMEC has reported that "Backpage executives have told NCMEC that they charge for escort ads only because law enforcement asked them to do so"—thus seemingly disavowing any claim that the revenue from adult services advertising is critical to its survival. *See* Brief of *Amicus Curiae* NCMEC in *J.S. et al. v. Village Voice Media Holdings, L.L.C.,* d/b/a *Backpage.com,* No. 4492-02-II (Supreme Court of Washington), Def. Ex. 6, at 11. Plainly, there are prominent examples of companies that operate web-based classified advertising services that do not depend on payments for ads for "adult services," whether those services be lawful or unlawful. The undisputed evidence, for example, indicates that the largest such business, Craigslist.com, eliminated its adult services advertising in 2010 and remains the leading classified advertising website. Furthermore, given

the continued availability of the forum and no evidence that collapse is imminent, Backpage has not shown any irreparable impact on the expressive rights of its users.

Only speculation and conjecture support Backpage's argument that an injunction is required to prevent irreparable harm. It has failed to set forth evidence that its business, and a forum for speech, will disappear without preliminary injunctive relief.

*C. Balance of Harms and Public Interest*

Even if it could be said on this record that there were some small chance that a jury could find that the card companies acted as a result of a threat implicit in Dart's letter, and even if the credit card companies were likely to reprise their relationship with Backpage if injunctive relief were granted, Backpage's request for a preliminary injunction would still fall short. The sliding scale provides that "the greater the likelihood of success on the merits, the less heavily the balance of harms must tip in the moving party's favor," *Korte v. Sebelius*, 735 F.3d 654, 665 (7th Cir. 2013), whereas "a lesser likelihood of success can be made sufficient by a greater predominance of the balance of harms," *AM General Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 804 (7th Cir. 2002). With its small likelihood of success on the merits, then, Backpage must establish that the balance of harms in this falls decisively on its side. It has failed to make this showing. Notwithstanding the fact that loss of any First Amendment right injures the public, the countervailing weight of the public's interest in preventing human trafficking and its associated criminal activity is also substantial.

Although neither party has presented definitive evidence on this point to date, the uncontroverted evidence that has been presented establishes, at least, that a large percentage of the ads in the adult services portion of the Backpage.com website are ads for prostitution and further, that these prostitution ads are connected to human trafficking. There is no First

Amendment interest in that material, and whatever other speech exists in the adult section is not a matter of record. Indeed, Backpage argues only that it cannot be assumed, *a priori*, that all ads in the adult services are for unlawful activity. That is true enough, and the Court is willing to assume that some portion of the ads appearing in that section at a given time offer lawful services.[11] Furthermore, Visa and MasterCard now cannot be used on any part of Backpage.com, and it is undisputed that much of the content posted outside the "adult" section is lawful, and therefore protected, speech. Official action that results in the elimination of a forum for that lawful speech (assuming, contrary to the Court's conclusion, that a case had been made in that regard) would therefore inflict harm upon the public. *Smith v. Exec. Dir. of Ind. War Memorials Com'n*, 742 F.3d 282, 286 (7th Cir. 2014) ("[R]estrictions on speech are generally understood not to be in the public interest."). The only other harm Backpage alleges is its loss of revenue. This is not a minor concern, but it is much more relevant to the issues of damages than to Backpage's request for an injunction. Moreover, Backpage presented no evidence as to how much revenue from lawful activity, as opposed its total revenue, is in jeopardy.

Although the interest of speakers and the public generally in preventing the suppression of *any* lawful speech is significant, in this context that interest can be found on both sides of the scale. As noted previously, the Sheriff's own First Amendment rights are at stake in this case and the Court must therefore also consider the risk that erroneously entering an injunction would chill Dart's own right to speak out on issues of public concern. Sheriff Dart has a First

[11] For the record, the Court has not accepted the invitation issued by the Sheriff's counsel to peruse the Backpage.com adult services site on its own. Happily, it would be inappropriate for the Court to conduct its own *ex parte* investigation of the Backpage.com website in order to supplement the evidence presented by the parties. The Court's findings rely exclusively on the evidence of record that has been presented by the parties. As noted above, however, that record is sufficient to warrant the finding that a substantial majority of the ads appearing in that section are "exhortations to illegal conduct" unprotected by the First Amendment.

