No. 15-3047

## UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

| | |
|---|---|
| BACKPAGE.COM, LLC, | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division |
| Plaintiff-Appellant, | |
| v. | |
| THOMAS J. DART, Sheriff of Cook County, Illinois, | No. 15 cv 06340 |
| Defendant-Appellee. | The Honorable John J. Tharp, Jr. Judge Presiding |

## BRIEF OF DEFENDANT-APPELLEE, SHERIFF THOMAS J. DART

**ANITA ALVAREZ**
STATE'S ATTORNEY OF COOK COUNTY
Cook County State's Attorney's Office
500 Richard J. Daley Center
Chicago, Illinois 60602
(312) 603-5365
*Attorney for Defendant-Appellee,*
Thomas J. Dart, Sheriff of Cook County

**Donald J. Pechous**
Assistant State's Attorney
Acting Chief, Civil Actions Bureau

**Kent S. Ray**
**Sisavanh Baker**
**Jill V. Ferrara**
Assistant State's Attorneys
        Of Counsel.

## ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................iii

JURISDICTIONAL STATEMENT ..................................................................... 1

ISSUES PRESENTED FOR REVIEW .............................................................. 1

STATEMENT OF THE CASE............................................................................. 2

I.      BACKPAGE.COM.................................................................................... 3

II.     COOK COUNTY SHERIFF TOM DART.............................................. 5

III.    SHERIFF DART'S LETTERS. ............................................................... 6

IV.     CREDIT CARD COMPANIES STOP DOING BUSINESS WITH
        BACKPAGE............................................................................................. 7

        A.      American Express ....................................................................... 7

        B.      The Relationship of MasterCard and Visa with Acquiring Banks......... 8

        C.      MasterCard................................................................................... 9

        D.      Visa ............................................................................................... 9

V.      PRELIMINARY INJUNCTION HEARING AND RULING. ......................... 10

SUMMARY OF ARGUMENT ......................................................................... 13

ARGUMENT ...................................................................................................... 14

I.      STANDARD OF REVIEW .................................................................... 14

II.     THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN
        CONCLUDING THAT BACKPAGE WAS UNLIKELY TO PREVAIL
        ON THE MERITS WHERE SHERIFF DART'S ACTIONS DID NOT
        AMOUNT TO INFORMAL CENSORSHIP IN VIOLATION OF THE
        *BANTAM BOOKS* LINE OF CASES. ................................................... 15

        A.      The Findings of Fact Are Supported By the Record. ........................... 15

B. The District Court Properly Recognized that Sheriff Dart Retains His Own First Amendment Rights to Speak Out About Matters of Public Concern and Therefore Has the Right to Criticize Illegal Activity. ...................................................... 16

C. In Applying *Bantam Books* and Other Governing Authority, the District Court Concluded that Any Implied Threat Sheriff Dart's Letter Could Have Contained Did Not Constitute a Prior Restraint Where the Credit Card Companies Voluntarily Withdrew their Services...................................................... 19

D. The District Court's Findings Support the Denial of the Preliminary Injunction...................................................... 22

E. The District Court Applied the Proper First Amendment Analysis. ...................................................... 23

III. THE DISTRICT COURT PROPERLY CONCLUDED THAT BACKPAGE LACKS AN IRREPARABLE INJURY IN THE ABSENCE OF A PRELIMINARY INJUNCTION...................................................... 27

IV. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN HOLDING THAT THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST DISFAVOR A PRELIMINARY INJUNCTION. ...................................................... 31

V. BACKPAGE'S ARGUMENT THAT VISA AND MASTERCARD ARE "STATE ACTORS" IS BOTH WAIVED AND UNSUPPORTABLE...................................................... 34

VI. BACKPAGE LACKS STANDING. ...................................................... 38

CONCLUSION...................................................... 41

CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 32 ...................................................... 42

CERTIFICATE OF COMPLIANCE WITH SEVENTH CIRCUIT RULE 31(e)........ 43

CERTIFICATE OF SERVICE...................................................... 44

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACLU v. City of Pittsburgh,*
    586 F. Supp. 417 (W.D. Pa. 1984)................................................................20, 21

*Air Line Pilots Association, Int'l v. Dept. of Aviation,*
    45 F.3d 1144 (7th Cir. 1995).......................................................................36, 38

*AM General Corp. v. Daimler Chrysler Corp.,*
    311 F.3d 796 (7th Cir. 2002).............................................................................31

*Am. Family Ass'n Inc. v. City and County of San Francisco,*
    277 F. 3d 1114 (9th Cir. 2002) ..............................................................16, 17, 18

*Am. Hospital Assn., v. Harris,*
    625 F.2d 1328 (7th Cir. 1980)...........................................................................28

*Anderson v. City of Bessemer City,*
    470 U.S. 564 (1985) ....................................................................................14, 15

*Blum v. Yaretsky,*
    457 U.S. 991 (1982)...................................................................................36, 37

*Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n,*
    531 U.S. 288 (2001) ..................................................................................36, 38

*Cabral v. City of Evansville,*
    759 F.3d 639 (7th Cir. 2014)........................................................................39, 40

*Carlin Communications v. Mountain States Telephone and
    Telephone Company,*
    827 F.2d 1291 (9th Cir. 1987)...........................................................................38

*Centurion Reinsurance Co. v. Singer,*
    810 F.2d 140 (7th Cir. 1987)..............................................................................14

*Cunningham v. Southlake Ctr. For Mental Health, Inc.,*
    924 F.2d 106 (7th Cir. 1991).............................................................................37

*Econ. Folding Box Corp. v. Anchor Frozen Foods Corp.,*
    515 F.3d 718 (7th Cir. 2008).............................................................................34

*Escobar v. Holder,*
657 F.3d 537 (7th Cir. 2011) ...................................................... 34

*Ezell v. City of Chicago,*
651 F.3d 684 (7th Cir. 2011) ...................................................... 15

*Fairley v. Andrews,*
578 F.3d 518 (7th Cir. 2009) ..................................................... 23

*FW/PBS, Inc. v. Dallas,*
493 U.S. 215 (1990) ................................................................. 39

*Garcetti v. Ceballos,*
547 U.S. 410 (2006) ................................................................. 17

*Goodman v. Illinois Dep't of Fin. & Prof'l Regulation,*
430 F.3d 432 (7th Cir. 2005) ..................................................... 15

*Greene v. Doruff,*
660 F.3d 975 (7th Cir. 2011) ..................................................... 23

*Henderson v. Huibregtse,*
281 F. App'x 557 (7th Cir. 2008) ............................................... 19

*In re A&F Enterprises, Inc. II,*
742 F.3d 763 (7th Cir. 2014) ..................................................... 29

*India Breweries, Inc. v. Miller Brewing Co.,*
612 F.3d 651 (7th Cir. 2010) ..................................................... 34

*Jackson v. Metro. Edison Co.,*
419 U.S. 345 (1974) ................................................................. 37

*Korte v. Sebelius,*
735 F.3d 654 (7th Cir. 2013) ..................................................... 31

*Lawson Products, Inc. v. Avnet, Inc.,*
782 F.2d 1429 (7th Cir. 1986) .............................................. 14, 27

*Libertyville Datsun Sales, Inc. v. Nissan Motor Corp.,*
776 F.2d 735 (7th Cir. 1985) ..................................................... 35

*Los Angeles v. Lyons,*
461 U.S. 95 (1983) ................................................................. 39

*Lugar v. Edmondson Oil Co., Inc.,*
457 U.S. 922 (1982) ........................................................... 36

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992) ...................................................... 39, 40

*Mazurek v. Armstrong,*
520 U.S. 968 (1997) ........................................................... 15

*McLaughlin v. Watson,*
271 F.3d 566 (3d Cir. 2001) ......................................... 17, 19

*Milligan v. Bd. of Trustees of S. Illinois Univ.,*
686 F.3d 378 (7th Cir. 2012) .............................................. 35

*Morales v. Trans World Airlines,*
504 U.S. 374 (1992) ........................................................... 15

*Penthouse Int'l, Ltd. v. Meese,*
939 F.2d 1011 (D.C. Cir. 1991) .............................. 17, 18, 20

*Perry v. Chi. Housing Auth.,*
791 F.3d 788 (7th Cir. 2015). ............................................. 38

*Peterson v. City of Greenville,*
373 U.S. 244 (1963) ........................................................... 38

*Planned Parenthood of Ind., Inc. v. Comm'r of
the Ind. State Dep't of Health,*
699 F.3d 962 (7th Cir. 2012) .............................................. 30

*Playboy Enterprises Inc. v. Meese,*
639 F. Supp. 581 (D.D.C. 1986) ......................................... 21

*R.C. Maxwell Co. v. Borough of New Hope,*
735 F.2d 85 (3d Cir. 1984) ......................................... 17, 18

*Reed v. Town of Gilbert,*
135 S. Ct. 2218 (2015) ....................................................... 26

*Simon v. E. Ky. Welfare Rights Org.,*
426 U.S. 26 (1976) ............................................................. 40