Amendment right to publicly criticize the credit card companies for any connection to illegal activity, as long as he stops short of threats. Therefore the Court must also account for the risk of improperly curtailing Dart's ability to engage in lawful advocacy. To this side of the scale must also be added the profound interests of the victims of the human trafficking that Backpage's advertising facilitates, including their safety, their dignity, and their very lives.[12] The facilitation of such trafficking and the other criminal activity with advertisements on Backpage's adult section harms those victims and also the public at large.

On this record, there is no clear basis to conclude that the balance of private and public harms favors Backpage's position or that of the Sheriff. The interests supported by both sides in this dispute are weighty and the scale does not, in the Court's view, tilt decisively in one direction or the other. Where Backpage has demonstrated little or no prospect for success on the merits, however, its failure to demonstrate that the balance of harms falls decisively in its favor provides further reason to conclude that preliminary injunctive relief is not appropriate.

* * *

For all of the reasons, Backpage has failed to meet its burden of establishing its entitlement to a preliminary injunction. The Court notes again, however, that this preliminary ruling is not dispositive of any factual issue in the case.

John J. Tharp, Jr.
United States District Judge

Date: August 24, 2015

[12] Whatever countervailing arguments could be hypothesized—for example, that online trafficking is safer for the enslaved adult or child victim than street prostitution, or that Backpage can be used as a tool by law enforcement officials—have not been supported with evidence by Backpage.

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| BACKPAGE.COM, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 15 C 06340 |
| v. | ) | |
| | ) | Judge John J. Tharp, Jr. |
| SHERIFF THOMAS J. DART, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

For the reasons explained more fully in the Statement below, the plaintiff's motion for temporary restraining order [4] is granted. A separate order shall issue setting forth the terms of the TRO. A status hearing is set July 28, 2015 at 9:00 a.m., for the purpose of scheduling a hearing on the motion for preliminary injunction. The motions for leave to appear pro hac vice [12], [13], [14], [15], [16] and motions to file oversized briefs [9], [19] are granted. ENTER TRO.

## STATEMENT

I. Background

Plaintiff Backpage.com, which operates a website devoted to online classified advertising, seeks to enjoin Cook County Sheriff Thomas Dart's extra-judicial, extra-legislative efforts to eliminate classified advertising for "adult" or "escort" services because, Dart maintains, those ads are largely, if not entirely, thinly disguised (and sometimes undisguised) solicitations for prostitution. And by facilitating the sex trade, Dart maintains, the ads also promote the human trafficking and exploitation of children that often accompany it. At issue in this case are letters Dart sent to the CEOs of Visa and Mastercard to "request" that they "cease and desist" allowing their credit cards "to be used to place ads on websites like Backpage.com, which we have objectively found to promote prostitution and facilitate online sex trafficking."

In the letters, Dart notes that he is "charged with eradicating such trafficking" in the Chicago area. He explains that Congress and the courts have been unhelpful in regulating sites such as Backpage.com but that other "institutions" have the "moral, social, and legal right" to address the problem. Dart invokes the credit cards' user and merchant "Terms of Use" that give the credit card companies the right to cancel or block transactions or activities that can impair the brand's reputation, and he then discusses the legal obligations of "financial institutions" to file Suspicious Activity Reports for suspected human trafficking and sexual exploitation of minors, and possible more (according to a federal prosecutor he quotes). An endnote points to federal statutes including the money laundering statute. Dart requests that each company provide "within

the next week" the contact information for a person with who he can work on "this issue." The letters are on official letterhead.

Within 48 hours of receiving the letters, both Visa and MasterCard elected to entirely disallow the use of their credit cards on all of Backpage.com, not just in its "adult" advertising section. Sheriff Dart declared victory, releasing a lengthy press statement touting his "demand" as the reason "Visa and MasterCard have agreed to stop processing payments" for Backpage. Dart "commends" the companies for "defunding this criminal enterprise."