*Spiegla v. Hull,*
371 F.3d 928 (7th Cir. 2004) .............................................. 23

**Page(s)**

*St. Mary's Medical Center, Inc. v. Disco Aluminum Products Co.,*
 969 F.2d 585 (7th Cir. 1992) ...................................................................... 14

*Stuller, Inc. v. Steak N Shake Enters., Inc.,*
 695 F.3d 676 (7th Cir. 2012) ................................................................ 29, 30

*Suarez Corp. Indus. v. Rodd,*
 202 F.3d 676 (4th Cir. 2000) ................................................................ 17, 32

*Surita v. Hyde,*
 665 F.3d 860 (7th Cir. 2011) ................................................................ 23, 24

*Swanson v. City of Chortek,*
 719 F.3d 780 (7th Cir. 2013) ...................................................................... 39

*United States v. Hays,*
 515 U.S. 737 (1995) .................................................................................... 39

*Univ. of Notre Dame v. Burwell,*
 786 F.3d 606 (7th Cir. 2015) ...................................................................... 25

*Wade v. Byles,*
 83 F.3d 902 (7th Cir. 1996) ........................................................................ 35

*Winter v. Natural Resources Defense Council, Inc.,*
 555 U.S. 7 (2008) ............................................................................ 27, 31, 32

*X-Men Sec., Inc. v. Pataki,*
 196 F.3d 56 (2d Cir. 1999) ................................................................... 17, 18

**Statutes**

28 U.S.C. § 1292(a)(1) .................................................................................... 1

28 U.S.C. § 1331 ............................................................................................. 1

28 U.S.C. § 1343 ............................................................................................. 1

42 U.S.C. § 1983 ............................................................................................. 1

42 U.S.C. § 1988 ............................................................................................. 1

**Rules**

Fed. R. App. P. 4(a)(1)(A) .............................................................................. 1

**Other Authorities**

Wright, C., A. Miller, & M. Kane,
      Federal Practice and Procedure (2d ed. 1995) ................................................. 27

## JURISDICTIONAL STATEMENT

Appellant's Jurisdictional Statement is not complete and correct as stated. This action arises under the First and Fourteenth Amendments of the Constitution and 42 U.S.C. §§ 1983, 1988. The district court and this Court have federal question jurisdiction under 28 U.S.C. §§ 1331 and 1343. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1) to hear this appeal from the district court's August 21, 2015 order denying a preliminary injunction. On September 17, 2015, Backpage.com timely filed a notice of appeal under Fed. R. App. P. 4(a)(1)(A). However, as set forth herein, Backpage omits that it lacks standing under Article III because its asserted injury is not causally connected to the conduct complained of and cannot be redressed by a favorable decision.

## ISSUES PRESENTED FOR REVIEW

This appeal concerns whether the district court properly denied a preliminary injunction where it found that Backpage did not establish that Sheriff Dart's actions of sending a letter to credit card companies requesting them to terminate their services from the adult section of Backpage.com amounted to informal censorship in violation of the *Bantam Books* line of cases. Specifically, the issues presented on review include:

I.      Whether the district court properly held that Backpage was unlikely to succeed on the merits of its First and Fourteenth Amendment claims where the district court concluded that any perceived threat Sheriff Dart's letters may have contained did not cause the credit card companies' action terminating their services.

II.     Whether the district court erred in holding that Backpage failed to establish irreparable harm absent the entry of a preliminary injunction.

III.     Whether the district court abused its discretion in holding that the balance of equities and the public interest disfavor entry of a preliminary injunction in light of the fact that Backpage is unlikely to succeed on the merits.

**STATEMENT OF THE CASE**

Backpage.com ("Backpage") seeks review of the district court's denial of its motion for a preliminary injunction. Below Backpage claimed that two multi-billion dollar global corporations, Visa, Inc. ("Visa") and MasterCard, were coerced to cease processing Backpage credit card transactions by a single letter from Sheriff Dart, who admits that he has no enforcement authority over these companies. Discovery in this case has shown Backpage's assertion to be false. The adult section on Backpage.com overwhelmingly contains advertisements for prostitution, including the prostitution of minors. As a result, American Express ("Amex") had independently severed ties with Backpage's adult services section before Sheriff Dart sent his letters. MasterCard was already investigating Backpage and determined that it would take steps to discontinue its relationship with the site out of concern for its own brand image and reputation. Visa has provided sworn testimony in this case that, "At no point did Visa perceive Sheriff Dart to be threatening Visa with prosecution or any other official state action, nor did Visa base its decision [to cease doing business with Backpage] on any such threat." R. 52, Ex. 19 at ¶ 4. As a result, Backpage cannot prevail on the merits.

2

Further, it is undisputed that Backpage has no First Amendment right to exhort illegal conduct, which is the only conduct that Sheriff Dart has ever criticized. Moreover, the principal impact of MasterCard's and Visa's decisions is on Backpage's revenue from precisely such ads. Any minimal impact on revenues from legitimate ads, which still can be purchased with Amex and by a variety of other means, cannot overcome the countervailing equities of protecting innocent men, women and children who would continue to be exploited and trafficked via Backpage's adult section. Encouraging a forum that criminals use to market children and women in the sex trade is directly contrary to the public interest.

Based on Backpage's failure to establish these necessary elements for a preliminary injunction, the district court properly denied its motion for preliminary relief. Backpage filed the instant appeal.

## I. BACKPAGE.COM.

Children and women are sold for sex on Backpage every day. Backpage freely admits this. It has repeatedly acknowledged, including in this lawsuit, that each and every month, there are hundreds of instances where it appears that a minor is being advertised for sale for sex on its site. R. 1 at ¶ 25; R. 52, Ex. 17 at ¶¶ 20-23. Indeed, Backpage optimizes traffickers' ability to post ads by helping criminals modify ads to avoid police scrutiny and ignoring recommended improvements. R. 52, Ex. 17 at ¶¶ 22, 24-26, 31-33.

Backpage touts itself as assisting law enforcement in its efforts to stamp out child prostitution and human trafficking. R. 1 at ¶¶ 23–26. But law enforcement agencies across the country say that the opposite is true. They say that the most

often-used and successful means of connecting would-be purchasers of women and children for illegal sex to their victims is through Backpage. R. 52, Exs. 26-28, Boston P.D. Affidavit, ¶ 5 ("Backpage.com is the number one site in Boston for prostitution and sex trafficking."); Alameda County D.A. Affidavit, ¶ 8; Seattle P.D. Affidavit, ¶ 8. This is a lucrative business for Backpage. It makes tens of millions of dollars every year and is reported to be the leading website for advertising prostitution in the U.S., generating more than 70% of prostitution-advertising revenue on the Internet.[1]

That Backpage is consistently used for these illegal purposes has been noted not only by local law enforcement, but also by the National Association of Attorneys' General ("NAAG") and members of Congress. R. 52, Ex. 13. NAAG has repeatedly told Backpage that its so-called efforts to prevent the use of its platform for prostitution, including child prostitution, are entirely ineffective. *Id*. It has urged Backpage to close down the innocently-named "adult" section of its website to eliminate an easy tool for criminals to market and buy and sell women and children for sex. *See id.*

The National Center for Missing and Exploited Children ("NCMEC")[2] has had a similar experience. NCMEC reports that it has seen a 1,432% increase in

---

[1] *See* R. 52, Ex. 1, http://www.nytimes.com/2012/03/18/opinion/sunday/kristof-where-pimps-peddle-their-goods.html, citing Ex. 16, http://aimgroup.com/2012/02/24/sites-set-combined-record-for-online-prostitution-ad-revenue/.

[2] NCMEC serves as the national clearinghouse for families, victims, private industry, law enforcement, and other professionals on information related to missing and exploited children. NCMEC assists law enforcement and others in reducing child sexual exploitation,

reports of suspected child sex trafficking over the past five years.  R. 52, Ex. 17 at ¶ 12.  Of the child sex trafficking reports submitted by the public to NCMEC's CyberTipline, the majority relate to Backpage ads.  *Id*. at ¶ 13.  NCMEC has repeatedly asked Backpage to make modest changes to its site to make it harder for sex traffickers to use—all to no avail.  *Id*. at ¶¶ 28-33.

Even worse, Backpage sometimes keeps ads up on its site even when it has been told they reflect possible child sex trafficking.  R. 52, Ex. 17 at ¶ 12.  By doing so, Backpage enables criminals to continue purchasing children for rape and other sexual exploitation.  *Id*.  Some child victims have brought suits against Backpage, detailing how "pimps" sold them to be raped hundreds of times a year by "johns" who bought them through Backpage.  R. 52, Ex. 15. However, Backpage has repeatedly succeeded in having those cases dismissed—not because the facts alleged were untrue—but on legal standing grounds.  *See*, *e.g.*, R. 52, Ex. 14.