Much of the advertising on Backpage is free, but it charges for posting ads for adult services, as well as across all categories for, among other things, recurrent ads and premium placement. With American Express having already terminated its services in April,[1] and Visa and MasterCard following suit in July, Backpage's primary revenue stream has been cut off. Backpage users can still pay for ads with Bitcoin, and Backpage also created a private system of "credits,"[2] but there is no credit card option available anymore. Before Dart's outreach, the companies had allowed their cards to be used on Backpage.com for 11 years. To prevent disruption to its customers, Backpage has stopped charging for ad placement, but it cannot remain in business long without its ad revenue.

Visa and MasterCard withdrew authorization for use of their credit cards at Backpage.com as a result of Dart's request. MasterCard's press statement stated that it severed ties with Backpage "based on a request from the Cook County Sheriff's office" that "confirmed" brand-damaging activities, and Visa explained that it had "received allegations from U.S. law enforcement that the merchant backpage.com is linked to child prostitution and human trafficking."

On July 22, Backpage filed suit against Dart, claiming his actions violate its rights of freedom of speech and due process. Backpage requested an immediate TRO to curtail any further efforts by Dart to put Backpage out of business, and ultimately an injunction that would require him to, among other things, retract his prior letters to the credit card companies and inform them of any court decision to the effect that his "requests" had been unlawful.

In support of its complaint, Backpage attached Dart's press release and copies of the letters to Visa and MasterCard, all of which are now part of the pleadings for all purposes. In support of the TRO motion, Backpage submitted an affidavit from its CEO, Carl Ferrer, and numerous exhibits that document longstanding efforts by Dart to force or pressure Backpage.com and Craigslist.com to abandon their "adult" classifieds, through lawsuits, lobbying, and public pressure. Among other points, Ferrer attests that credit card companies' withdrawal has "cut off nearly all revenue to Backpage.com" across its entire website, including "ads for dating, housing, services, trades, and sales of goods." Backpage has also put into evidence the record of its own history of interactions with Sheriff Dart, including attempts to cooperate with him, as well as Dart's public statements about Backpage and other providers of

---

[1] It is not clear on the current record that American Express was also lobbied by Dart, although Backpage apparently believes that it was.

[2] The credits could be purchased with payments sent through the mail. However, Sheriff Dart also has written to the Chief Postal Inspector asking him to use "all available means" to prevent the postal service from being used "for sex trafficking via Backpage.com."

online classified advertising. In one media report, a spokesman for Dart states (with apparent satisfaction) that Backpage knows its "business model is on the brink of destruction" and is "gasping for air."

The Sheriff has moved to dismiss Backpage's complaint and also filed a brief in opposition to the TRO request. Dart has not submitted any evidence. The Court heard the parties' oral arguments on July 23, 2015.

II. Discussion

To obtain a TRO or a preliminary injunction, the moving party must demonstrate that it has no adequate remedy at law, that it will suffer irreparable harm relief is denied, and that it has some likelihood of success on the merits. *See Ezell v. City of Chicago*, 651 F.3d 684, 694 (7th Cir. 2011). "If the moving party meets these threshold requirements, the district court weighs the factors against one another, assessing whether the balance of harms favors the moving party or whether the harm to the nonmoving party or the public is sufficiently weighty that the injunction should be denied." *Id.* "These considerations are interdependent: the greater the likelihood of success on the merits, the less net harm the injunction must prevent in order for preliminary relief to be warranted." *Judge v. Quinn*, 612 F.3d 537, 546 (7th Cir.2010).

In arguing that it is likely to succeed on the merits, Backpage contends that Dart's actions constitute precisely the type of informal prior restraint condemned as a First Amendment violation in *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963).[3] In that case, the Supreme Court held that the informal but coercive notices (often followed up with visits from police officers) sent to distributors of books deemed "objectionable" by a state commission amounted to a system of informal censorship violated the First Amendment rights of the publishers who sued to stop the interference.

On the other hand, Dart vigorously disputes Backpage's likelihood of success on the merits. Dart argues, *inter alia*: (1) Backpage has no First Amendment interest of its own at stake and therefore no standing; (2) there is no First Amendment protection for the content at issue; and (3) Dart did not threaten the credit card companies and therefore the *Bantam Books* line of cases is not applicable to his conduct.