## II.    COOK COUNTY SHERIFF TOM DART.

For years, Sheriff Dart ("Sheriff Dart") or ("Dart") has worked against human trafficking, including prostitution and the sexual exploitation of women and children, in his capacity as the Sheriff of Cook County.  R. 65 at 15:24-16:24; 17:10-18:4; 18:20-20:16; 22:20-23:9; 24:24-25:3.  Sheriff Dart maintains the Vice and Special Operations Units of the Cook County Sheriff's Police, which actively pursue human trafficking cases.  *Id*. at 22:1-19.  These Units regularly conduct prostitution

---

preventing child victimization, and eliminating child sex trafficking and child pornography. (Ex. 17, NCMEC Aff. ¶¶ 2-10).

stings and demand suppression operations to apprehend "johns" who solicit sex and "pimps" who sell prostitutes. *Id.*

When Backpage began hosting "adult" ads, Sheriff Dart tried to work with Backpage to assist his efforts to curtail sex trafficking. R. 65 at 19:13-20:16; 20:18-25; 22:20-24:16; 24:24-25:3; 62:14-17. The Cook County Sheriff's Office ("CCSO") had numerous discussions with Backpage. *Id.* CCSO suggested that Backpage use additional methods of identifying the individuals who used Backpage for unlawful sex trafficking, including by requiring identification of ad purchasers through the use of credit cards. R. 6, Ex. K; R. 65 at 22:20-23:9. When Sheriff Dart learned that Backpage was not using robust credit card identification or any other effective means of prohibiting the use of its site for the sale of women and children for sex, he asked Backpage to take down the "adult" section of its website. R. 6, Ex. L.

In over 800 cases, Sheriff Dart's team has tested the legality of the "business" advertised in the adult section of Backpage, and *each and every time* has made an arrest for crimes ranging from prostitution to child trafficking.[3] R. 65 at 22:13-19; 30:21-31:8. Notably, Sheriff Dart's office has never arrested anyone in connection with an ad placed in a section other than the "adult" section of Backpage.

### III.   SHERIFF DART'S LETTERS.

On June 29, 2015, Sheriff Dart wrote letters to Visa and MasterCard, inviting them to look into how their cards were being used to facilitate sex

---

[3] Other police departments have had similar experiences. *See* R. 52, Ex. 28 at ¶ 7 (Seattle P.D. "has not once found that the individual posting or responding to one of our decoy ads in the adult section of Backpage.com was in fact seeking any type of innocent, legal activity.")

trafficking, and asking that they consider ceasing to do business with Backpage. R. 52, Exs. 3, 4. He noted that the companies already banned the use of their cards for certain gambling and marijuana transactions and asked them to consider the "cost to your image" of being associated with ads for sex trafficking. He also invited them to follow the example of Amex, which "decided to stop allowing its cards to be used to buy ads in the adult section of Backpage.com." *Id.*

The letters contain no threats; in fact, they do not identify any action Sheriff Dart might take. R. 65 at 33:15-23. Instead, Sheriff Dart invited the companies to become his partners "in the fight to help protect vulnerable and victimized women and children" and asked them to identify someone "that I can work with on this issue." R. 52, Exs. 3, 4; *see also* R. 65 at 33:24-34:2. On their face the letters pertain only to the "adult" section of the site.

## IV. CREDIT CARD COMPANIES STOP DOING BUSINESS WITH BACKPAGE.

### A. American Express

Unbeknownst to Sheriff Dart and his staff, in early 2015 (at the latest), Amex began evaluating whether it wanted to continue to be associated with Backpage, apparently concerned that Backpage facilitated illegal activities. R. 65 at 31:17-24. Backpage states that in April 2015, Amex told Backpage that it would no longer allow its cards to be used to post ads in the "adult" section of its site. R. 1 at ¶ 43; *see also* R. 65 at 31:17-24; 32:10-12; 36:21-25; 64:5-8; 239:14-240:11.[4] In June 2015,

---

[4] Notwithstanding this admission, Backpage alleged in its complaint that Amex's decision was based upon the actions of Sheriff Dart. *See* R. 1 at ¶43.

when Sheriff Dart learned of this decision, he wrote Amex to thank it for its leadership in the effort to stamp out the sex trafficking taking place through Backpage's adult ads. R. 52, Ex. 20. Amex continued to let its cards be used on the other, legitimate portions of Backpage. R. 52, Ex. 21. Sheriff Dart never raised any complaint or issue with Amex regarding that decision.

Undaunted, Backpage took advantage of a loophole to make an end-run around Amex's decision. Backpage allowed users to buy "credits" with Amex and use them to post adult ads. R. 65 at 118:12-119:3; 128:4-11; 128:22-129:1. When Amex learned of this, it insisted that Backpage honor its prior instruction, and requested that its card not be used in any way to purchase "adult" ads. R. 52, Ex. 6; *see also* R. 52, Ex. 22.

## B. The Relationship of MasterCard and Visa with Acquiring Banks

The relationship between merchants that accept credit cards and MasterCard and Visa is not a direct one. Neither MasterCard nor Visa issues credit cards, extends credit to customers, or contracts with "Merchants" like Backpage. MasterCard and Visa instead provide the technological payment process by which banks can provide credit and debit card services for *their* customers. Merchants contract directly with financial institutions for credit card services, not with MasterCard or Visa. These financial institutions, known as "Acquirers," initiate and maintain contracts with Merchants for the purpose of accepting and processing credit card transactions. Where, as here, a Merchant is removed as an active one, that decision is implemented by an "Acquirer" bank, and not MasterCard or Visa.

8

### C.  MasterCard

Again unbeknownst to Sheriff Dart, as far back as March 2015, MasterCard executives discussed the pressures they were receiving from stockholders and others to cease doing business with Backpage.  R. 52, Ex. 12; *see also* R. 65 at 39:24-40:5.  Stockholders threatened to write MasterCard CEO Ajay Banga and go to the media.  *Id*.  Internal meetings were scheduled to discuss this.  R. 52, Ex. 8. In mid-June MasterCard told an issuer bank in Liechtenstein that its continued association with Backpage could be brand damaging and a violation of MasterCard's rules.  R. 52, Ex. 9.  Accordingly, on June 23, 2015, Bank Frick advised that "the Bank's management has taken the decision to close down the account for Backpages.com" and would do so after providing notice of approximately thirty days. R. 52, Ex. 10; *see also* at R. 65 at 66:19-67:14; 98:4-20.

Approximately one week later, on June 29, 2015, MasterCard received the letter from Sheriff Dart advising it of Amex's prior actions regarding Backpage and alerting it to his concerns about sex trafficking occurring via the "adult" section of Backpage's site.  Joking that she thought "a sheriff's letter is, um, unusual," a MasterCard employee agreed that it provided an opportunity to carry out "Ajay's" (the CEO's) direction that MasterCard immediately cease being affiliated with Backpage.  R. 52, Ex. 11.

### D.  Visa

According to Visa, its rules prohibit its cards from being used for illegal or other activity that may impair the goodwill or reputation of the Visa brand.  R. 52, Ex. 24.  The evidence shows that, after Visa, Inc. received Sheriff Dart's letter, it

forwarded it to Visa Europe, a licensee that provides services to its Acquirer banks. As Visa, Inc. did not have a direct relationship with Backpage, it encouraged Visa Europe to review the matter and conduct its own due diligence. R. 52, Ex. 25. On July 1, Visa Europe took action to stop processing payments for Backpage and the acquiring banks terminated their agreement for all Visa transactions immediately. R. 52, Ex. 7.

Visa has testified unconditionally that its decision was independent: "[A]t no point did Visa perceive Sheriff Dart to be threatening Visa with prosecution or any other official state action, nor did Visa base its decision on any such threat." R. 52, Ex. 19 at ¶ 4.

## V. PRELIMINARY INJUNCTION HEARING AND RULING.

On July 21, 2015, Backpage filed a Complaint for Injunctive and Declaratory Relief and Damages as well as a Motion for Temporary Restraining Order and Preliminary Injunction that would enjoin Sheriff Dart from taking any actions to formally or informally request credit card companies, processors, financial institutions, or any other third parties to discontinue, terminate, disallow or interfere with credit card or other financial services to Backpage.com and that would require Sheriff Dart to send a copy of any order granting a preliminary injunction to Visa and MasterCard. R. 1. Within forty-eight hours and after expedited briefing, the district court held a brief hearing on Backpage's TRO. R. 28. Without any evidence presented by Sheriff Dart, the district court granted Backpage's TRO, finding that it had a better than negligible chance of prevailing on its claim based on the limited record. R. 29, 30.

10

Following the TRO, the parties engaged in expedited discovery, including the depositions of two Backpage principals and written discovery from Visa and MasterCard. An evidentiary hearing was held on August 20, 2015, at which time Sheriff Dart presented testimony from live witnesses, declarations and additional documentary evidence. R. 65. Backpage relied on the declarations and documentary evidence submitted in its pleadings and initial motion. Based on the evidence at the hearing and the submissions by the parties, the district court denied Backpage's motion for preliminary injunction. R. 66.