As a threshold matter, there is no "standing" impediment to Backpage's First Amendment claim. It is well settled that traditional notions of third party standing are relaxed in the First Amendment context. *See Sec of St. of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 956 (1984). Backpage may stand in the shoes of its users in seeking relief from the burden placed on their freedom of speech as a result of not being able to use credit cards to access Backpage's forum. Here, Backpage meets the "relaxed" third-party standing requirements because its Backpage's commercial injury gives it "sufficient injury-in-fact to satisfy the Article III case-or-controversy requirement" and it can "reasonably be expected properly to frame the issues and present them with the necessary adversarial zeal." *Id.* at 956. In addition, Backpage's own status as, in essence, a publisher (it does not create any content) gives it a direct First Amendment injury. *See Bantam*, 372 U.S. at 64 n.6 (publishers suffered First Amendment injury even though

[3] The Court does not find it necessary to evaluate Backpage's separate due-process claim at this time.

cease-and-desist notices were sent only to distributors); *Drive In Theatres, Inc. v. Huskey*, 435 F.3d 228, 229 (4th Cir. 1970) (allowing, without specifically discussing standing, the claim of theater owner injured with loss of business as a result of ban on adult-rated movies).[4]

Nor does the Court accept Dart's argument that standing is lacking because there is no protected First Amendment interest at stake here at all. Clearly First Amendment protection does not extend to exhortations to illegal conduct— Dart's stated concern. *E.g., United States v. Williams*, 553 U.S. 285, 297 (2008) ("Offers to engage in illegal transactions are categorically excluded from First Amendment protection."). But here, there is no dispute that *all* of the advertisements on Backpage.com are affected; Backpage cannot collect its normal fees for even the most benign advertisements, and therefore will be unable to host any when the money runs out. Given that Dart sought to "defund" Backpage, not just shut down its adult sections, based wholly on the content[5] of some ads, Dart cannot maintain that the First Amendment is not implicated by his actions, even if he were correct that none of Backpage's "escort ads" themselves are protected. (The Court need not decide.)

The only remaining question with respect to the plaintiff's likelihood of success on the merits is whether Backpage will be able to establish a First Amendment violation—that is, whether Dart's actions are the type of informal prior restraint that the *Bantam Books* line of cases prohibits. And, as the parties' oral arguments made clear, that involves two main questions: (1) whether Dart's letter constitutes a threat, and (2) whether the credit card companies involuntarily withdrew business from Backpage. The plaintiff has a better than negligible—but not certain—chance of proving that both answers are "yes."

The threat at issue in *Bantam Books* came from Rhode Island's Commission to Encourage Morality in Youth, which had no direct authority to prosecute or impose sanctions on the distributors it entreated to stop circulating certain books. Despite simply requesting "cooperation" from book distributors, the Commission's actions effectively suppressed the circulation of the objectionable books entirely because of the Commission's official status, its coercive language, and its practice of sending police to follow up with the distributors. As the Supreme Court explained, "though the Commission is limited to informal sanctions—the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation—the record amply demonstrates that the Commission deliberately set about to achieve the suppression of publications deemed 'objectionable' and succeeded in its aim." 372 F.3d at 67.

---

[4] As to the additional Article III requirements of causation and redressability, *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992), both have been alleged but cannot be resolved absent further evidence regarding the credit card companies. The letters likely were a but-for cause of the terminations (the companies said as much), and although the Court cannot un-ring that bell with an injunction, at this point the TRO request is limited to stopping Dart from any further defunding efforts. Redressability with respect to Visa and MasterCard can be set aside for now. However, it is at least possible that the credit card companies would reprise their business relationships with Backpage if Dart's actions were pronounced unconstitutional after a merits ruling. Backpage is not the only player with a financial interest in the outcome.

[5] As Backpage notes, Dart's judgment that the escort ads are illegal—and therefore not protected by the First Amendment—was not tested with due process or subjected to any oversight because of the informal channels through which he censored them.