In denying Backpage's motion for preliminary injunctive relief, the district court issued a thorough twenty-nine page memorandum opinion and order that extensively analyzed all the relevant issues and ultimately concluded that Plaintiff's "likelihood of success on the merits is nil." R. 66. After employing the First Amendment analysis set forth in *Bantam Books* and other governing authority, the district court preliminarily found that a jury could find that Sheriff's Dart's letters contained a threat of official action; however, any threat the letter may have contained did not cause the credit card companies' actions. R. 66 at 13-21. Notably, the district court found that Sheriff "Dart's oblique, footnoted, references to irrelevant statutes and clunky statements about legal duties seem unlikely to inspire fear of legal reprisals—particularly on the part of large, sophisticated corporations with immediate access to top-tier legal resources and advice" and therefore, falls closer to an attempt to convince as opposed to an attempt to coerce. R. 66 at 15.

11

In considering the voluntariness of the companies' actions, the district court concluded that there was an abundance of affirmative evidence of voluntary action by the credit card companies to dissociate themselves from Backpage's "seedy offerings." *R.* 66 at 20-21. Thus, where there was no basis to conclude that the threat of official action caused any restraint on speech, the district court held that Backpage's likelihood of success on the merits was nil.

Additionally, the district court found that Backpage had failed to demonstrate irreparable harm if the preliminary injunction was not granted. The district court pointed out that while it is "reasonable to infer that Backpage has sustained financial losses," it is clear no irreparable harm is imminent, considering Backpage.com is still operational and Backpage remains in business. R. 66 at 24. Finally, after analyzing and weighing the balance of harms and the public interest, the district court found that the interests supported by both sides in the dispute "are weighty and the scale does not, in the Court's view, tilt decisively in one direction or the other." R. 66 at 28. Thus, the district court properly held that preliminary injunctive relief was not appropriate where Backpage had failed to establish a likelihood of success on the merits and failed to decisively demonstrate that the balance of harms falls in its favor. R. 66 at 28.

On September 16, 2015, Backpage filed a motion to stay and an injunction pending appeal. R. 70. The district court denied the motion for an injunction pending appeal for the same reasons the preliminary injunction had been denied. R. 72. Backpage's motion to stay pending appeal was subsequently denied as well.

R. 92.  Backpage now seeks review of the district court's denial of the preliminary injunction.  Sheriff Dart submits this brief in opposition.

## SUMMARY OF ARGUMENT

The district court did not abuse its discretion when it denied Backpage's motion for a preliminary injunction.  First, Backpage is not likely to succeed on its First and Fourteenth Amendment claims that Sheriff Dart's letters to the credit card companies were unconstitutional prior restraints.  The district court properly held that Backpage failed to establish that the letter caused the termination of credit card services.  Rather, Visa and MasterCard voluntarily withdrew their services due to the illegal or brand damaging activity present in the adult section of Backpage.com.

Second, Backpage has failed to show that the district court clearly erred in finding that Backpage failed to demonstrate imminent irreparable harm in the absence of a preliminary injunction where Backpage.com is still available to users and where there was no evidence that its alleged collapse was imminent.

Finally, the district court correctly found that issuing a preliminary injunction would chill Sheriff Dart's own right to speak out on issues of public concern.  In addition, the district court considered the profound interests of the victims of human trafficking that Backpage's advertising facilitates.  The district correctly balanced those harms against the loss of First Amendment rights of users on Backpage and held that with Backpage's little to no prospect of success on the merits, a preliminary injunction was not appropriate.

13

**ARGUMENT**

## I.    STANDARD OF REVIEW

This Court reviews the district court's denial of a preliminary injunction for an abuse of discretion. *Lawson Products, Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1437 (7th Cir. 1986). Factual determinations are reviewed for clear error and legal conclusions are reviewed *de novo. Id.* When reviewing for clear error, this Court must affirm the district court's findings of fact unless it reaches a "firm and definite conviction" that the district court made a mistake. *St. Mary's Medical Center, Inc. v. Disco Aluminum Products Co.*, 969 F.2d 585, 589 (7th Cir. 1992), *citing Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985). If the district court has correctly apprehended the law and found the facts, "the final, and most important, decision as to whether to grant or deny the motion is discretionary," involving traditional equitable balancing, *Lawson Prods.*, 782 F.2d at 1436, and the district court's discretionary decision is entitled to "substantial deference" and should be disturbed on appeal "only in the rarest of cases." *Id.* at 1437. A district court abuses its discretion only when it commits an error of law or a clear error of fact, or strikes an unreasonable (not merely erroneous) balance among the factors for preliminary injunctive relief. *Centurion Reinsurance Co. v. Singer*, 810 F.2d 140, 143 (7th Cir. 1987). Reviewing courts adopt this deferential standard believing that the district court is in a better position to assess the credibility of testimony and make factual findings. *Lawson Prods.*, 782 F.2d at 1439.

Any preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of

14

persuasion." *Goodman v. Illinois Dep't of Fin. & Prof'l Regulation*, 430 F.3d 432, 437 (7th Cir. 2005) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original). An injunction is an equitable remedy warranted only when the plaintiff has no adequate remedy at law, such as monetary damages. *See Morales v. Trans World Airlines*, 504 U.S. 374, 381 (1992). To obtain an injunction, a party must show that it has: "(1) no adequate remedy at law and will suffer irreparable harm if a preliminary injunction is denied and (2) some likelihood of success on the merits." *Ezell v. City of Chicago*, 651 F.3d 684, 694 (7th Cir. 2011). If the movant meets these threshold requirements, the district court must weigh the factors against one another in a sliding scale analysis and consider "whether the balance of harms favors the moving party or whether the harm to the nonmoving party or the public is sufficiently weighty that the injunction should be denied." *Id.*

## II. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN CONCLUDING THAT BACKPAGE WAS UNLIKELY TO PREVAIL ON THE MERITS WHERE SHERIFF DART'S ACTIONS DID NOT AMOUNT TO INFORMAL CENSORSHIP IN VIOLATION OF THE *BANTAM BOOKS* LINE OF CASES.

### A. The Findings of Fact Are Supported By the Record.

The district court's findings of fact are supported by the record and are not clearly erroneous. This Court must affirm the district court's findings of fact as long as they are plausible in light of the record, viewed in its entirety, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. *Anderson*, 470 U.S. at 574.

The district court took great pains to establish a thorough record. Following the entry of a temporary restraining order after a brief hearing, the court allowed

the parties to engage in expedited discovery, allowed the parties to submit trial briefs prior to the preliminary injunction hearing, conducted a full-day preliminary injunction hearing, and heard extensive closing arguments to address any lingering questions by the court. The court resisted efforts to limit or strike proffered testimony and allowed all parties every opportunity to make their case. Backpage has not asserted before this Court or below that they were precluded from presenting testimony or evidence in support of its claims, nor could they. The district court allowed Backpage great latitude in attempting to build a record to meet its factual and legal burdens, and it was not an abuse of discretion to find that Backpage plainly failed to carry that responsibility.

**B.      The District Court Properly Recognized that Sheriff Dart Retains His Own First Amendment Rights to Speak Out About Matters of Public Concern and Therefore Has the Right to Criticize Illegal Activity.**

Contrary to Backpage's contention, government officials, including law enforcement officials, retain their own First Amendment rights to speak on matters of public concern. Backpage repeatedly contends that Sheriff Dart has no First Amendment protection. Op. Br. at 24-25. It cannot be contested that "public officials may criticize practices that they would have no constitutional ability to regulate, so long as there is no actual or threatened imposition of government power or sanction." *Am. Family Ass'n Inc. v. City and County of San Francisco*, 277 F. 3d 1114, 1125 (9th Cir. 2002). Requiring a plaintiff to prove a threat or coercion, as the district court properly required here, "recognizes that a balance must be struck between the citizen's right to exercise his First Amendment rights and the public

official's personal First Amendment rights, as well as his duty to speak out about matters of public concern." *Suarez Corp. Indus. v. Rodd*, 202 F.3d 676, 688, n.13 (4th Cir. 2000).

Backpage mistakenly relies on *Garcetti*, a First Amendment retaliation case that involved a deputy district attorney who alleged that his supervisors had penalized him for writing an internal disposition memorandum that highlighted police misconduct in a pending criminal prosecution. *Garcetti v. Ceballos*, 547 U.S. 410 (2006). The Supreme Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421.

*Garcetti* is inapplicable. Sheriff Dart is not an "employee; " rather, he is a governmental official who can permissibly "advocate for particular results, criticize conduct, and even threaten others with public embarrassment." R. 66 at 13, citing *Am. Family Ass'n*, 277 F. 3d at 1125; *McLaughlin v. Watson*, 271 F.3d 566, 573 (3d Cir. 2001); *X-Men Sec., Inc. v. Pataki*, 196 F.3d 56, 69 (2d Cir. 1999); *Penthouse Int'l, Ltd. v. Meese*, 939 F.2d 1011, 1016 (D.C. Cir. 1991); *R.C. Maxwell Co. v. Borough of New Hope*, 735 F.2d 85 (3d Cir. 1984).