The same principle applies in this case. Dart did not directly threaten the companies with an investigation or prosecution. But by writing in his official capacity on Sheriff's Department letterhead, requesting a "cease and desist," invoking the legal obligations of "financial institutions" to cooperate with law enforcement, and requiring ongoing contact with the companies, among other things, it could reasonably be inferred that Dart brought the weight of his office to bear on his "request" that the companies stop their association with Backpage altogether. And even if it is true that Dart has no jurisdiction over the credit card companies,[6] he could certainly refer an investigation to the appropriate authority. *See Okwedy v. Molinari*, 333 F.3d 339, 344 (2003) (2d Cir. 2003) Moreover, the credit card companies were not privy to Dart's candid admission when they read the letters and acted accordingly.

Another potential distinguishing feature of *Bantam Books* is the clear finding in that case that the book distributed had not cooperated voluntarily with the Commission's request to stop circulating certain titles. Here, Dart contends that any action by the credit card companies was wholly voluntary. But for purposes of a TRO, enough signs point in the other direction. These companies had worked with Backpage for more than a decade, and they terminated their relationships because of Dart's letters. The Court cannot state as a matter of law that the letters were not a threat. *See Okwedy*, 333 F.3d at 344 ("intent" and "effect" of potentially threatening letter not resolvable on motion to dismiss). Whether Dart coerced the companies or simply educated them has not yet been definitively established, but given the timing of the withdrawals and the companies' public statements, at the very least it is clear on this record that the companies did not act spontaneously.

Accordingly, Backpage has established a more-than-negligible likelihood of success on the merits of its claim that Dart's informal lobbying of the credit card companies violated the First Amendment by imposing an informal prior restraint on the advertisements hosted by Backpage.com.

Backpage has also made a sufficient showing of irreparable harm. Although there are no figures in the record yet, Backpage's CEO has attested that the Backpage's entire business hangs in the balance. There is no dispute that revenue from ad sales is Backpage's lifeblood, and the drastic reduction in sales because Backpage cannot accept credit cards is enough of a commercial injury to constitute irreparable harm: damages will not suffice if the business goes under. Moreover, there is the already discussed First Amendment injury incurred by the users and by Backpage as the "publisher"; free-speech injuries are irreparable almost by definition. *See, e.g., Nuxoll ex rel. Nuxoll v. Indian Prairie School Dist. # 204*, 523 F.3d 668, 669 (7th Cir. 2008) (citing, *inter alia*, *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). In the short term, when Backpage is hosting advertisements for free, there is not yet a noticeable chilling effect. But the whole forum is jeopardy of disappearing. The inquiry is not whether the injury has already occurred, but whether irreparable harm will be suffered without a TRO. Enough of a showing has been made.

---

[6] When the merits of this case are resolved, Backpage will have to contend with the Sheriff's candid, and somewhat surprising, admission on the record that there is no investigatory or prosecutorial action within his jurisdiction that he could take vis-à-vis the credit card companies. The credibility of any purported "threat" would seem to be lessened by such an admission.

Finally, there is the balance of hardships and the public interest to consider. The hardships clearly weigh more heavily on the plaintiff and its users. Backpage's business is imperiled, and the users are in imminent jeopardy of losing a forum for protected (as well as unprotected) speech. Sheriff Dart has made no argument, and has provided no evidence, that prostitution, trafficking, and sexual exploitation of minors will be reduced significantly reduced by Backpage's demise; indeed, it appears that an oft-used tool for identifying lawbreakers (by Dart and other law enforcement agencies) will be lost if Backpage were to fold. Dart makes no claim of harm from a TRO. As for the public interest, Dart contends that public interest is best served right now because "the public is able to use Backpage.com for free." Curious as it is for Dart to equate the public interest with *more* access to Backpage.com, the argument is specious, for the record suggests that Backpage is in jeopardy of going under as a result of Dart's tactics.

The Court makes no judgment as to the merits of Backpage's claims, and any factual findings it has made are preliminary only and not binding in any proceedings on the merits. *See Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765, 782 (7th Cir. 2011). Backpage is entitled to a TRO to enjoin any further efforts by to "defund" its business until a full hearing can be held on its request for preliminary injunction.

Entered: July 24, 2015

John J. Tharp, Jr.
United States District Judge