While public officials retain their First Amendment rights to speak on matters of public concern, they may not make implied or explicit threats of government sanction that have the effect of chilling protected speech. *Penthouse, Int'l Ltd. v. Meese*, 939 F.2d 1011 (D.C. Cir. 1991) is illustrative. There, the

17

Attorney General's Commission on Pornography sent letters asking companies to cease selling Penthouse magazines. *Id.* at 1013. Even though the letters appeared on official Justice Department stationary, used the word "allegations," and instructed the recipient to contact an attorney, the court held that the Commission did not violate the First Amendment because the letters contained no threat to prosecute or "intimation of intent to proscribe the distribution of the publications." *Id.* at 1015. The court distinguished *Bantam Books*, explaining that the Supreme Court "has never found a government abridgement of First Amendment rights in the absence of some actual or threatened governmental power or sanction." *Id.; see also Am. Family Ass'n*, 277 F.3d at 1125 (dismissal was affirmed where there was "no sanction or threat of sanction if the Plaintiffs continued to urge conversion of homosexuals or if the television stations failed to adhere to the Defendants' request."); *see also R.C. Maxwell Co.,* 735 F.2d at 88–89 (holding that letter from borough official to billboard owner requesting removal of plaintiff's ads but lacking "enforceable threats" did not violate First Amendment, and distinguishing *Bantam Books* because the Supreme Court "stressed . . . the trial judge's factual finding that distributors cooperated with the Commission only out of fear of prosecution"); *see also X-Men,* 196 F.3d at 70–71 (disparaging, accusatory, or untrue statements do not state a First Amendment claim in absence of threats, intimidation, or coercion).

In sum,

> [w]hen a public official is sued for allegedly causing a third party to take some type of adverse action against plaintiff's speech, we have

18

held that defendant's conduct must be of a particularly virulent character. It is not enough that defendant speaks critically of plaintiff or even that defendant directly urges or influences the third party to take adverse action. Rather, defendant must 'threaten' or 'coerce' the third party to act."

*McLaughlin*, 271 F.3d at 573. The district court concluded that while Sheriff Dart did not directly threaten the credit card companies with an investigation or prosecution, Sheriff Dart's letter could be construed as a threat of official action. The district court correctly concluded, however, that the letters did not have the required coercive effect as stated *infra*.

**C.    In Applying *Bantam Books* and Other Governing Authority, the District Court Concluded that Any Implied Threat Sheriff Dart's Letter Could Have Contained Did Not Constitute a Prior Restraint Where the Credit Card Companies Voluntarily Withdrew their Services.**

The district court properly concluded that Visa's and MasterCard's decisions to discontinue providing services to Backpage were wholly voluntary, just like Amex's. Where government speech to a third party has no coercive effect, and that party makes an "independent business decision," a plaintiff's claim of prior restraint fails as a matter of law. *Henderson v. Huibregtse*, 281 F. App'x 577, 580–81 (7th Cir. 2008) (because newspaper independently "was not inclined" to sell subscription to plaintiff regardless of the challenged government speech, there was no redressable harm).

While the district court concluded that it might be possible for a jury to conclude that Sheriff Dart's letters were threats of official action, any such threat must cause the intended result of censoring certain speech based on its content, which did not occur here. Backpage contends that pursuant to *Bantam Books*, once

19

the district court found that Sheriff Dart's actions might convey a threat and caused the credit card companies to act, this was sufficient to establish a prior restraint. According to Backpage, it is irrelevant what caused Visa and MasterCard to act, only that they did. Op. Br. at 20, 23, 27-30. Backpage attacks the district court's application of *Bantam Books* and the governing authority; however, no legal error occurred.

The involuntary nature of the third parties' actions is relevant and was deemed relevant in *Bantam Books*. As the district court recognized,

> [i]n *Bantam Books*, the Supreme Court rejected the argument of Rhode Island's Commission to Encourage Morality in Youth that it 'simply exhorts booksellers and advises them of their legal rights,' in part because it was found as a fact—a finding the Court expressly noted that it was bound by—that the distributor's 'compliance with the Commission's directive was not voluntary,' in keeping with the 'general rule' that '[p]eople do not lightly disregard public officers' thinly veiled threats to institute criminal proceedings against them if they do not come around.' 372 U.S. at 68. Deeming it to have been 'particularly relevant.' *id.* at 63, the Court highlighted and relied upon the factual finding that the book distributor was compelled by the Commission's threat to involuntarily comply with the directive[.]

R. 66 at 17-18. Other cases have similarly examined the voluntariness of third parties' decisions. *See Penthouse,* 610 F.2d at 1360 ("it cannot be said that the retailers of the magazines in question 'voluntarily' removed the magazines from their shelves" because it resulted directly from a "calculated scheme of warrantless arrests and harassing visits to retailers); *ACLU v. City of Pittsburgh,* 586 F. Supp. 417, 422 (W.D. Pa. 1984) ("the distribution of a publication, which has not been judicially determined to be obscene, has been deterred by the Mayor's official pronouncements," specifically noting that the vendors' compliance with Mayor

20

Caliguiri's directives in this case was not voluntary); *Playboy Enterprises Inc. v. Meese*, 639 F. Supp. 581, 585 (D.D.C. 1986) (in rejecting the argument that distributors voluntarily stopped selling the magazine, the court noted that "many of the decisions not to sell were made after [the defendant's] letters were sent out").

While acknowledging that courts consider the voluntariness of third parties' actions, Backpage attempts to distinguish each of these cases by claiming that the "courts ***rejected outright*** officials' claims that third parties acted voluntarily[.]" Op. Br. at 28 (emphasis in original). Yet, Backpage ignores that the courts rejected the officials' arguments in each case because there was no affirmative evidence to support the officials' claims of voluntariness. For example in *ACLU*, the court rejected the city's position that the vendors voluntarily removed the publications from their shelves because, unlike here, several vendors offered testimony that they removed the publications because of the Mayor's letter. *ACLU*, 586 F. Supp. at 422.

Unlike the speculation and conjecture offered by the city in *ACLU*, here, Sheriff Dart offered affirmative evidence from Visa and MasterCard regarding the reasoning behind their Acquirers termination of terminating credit card services to Backpage. Sheriff Dart's letter did not have the necessary coercive effect on the protected speech and thus, did not amount to an informal system of prior restraint. Backpage fails to offer any authority where a court found an unconstitutional prior restraint where the official offered affirmative evidence that the third party acted voluntarily and not as a result of any threated prosecution or official action. Accordingly, the district court did not commit error.

**D. The District Court's Findings Support the Denial of the Preliminary Injunction.**

Rather than assert that the district court committed clear error in its factual determinations, because it cannot, Backpage contends that the district court improperly denied the preliminary injunction because the court's factual conclusions establish a prior restraint. Op. Br. at 20-21. However, the findings only support the conclusion that any perceived threat Sheriff Dart's letter may have contained was not the reason the credit card companies' Acquirers took action to terminate their services. The district court found that Visa and MasterCard responded to Sheriff Dart's letter but not that any threat the letter may have contained caused the companies' actions.

In support, the district court relied on both the public statements made by the credit card companies as well as their internal communications, which reflect the companies' desire not to be associated with illegal transactions or the "brand damaging" activity present on the adult section of Backpage.com. R. 66 at 16-17. There is no evidence that the credit card companies considered the letters to be a threat—in fact, the uncontroverted evidence is otherwise. By the time MasterCard received Sheriff Dart's letter, it had already been advised by the acquiring bank that "the Bank's management has taken the decision to close down the account for Backpage.com." R. 52, Ex. 10. Visa has testified that "[a]t no point did Visa perceive Sheriff Dart to be threatening Visa with prosecution or any other official state action, nor did Visa base its decision on any such threat." R. 52, Ex. 19 at ¶ 4.

Accordingly, the district court properly concluded that while the credit card companies responded to Sheriff Dart's letter, there was insufficient evidence to support a finding that any threat the letter may have contained caused the companies' action. R. 66 at 16-21. Therefore, the letters did not have the coercive effect on protected speech to amount to an informal system of prior restraint.

### E. The District Court Applied the Proper First Amendment Analysis.

Contrary to Backpage's contention, the district court did not misunderstand First Amendment presumptions and burdens. Op. Br. at 37. In an effort to support the district court's holding that there is no prior restraint unless a threat causes involuntary action, the district court cited Seventh Circuit retaliation cases, including *Fairley v. Andrews*, 578 F.3d 518 (7th Cir. 2009). Contrary to Backpage's contention, *Greene* did not "aboragat[e] *Fairley*'s causation analysis." *See Greene v. Doruff*, 660 F.3d 975, 977 (7th Cir. 2011) and *Spiegla v. Hull*, 371 F.3d 928 (7th Cir. 2004). The district court correctly cited *Surita v. Hyde*, 665 F.3d 860 (7th Cir. 2011), a decision following *Greene*, which noted that "*Spiegla* and *Fairley* are correct to an extent because the burden of proof relating to causation is divided between the parties in First Amendment cases." *Id.* at 874. As articulated in *Greene*, and reiterated in *Surita*,

> [t]o meet the prima facie burden regarding causation in a First Amendment case, a plaintiff needs to show only that the defendant's conduct was a motivating factor, i.e., a 'sufficient factor,' meaning when something present makes something else bound to happen. [citing *Greene*, 660 F.3d at 978-79]. The defendant can then rebut that showing, but only by establishing that his or her conduct was not a but-for or 'necessary condition' of the harm, i.e., that the harm would have occurred anyway. [citing *Greene*, 660 F.3d at 979].

23

*Id.* Correctly applying this analysis, the district court found that any threat the letters may have contained did not *cause* the companies' action.

The district court concluded that while Sheriff Dart's letter may have resulted in a response, or the timing of that response, by Visa and MasterCard, "the letter was primarily information and advocacy . . . and so cannot be wholly equated with whatever implicit threat of government sanction it also contained." R. 66 at 21. Sheriff Dart established that the credit card companies terminated services to Backpage.com voluntarily and not because they were coerced by threats from the Sheriff. Even if Sheriff Dart's letter had been a "motivating factor" of the credit card companies to terminate services, which it was not, Sheriff Dart established that his conduct was ***not*** a necessary condition of the harm because the termination of services would have occurred anyway. "If [Sheriff Dart's] use of the bully pulpit to educate and even shame the companies persuaded them to act, then there has been no prior restraint of speech by the government." R. 66 at 16.

Sheriff Dart offered internal communications from MasterCard to establish that prior to receiving Sheriff Dart's letter, MasterCard had taken steps to terminate services with Backpage due to the illegal or brand damaging activity present in the adult section of Backpage.com. R. 52, Ex. 9. In addition, Visa's affidavit demonstrates that it was not influenced by any threat. R. 52, Ex. 19 at ¶ 4. Moreover, American Express terminated its credit card services to the adult section of Backpage.com in April 2015, which further corroborates the evidence that

Visa and MasterCard simply did not want to be associated with online sex trafficking.

No additional burdens were placed on Backpage; rather, Sheriff Dart established that the same actions would have occurred had his letters "contained the language to which Backpage points as carrying coercive import." R. 66 at 21.

Backpage also criticizes the district court for reversing the applicable burdens in First Amendment cases. Op. Br. at 34-36. By way of example, Backpage contends that the district court required Backpage to disprove Sheriff Dart's accusations that its website facilitates illegal conduct and that it failed to impose the burden on Sheriff Dart to prove that his efforts to censor Backpage.com were lawful. *Id.* According to Backpage, Sheriff Dart was required to prove his actions furthered a compelling interest and were narrowly tailored to that end. *Id.* Because the district court concluded that Sheriff Dart's letters were not content-based speech restrictions, no further constitutional analysis was necessary.

Foremost, Backpage ignores that the burden of establishing an entitlement to a preliminary injunction is on Backpage, not on Sheriff Dart. *See Univ. of Notre Dame v. Burwell*, 786 F.3d 606, 619 (7th Cir. 2015). Second, the district court properly held that Sheriff Dart's letters did not constitute "speech-restrictive action," and therefore, the district court's inquiry ended.

Further, as explained *supra*, the district court applied the correct First Amendment analysis. None of the cases cited by Backpage involve a First Amendment prior restraint on protected speech; rather, Backpage relies on cases

25

involving content-based speech restrictions subject to strict scrutiny. For example, Backpage relies on *Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015), which involved a town's comprehensive code governing the manner in which people may display outdoor signs. In *Reed*, the Supreme Court held the code amounted to a content-based regulation of speech that cannot survive strict scrutiny. The *Reed* Court explained that "[c]ontent-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Id.* at 2226. Such cases are inapplicable here where no government regulation or law is at issue. Backpage has cited no precedent to extend this analysis to Sheriff Dart's actions here.

The district court properly concluded that based on the uncontroverted record, the evidence "establishes that the credit card companies caused the termination of their agreements with the website voluntarily and not because they were coerced by threats from Dart," and therefore, there is no basis to conclude that Sheriff Dart's letters caused any restraint on speech. R. 66 at 21. Because the credit card companies did not act out of concern that Sheriff Dart would initiate, or cause to be initiated, any enforcement proceedings or other legal action against them, the district court properly concluded that "Backpage's likelihood of success on the merits is nil." R. 66 at 22.

## III. THE DISTRICT COURT PROPERLY CONCLUDED THAT BACKPAGE LACKS AN IRREPARABLE INJURY IN THE ABSENCE OF A PRELIMINARY INJUNCTION.

In addition to a likelihood of success on the merits, the Supreme Court has "frequently reiterated" that a plaintiff seeking a preliminary injunction must also demonstrate that "irreparable injury is likely in the absence of an injunction." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). Not only must irreparable injury to the plaintiff be likely absent the injunction, but that injury must be likely to occur "before a decision on the merits can be rendered." *Id*. (quoting 11 A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948.1, p. 139 (2d ed. 1995)); *Lawson Prods.*, 782 F.2d at 1440 ("The first point that must be stressed is that this is a preliminary injunction so that we are concerned with the equities of maintaining the status quo pending the ultimate determination on the merits."). Thus, a preliminary injunction may not issue "simply to prevent the possibility of some remote future injury." *Winter*, 555 U.S. at 22.

Based on the dearth of evidence submitted by Backpage to support its claim of irreparable injury in the absence of a preliminary injunction, the district court properly concluded that it had not shown any irreparable impact on the expressive rights of its users. R. 66 at 25-26. Backpage claims that it cannot stay in business absent injunctive and declaratory relief. However, the only support Backpage offered for its proposition is a single uncorroborated, self-serving declaration from the company's CEO, which unequivocally pronounces that Visa and MasterCard "cut off nearly all revenue to Backpage." R. 6 at ¶ 27. Backpage insists that this single statement constitutes irreparable harm. However,

> "to constitute irreparable harm the threatened injury must be, in some way, 'peculiar.' Mere injuries however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. Only harm that the district court cannot remedy following a final determination on the merits may constitute irreparable harm."

*Am. Hospital Assn., v. Harris*, 625 F.2d 1328, 1331 (7th Cir. 1980). The district court appropriately held that Backpage had failed to demonstrate that the financial loss it claimed to have sustained from withdrawal of the credit card services would result in Backpage's demise before a claim for damages could be resolved.

Backpage offered no evidence that the alleged financial losses incurred since the termination of credit card services will force Backpage to close its doors without a preliminary injunction. The district court recognized the lack of evidence offered to establish the financial impact on Backpage from the termination of the credit card companies, considering "'Backpage executives have told NCMEC that they charge for escort ads only because law enforcement asked them to do so.'" R. 66 at 25, citing Brief of *Amicus Curiae NCMEC in J.S., et al. v. Village of Voice Media Holdings, L.L.C., d/b/a Backpage.com*, No. 4492-02-II (Supreme Court of Washington), Def. Ex. 6, at 11. Nor did Backpage offer any evidence of its lack of success using alternative methods of payment by its customers, such as through Bitcoin or through credits that can be purchased by check, cash or money order. In fact, as the district court noted, Backpage is still operating and permitting ads to be placed on its adult section for free as it did prior to utilizing credit card services. Thus, the district court appropriately found that Backpage failed to demonstrate that it will suffer any harm, let alone irreparable harm, if injunctive relief is not

granted where Backpage.com is still available to users and where there is no evidence that collapse is imminent.

Thus, any alleged harm at issue is solely monetary. Damages are adequate to remedy almost all business losses; it is rarely the case that courts find monetary damages can constitute irreparable harm. *See In re A&F Enterprises, Inc. II,* 742 F.3d 763, 768 (7th Cir. 2014). Thus, in the unlikely event that Backpage can prevail here, it can prove up its claims for monetary damages. In fact, the record evidence is that Backpage continues to permit the posting of advertisements, including in the "adult" section, and, indeed, has found ways to obtain fees for such postings using other forms of payment. Accordingly, there is no reason to believe that Backpage would not be able to calculate and offer evidence of its monetary damages if it demonstrates its entitlement to them.

Backpage cites *Stuller* in support of its contention that an injunction is proper where damages "may come too late to save the business." *Stuller, Inc. v. Steak N Shake Enters., Inc.*, 695 F.3d 676 (7th Cir. 2012). Op. Br. at 41. In *Stuller*, a franchisor adopted a new policy requiring all franchisees to follow the franchisor's menu pricing and promotions. *Id.* at 677. The franchisee refused to implement the new policy and requested injunctive relief to prevent the franchisor from enforcing the new policy and from terminating the franchisee's franchises. *Id.* at 677-78. The appellate court determined that the district court did not abuse its discretion in granting the franchisee's motion for a preliminary injunction because the franchisee showed that it would suffer irreparable harm without a preliminary injunction since

29

the franchisee presented evidence that the new pricing policy would be a significant change to its business model and that it would negatively affect its revenue, possibly even to a considerable extent. *Id*. at 680.

Stuller is distinguishable for multiple reasons. Foremost, in *Stuller*, the franchisee offered evidentiary support that the new policy would harm its business and would be a significant change to its business model. *Id*. Here, Backpage has failed to offer evidentiary support for its alleged loss of revenue. Additionally, in *Stuller*, it was uncontested on appeal that the franchisee had a likelihood of success on the merits and that the public interest weighed in its favor. *Id*. at 679. Thus, the strength of the franchisee's likelihood of success on the merits affected the balance of the harms analysis. *See Planned Parenthood of Ind., Inc. v. Comm'r of the Ind. State Dep't of Health*, 699 F.3d 962, 972 (7th Cir. 2012) ("The more likely it is that [the moving party] will win its case on the merits, the less the balance of harms need weigh in its favor."). The district court in *Stuller* failed to balance the competing interests as required, thus the appellate court found the sliding scale approach weighed in the franchisee's favor where it had a likelihood of success on the merits. *Stuller,* 695 F.3d at 680. The *Stuller* court reasoned that if the franchisor implemented the new policy and subsequently prevailed on the merits, it would be difficult for the franchisee to reestablish its previous business model without a loss of goodwill and reputation, which constituted irreparable harm. *Id*.

Here, Backpage is unlikely to succeed on the merits, thus the balance of harms needs to weigh more in its favor, which it does not. Additionally, Backpage

has offered no evidence that it would suffer any loss of goodwill or reputation without injunctive relief. Finally, in *Stuller,* the injunctive relief requested definitively prevented the irreparable harm. Here, Sheriff Dart does not have the ability or authority to resurrect credit card services for Backpage, and thus, even if a preliminary injunction was entered, there is no evidence that either Visa or MasterCard would reinstitute credit card services. Accordingly, the district court properly held that Backpage did not establish that it would suffer irreparable harm without a preliminary injunction.

## IV.  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN HOLDING THAT THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST DISFAVOR A PRELIMINARY INJUNCTION.

Where the district court held that Backpage's likelihood of success on the merits was nil, the district court denied the preliminary injunction because Backpage failed to demonstrate that the balance of harms falls decisively in its favor. *See Winter v. Nat'l Resource Defense Council*, 555 U.S. 7 (2008) (reversing preliminary injunction without regard to plaintiffs' likelihood of success or irreparable injury because the balance of equities and public interest "plainly outweigh[] the interests advanced by the plaintiffs"). Contrary to Backpage's contention, the district court properly employed the sliding scale approach, which

> "provides that 'the greater the likelihood of success on the merits, the less heavily the balance of harms must tip in the moving party's favor,' *Korte v. Sebelius*, 735 F.3d 654, 665 (7th Cir. 2013), whereas 'a lesser likelihood of success can be made sufficient by a greater predominance of the balance of harms,' *AM General Corp. v. Daimler Chrysler Corp.*, 311 F.3d 796, 804 (7th Cir. 2002)."

31

R. 66 at 26.  After analyzing the balance of harms to both Backpage and Sheriff Dart, the district court held that "[t]he interests supported by both sides in this dispute are weighty and the scale does not . . . tilt decisively in one direction or the other."  R. 66 at 28.  The district court's analysis of the evidence presented defies any suggestion that the court abused its discretion.

Despite Backpage's assertion, the district court recognized that the loss of any First Amendment rights injures the public, but acknowledged the substantial public interest in preventing human trafficking.  On the one hand, there is a website that wants carte blanche to advertise illegal conduct under the guise of "adult services."  Such ads receive no First Amendment protection.  Backpage failed to offer any evidence that lawful and legitimate ads exist in the adult section of Backpage.com.

On the other side of the ledger is the chief law enforcement officer of a major metropolitan area who has the right to speak on a key matter of public concern: the exploitation and sex trafficking of women and minors.  Contrary to Backpage's contention, the district court recognized that Sheriff Dart's own First Amendment right—and public duty—to speak out against sex trafficking must be respected. *E.g.*, *Suarez Corp.*, 202 F.3d at 688.  A letter from a public official that educates a corporation about a social problem, and seeks support in combating that problem, is core government speech that should not be suppressed by a preliminary injunction.

In addition, the rights and safety of the victims of Backpage's adult ads "plainly outweigh[] the interests advanced by the plaintiffs."  *See Winter*, 555 U.S.

32

at 26. The evidence of the unquestioned harm Backpage's ads inflict on women, children, and communities across the country is overwhelming and the district court recognized these profound interests. R. 66 at 27-28. For example, according to Senator Mark Kirk, Backpage is the "nation's most active sex trafficking website. . ., where an estimated 70% of the sex trafficking transactions are arranged." R. 52, Ex. 5. Granting a preliminary injunction to support a profit center that is the central hub for the sale of women and children for sex in America is directly contrary to the public's interest. Removing the adult section would greatly assist to disrupt sex traffickers' easy means of communication and connection for these illegal activities and therefore would reduce the demand for, and access to, the sex trafficking industry. R. 52, Ex. 27 at ¶ 8; Ex. 28 at ¶ 8; R. 65 at 40:14-41:5.

Backpage suggests that the district court erred by considering the "profound interests of the victims of the human trafficking that Backpage's advertising facilitates," because it works with law enforcement to prevent misuse of the website and to combat trafficking and exploitation. Op. Br. at 43, quoting R. 66 at 28. Backpage's CEO's self-serving statements are contradicted by evidence that these alleged efforts are nothing more than a "façade of concern." *See* R. 52, Ex. 14 at 4. Sheriff Dart, the NAAG, and the National Center for Missing and Exploited Children ("NCMEC") exposed Backpage's unwillingness to effectually cooperate in making meaningful adjustments to its business practices relating to ads on its adult section. R. 52, Ex. 13; Ex. 17 at ¶ 22-33; R. 65 at 22:20-24:16. Additionally, any "extensive measures" allegedly utilized by Backpage are useless where law

enforcement, both locally and nationally, report that every time they respond to adult ads posted on Backpage.com, each and every ad was a posting for illegal activity. R. 52, Ex. 27 at ¶ 6-7; Ex. 28 at ¶ 7; R. 65 at 30:21-31:8.

After consideration of the interests by both parties, the district court concluded that because Backpage's likelihood of success on the merits was "nil," "its failure to demonstrate that the balance of harms falls decisively in its favor was further reason to conclude that preliminary injunctive relief " was not appropriate. R. 66 at 28. Where the district court properly balanced the equities and considered all public interests, the district court's discretionary decision should be affirmed.

## V. BACKPAGE'S ARGUMENT THAT VISA AND MASTERCARD ARE "STATE ACTORS" IS BOTH WAIVED AND UNSUPPORTABLE.

In a final attempt to salvage its claim for a preliminary injunction, Backpage makes the novel argument that Visa's and MasterCard's decisions to terminate Backpage's use of their cards somehow constitute state action that can be attributed to the Sheriff simply because he "encouraged the result." Op. Br. at 32. As a threshold matter, this argument was never raised in the District Court and, therefore, is waived. Nevertheless, it finds no support in either the law or the facts.

"It is axiomatic that an issue not first presented to the district court may not be raised before the appellate court as a ground for reversal." *Econ. Folding Box Corp. v. Anchor Frozen Foods Corp.*, 515 F.3d 718, 720 (7th Cir. 2008). Consequently, a party who fails to argue an issue to the district court has forfeited it for purposes of appeal. *Escobar v. Holder*, 657 F.3d 537, 548 (7th Cir. 2011); *India Breweries, Inc. v. Miller Brewing Co.*, 612 F.3d 651, 660 (7th Cir. 2010)

34

(disregarding argument because the plaintiff failed to properly raise it before the district court). Further, a "specific point in support of a general argument" is forfeited where the specific argument is first raised on appeal, even where a party argues that the "general issue" was before the district court. *Milligan v. Bd. of Trustees of S. Illinois Univ.*, 686 F.3d 378, 386 (7th Cir. 2012); *see Libertyville Datsun Sales, Inc. v. Nissan Motor Corp.*, 776 F.2d 735, 737 (7th Cir. 1985) ("In our view, a trial judge may properly depend upon counsel to apprise him of the issues for decision. He is not obligated to conduct a search for other issues which may lurk in the pleadings." (internal citations omitted)).

Even the most liberal reading of Backpage's pleadings before the district court show that it never argued that the state action doctrine could apply here. Since this argument was not raised at the district court level, the district court did not have the opportunity to consider this unusual argument proffered here for the first time. Sheriff Dart respectfully submits that Backpage should not be permitted to shift its theory after the relevant proceedings in the district court have been concluded.

Regardless, Backpage's "state action" argument lacks any legal or factual support. As a general rule, constitutional standards apply only when the government, not a private party, is responsible for the conduct complained of. Thus, in order to hold a state liable for decisions of a private party, "there must be a sufficiently close nexus between the state and the private conduct so that the action 'may be fairly treated as that of the State itself.'" *Wade v. Byles*, 83 F.3d 902, 905

(7th Cir. 1996) (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982)); *see also Air Line Pilots Association, Int'l v. Dept. of Aviation*, 45 F.3d 1144, 1149 (7th Cir. 1995) (constitutional constraints apply to private conduct only where "governmental authority dominates an activity to such an extent that its participants must be deemed to act with the authority of the state.").

Whether a private decision is attributable to the state is a fact-specific inquiry that requires "normative judgment." *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001); *Lugar v. Edmondson Oil Co., Inc.,* 457 U.S. 922, 939 (1982). None of the undisputed facts in the district court record below remotely supports application of the state action doctrine here.

It is implausible to fairly read the record below as supporting a claim that Visa's and MasterCard's decisions to recommend that their acquiring banks cease doing business with Backpage resulted from the State's exercise of 'coercive power;" that they were "willful participant[s] in joint activity with the State"; or as showing that Sheriff Dart provided "significant encouragement, either overt or covert" for their decisions. Op. Br. at 32.

As discussed above, the district court expressly held that on the evidence before it the credit card companies' decisions to terminate Backpage were not caused by any "coercive power" exerted by Sheriff Dart. Instead, Visa and MasterCard, two large and sophisticated companies with effective legal counsel, made independent business decisions to terminate their relationships with the

36

website.  Accordingly, their decisions did not "result[] from the State's exercise of 'coercive power.'"

In addition, the record is devoid of any evidence that Visa or MasterCard acted jointly with Sheriff Dart in any regard.  "A charge of joint action amounts to alleging some agreement between private and public actors to violate plaintiff's constitutional rights." *Cunningham v. Southlake Ctr. For Mental Health, Inc.*, 924 F.2d 106, 107 (7th Cir. 1991).  Nor does the record reflect that Sheriff Dart provided "significant encouragement" so substantial that the decisions must be deemed as a matter of law to be that of the state, as is required for Backpage to prevail:  "A State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement *that the choice must in law be deemed to be that of the State*."  *Blum*, 457 U.S. at 1004 (emphasis added).

The cases Backpage cites are not to the contrary.  In fact, two *rejected* any claim of state action.  *See id.* at 1006–08 (rejecting claim of state action where the complained-of decision was not commanded by the state agent); *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 358–59 (1974) (holding that the state was not sufficiently connected to the utility company's decision where the decision was not required, under state law).  The remaining cases cited all involved extensive contractual or regulatory interdependence between the state actor and the private parties.  In *Air Line Pilots*, for example, the City of Chicago and TMI had a contractual relationship under which the city funded aspects of TMI's displays, provided office and storage space to TMI, had involvement in TMI's employment decisions, was

entitled to 60% of TMI's revenues, and could deny advertising material that it deemed objectionable at its discretion. 45 F.3d at 1149; *see also Brentwood Acad.*, 531 U.S. at 291 (holding that the governmental entity's "regulatory activity may and should be treated as state action owing to the pervasive entwinement of state school officials in the structure of the association"). The private party involved in *Carlin Communications v. Mountain States Telephone and Telephone Company*— a public utility—was likewise subject to extensive regulation by the state actor. *Id.* at 1295. Here, however, there is no contractual relationship between the Sheriff and Visa/MasterCard, and Dart has no regulatory authority over the companies. Finally, in *Peterson v. City of Greenville*, the private conduct at issue was actually compelled by a city ordinance. 373 U.S. 244 (1963).

As this Court recently explained, in order to transform private action into state action, the state's conduct must be more akin to a command or coercion than simple encouragement. *Perry v. Chi. Housing Auth.*, 791 F.3d 788, 791 (7th Cir. 2015). "Request and command are not synonyms," the Court explained, and "urging is not requiring." *Id.* at 791. Indeed, "[g]overnment officials and agencies spend a great deal of time urging private persons and firms and other institutions to change their behavior without backing up their urging with coercion of the threat of it." *Id.* at 790.

## VI. BACKPAGE LACKS STANDING.

Preliminarily, the district court did not decide the case based on standing, "It goes without saying that those who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Art. III of the

Constitution by alleging an actual case or controversy." *Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983) (internal citations omitted). This question of standing, even in the context of the First Amendment, is not subject to waiver. *United States v. Hays*, 515 U.S. 737, 742 (1995). Indeed, the Court must examine a plaintiff's standing even if the parties fail to raise the issue. *Id.* ("The federal courts are under an independent obligation to examine their own jurisdiction, and standing 'is perhaps the most important of [the jurisdictional] doctrines.'") (quoting *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 230-31 (1990) (citations omitted)).

"Standing ensures that the parties have a vested interest in the case and guarantees that the court only adjudicate 'cases and controversies.'" *Cabral v. City of Evansville*, 759 F.3d 639, 641 (7th Cir. 2014). "To satisfy standing (1) a plaintiff must have suffered an "injury in fact:" an invasion of a legally protected interest which is concrete and particularized, and actual and imminent; (2) there must be a causal connection between the injury and the conduct complained of; and (3) it must be likely that the injury will be redressed by a favorable decision." *Swanson v. City of Chortek*, 719 F.3d 780, 783 (7th Cir. 2013), citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

As discussed fully *supra*, Backpage cannot establish a causal connection between the termination of the credit card services and Sheriff Dart's action. The voluntary, independent actions of Visa and MasterCard caused harm to Backpage and not the claimed threat of official action.

More troubling for Backpage is the lack of evidence to support redressability. As the Supreme Court has cautioned, standing requires that such redress must be "likely" and not "speculative." *Id.* at 561. "The relevant inquiry is whether . . . the plaintiff has shown an injury to himself that is likely to be redressed by a favorable decision." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38 (1976). Here, Backpage will not be able to establish that Visa or MasterCard would reverse its action upon entry of a preliminary injunction. Indeed, the evidence suggests the opposite. MasterCard had considered ending its relationship with Backpage before receiving Sheriff Dart's letter, and its acquiring bank made the decision to terminate Backpage before Sheriff Dart sent the letter. R. 52, Ex. 10. With knowledge that its industry peers had cut ties due to the illegal activity facilitated by Backpage's "adult" section, Visa also voluntarily terminated services with Backpage. R. 52, Ex. 19 at ¶4. Both companies terminated services due to fears that continued association with Backpage, and the content posted on Backpage.com, could be brand damaging and in violation of the companies' rules. R. 89, Exs. DEX.037, DEX 074.

Thus, if an injunction was entered it would only affect how Sheriff Dart can act going forward. "There is no way to know how the credit companies would proceed if informed that Dart had acted unlawfully in threatening them. And that alone is enough to defeat the claim for injunctive relief." R. 66 at 23, citing *Cabral,* 759 F.3d at 642-43 ("speculation is not enough to turn this into a case and controversy with a redressable injury"). In the absence of any evidence that Visa or

40

MasterCard would resurrect their relationship with Backpage if an injunction is entered, Backpage lacks standing.

## CONCLUSION

For all of the reasons set forth above, Sheriff Dart respectfully requests this Court affirm the district court's denial of Backpage's motion for a preliminary injunction.

Dated:  October 26, 2015

Respectfully submitted,

ANITA ALVAREZ
State's Attorney of Cook County


By:    */s/ Jill V. Ferrara*
          Jill V. Ferrara
          Kent Ray
          Sisavanh Baker
          Assistant State's Attorney
          500 Richard J. Daley Center
          Chicago, Illinois 60602
          (312) 603-4320

## CERTIFICATE OF COMPLIANCE WITH
## FEDERAL RULE OF APPELLATE PROCEDURE 32

Pursuant to Rule 32(a)(7) of the Federal Rules of Appellate Procedure,

I hereby certify that this brief complies with the stated type-volume limitations.

The text of this brief was prepared in Century Schoolbook 12 point font, with

footnotes in Century Schoolbook 11 point font.  All portions of the brief, other than

the Disclosure Statements, Table of Contents, Table of Authorities, and the

Certificates of Counsel, contain ___10,995___ words.  This certification is based on

the word count function of Microsoft Office's word processing software, which was

used in preparing this brief.

Dated:  October 26, 2015

Respectfully submitted,

ANITA ALVAREZ
State's Attorney of Cook County


By:     */s/ Jill V. Ferrara*
        Jill V. Ferrara
        Kent Ray
        Sisavanh Baker
        Assistant State's Attorney
        500 Richard J. Daley Center
        Chicago, Illinois 60602
        (312) 603-4320

**CERTIFICATE OF COMPLIANCE WITH SEVENTH CIRCUIT RULE 31(e)**

The undersigned hereby certifies that she has filed electronically, pursuant to

Circuit Rule 31(e), a virus free version of the brief in PDF format.

Dated:  October 26, 2015 Respectfully submitted,

ANITA ALVAREZ
State's Attorney of Cook County


By:    */s/ Jill V. Ferrara*
Jill V. Ferrara
Kent Ray
Sisavanh Baker
Assistant State's Attorney
500 Richard J. Daley Center
Chicago, Illinois 60602
(312) 603-4320

**CERTIFICATE OF SERVICE**

The undersigned certifies that on October 26, 2015, a true and accurate copy of Defendant-Appellee's Brief was electronically filed with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated:  October 26, 2015

Respectfully submitted,

ANITA ALVAREZ
State's Attorney of Cook County

By:    */s/ Jill V. Ferrara*
Jill V. Ferrara
Kent Ray
Sisavanh Baker
Assistant State's Attorney
500 Richard J. Daley Center
Chicago, Illinois 60602
(312) 603-4320